IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, for the Use and Benefit of **JERSEY SHORE AUTOMATION, INC.**, a New Jersey corporation, and **JERSEY SHORE AUTOMATION, INC.**, a New Jersey corporation,<br><br>          Plaintiffs,<br><br>    v.<br><br>**CHUGACH SUPPORT SERVICES, INC.**, an Alaska corporation, and **SAFECO INSURANCE COMPANY OF AMERICA**, a Washington corporation,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   C.A. NO. 04-1416 (JJF)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## FIRST AMENDED COMPLAINT

1.  Plaintiffs are the United States of America for the use and benefit of Jersey Shore Automation, Inc., a New Jersey corporation with its principal place of business at 2510 Belmar Boulevard, Suite I24, Wall, New Jersey 07719 and Jersey Shore Automation, Inc. in its individual capacity ("Jersey Shore").

2.  Upon information and belief, Defendant, Chugach Support Services, Inc. ("Chugach"), is an Alaskan corporation, registered with the Secretary of State of the State of Delaware to do business in the State of Delaware and is doing business in Delaware.

3.  Upon information and belief, Defendant, Safeco Insurance Company of America ("Safeco"), is a Washington corporation.

4.  This Court has jurisdiction over Count I of the case under the Miller Act, 40 U.S.C. §270 *et.seq.*, in that Plaintiff's claim is for payment under a bond issued under the Act.

The Court has jurisdiction over the State and common law claims pursuant to 28 U.S.C. § 1332(a) based upon the diversity of citizenship of the parties and the doctrine of pendant jurisdiction. The amount in controversy exceeds seventy-five thousand dollars ($75,000.00).

5. Venue is appropriate in this District because the construction contract, which the Miller Act bond secured, was to be performed and executed in this District, to wit, at the Dover Airforce Base ("DAFB") in Dover, Delaware.

6. On or about February 21, 2003, Chugach was awarded SABER Contract Number F07603-D0002 (the "SABER Contract") from the United States Air Force ("Air Force"), 436th Contracting Squadron, for indefinite delivery, indefinite quantity construction, alteration or repair of public buildings or public works at the DAFB. The renovation and repair of several buildings at DAFB, including Buildings 401, 300, 302, 779, 712, 778, 1272 and 781 were included in the Contract.

7. Chugach was the prime contractor for the SABER Contract.

8. Chugach, pursuant to the SABER Contract and/or 40 U.S.C. § 3131 *et seq.* provided the United States of America with a payment bond ("Bond") to secure payment to subcontractors like Jersey Shore. Safeco is the surety of the Bond.

9. The Bond was executed by Chugach and Safeco. A copy of the Bond is attached hereto as Exhibit "A" and incorporated herein by referenced as if fully set forth.

10. On or about May 19, 2003, Chugach, in the performance of the SABER Contract, entered into a Master Subcontract ("MSA") with Jersey Shore to perform portions of the work under the SABER Contract.

11. The scope of work to be performed by Jersey Shore under the SABER Contract was to be specified by Chugach by subsequently issued delivery orders.

12. Work under the MSA was at all times performed by Jersey Shore within the State of Delaware with management from Jersey Shore's offices in New Jersey.

13. Jersey Shore is a subcontractor having a direct relationship with Chugach, the general contractor for the SABER Contract and is otherwise entitled to bring an action under the Bond.

14. Jersey Shore complied with all applicable provisions of the Miller Act necessary to bring this action, including providing notice to Safeco.

15. The scope of work for individual delivery orders provided to Jersey Shore by Chugach were general descriptions of work as initially provided by the Air Force to Chugach.

16. On or about June 4, 2003, the first Delivery Order (Delivery Order No. 5000) under the MSA was awarded by Chugach to Jersey Shore for construction of additional office space at building 779.

17. Chugach provided to Jersey Shore a one-page statement of work for Delivery Order 5000 and only one site visit was provided to Jersey Shore prior to acceptance of the Delivery Order.

18. Chugach was already contractually obligated to the Air Force to perform the work at building 779 at a price of approximately $131,489 at the time Jersey Shore was contacted to subcontract this work.

19. Chugach offered a delivery order to Jersey Shore Force to perform the work at building 779 in Delivery Order No. 5000 in the amount of $102,300.

20. Upon information and belief, Chugach received a notice to proceed from the Air Force on the work at building 779 encompassed by Delivery Order No. 5000 on or before May 19, 2003.

21. Upon information and belief, the delivery order/ notice to proceed to Chugach from the Air Force at building 779 provided for Chugach to commence work on the project promptly following notice to proceed or incur liquidated damages. Chugach represented to Jersey Shore that it needed to commence work on the project immediately to avoid this result.

22. As an accommodation to Chugach and relying upon Chugach's representation that the work would be profitable, Jersey Shore agreed to perform the work in Delivery Order 5000

despite the reduced time for performance and the lack of adequate opportunity to investigate the costs and scope of work.

23. As part of the SABER Contract, and prior to issuance of individual delivery orders to Jersey Shore, Chugach was charged with, *inter alia*, computing the price for which the work was to be performed using set formulas under SABER, using R.S. Means® database costs multiplied by (1) the City Cost Index Weighted Average Total for Dover, Delaware, and (2) a coefficient of 1.23 (reflecting profit, overhead, contingencies, taxes, etc.) which could be increased for certain contingencies (such as work performed at non-standard times). The SABER Contract provided that payment to various trades, such as carpenters and electricians, was to be computed using the prevailing wage rates for each particular trade in Kent County as established by the United States Department of Labor General Wage Determination DE020009.

24. The SABER Contract provided that wage rates payable to Chugach were to be determined using RSMEANS amended by the Unit Price Guide ("UPG").

25. Because the task specifications and prices contained in RSMEANS apply to a general area or industry, it is necessary to tailor the UPG to reflect the actual costs and practices of a specific location.

26. This step, which is called "localization," is critical to the success of the United State's Air Force SABER contracting program.

27. Chugach incorrectly used the RSMEANS wage rates in its estimates for all contracts performed by Jersey Shore at the DAFB.

28. Cumulatively, the wage rates paid to the various trades greatly exceeded the amounts provided in compensation by the RSMEANS data. For example, the wage rate specified in the RSMEANS data for a carpenter was $31.55. The United States Department of Labor General Wage Determination DE020009 required that carpenters actually be paid at a rate of $36.39. In addition, JSA was required to pay Workman's Compensation, taxes and insurance on top of the carpenter's wage making the true cost per hour $45.01. The UPG rate for carpenters was $54.58.

29. Chugach represented that each and every delivery order would be profitable for Jersey Shore.

30. The documentation given by Chugach for all delivery order offers was comprised of a narrative and a description of the scope of work.

31. Upon information and belief, the narrative and description of the scope of work was based upon the statement of work originally provided by the Air Force to Chugach.

32. Jersey Shore, prior to accepting the delivery orders, did a rough take off based on the narrative and a description, which indicated that the delivery orders would be profitable.

33. However, the estimates which Chugach submitted to DAFB, which formed the basis of the delivery order to Chugach, invariably included work which was well beyond the scope of work reasonably inferable from the documentation provided to Jersey Shore by Chugach.

34. Despite repeated requests, Chugach never provided its estimates to Jersey Shore prior to Jersey Shore accepting a DO.

35. Jersey Shore routinely requested change orders for the work which was outside the scope of the documentation provided to it but Chugach either denied the requests and/or failed to pursue the change orders with DAFB. Chugach compelled Jersey Shore to perform the extra work by threatening to withhold payment.

36. Jersey Shore first recognized these problems and brought the issues to Chugach's attention during negotiations for Delivery Order No. 5001 for Building 401. Negotiations between Chugach and Jersey Shore resulted.

37. It was agreed during these negotiations that Chugach would apply to the Air Force to add a skilled laborers position to the existing wage decision and that all future estimates prepared by Chugach in setting the price of delivery orders would utilize the UPG rates which reflected local conditions or that Chugach would obtain additional compensation to compensate for the inadequate RSMEANS wage structure.

38. Chugach failed to perform as agreed.

39. Representatives for Jersey Shore and Chugach met a second time in September 2003 to resolve problems with the MSA.

40. The purpose of the meeting was to negotiate the terms under which Jersey Shore would consider further contracting with Chugach to perform renovations on Buildings 300, 302, 778, 781 and 1272 at the DAFB.

41. Chugach and Jersey Shore agreed to modified terms for the MSA which included that "Jersey Shore Automation will perform the required services for a 1.02 coefficient of the final line item estimate; this is based upon a .21 deduction from Chugach Support Services 1.23 co-efficient. These co-efficients will be based on the then current RSMeans data and adjusted for items included in the Dover AFB Unit Price Book when applicable."

42. Chugach further represented and confirmed its agreement to use the UPG in its estimates and/or to negotiate additional funds to offset the inadequate price structure reflected in RSMEANS and to permit Jersey Shore to review the line item estimates based upon the RSMEANS data prior to negotiation with the Air Force.

43. Jersey Shore confirmed the agreement reached at this meeting in writing with Chugach in a memo from Daryl Meehan to Robert Hafey, Project Manager for Chugach, dated October 3, 2003. Bates No. JSA1940 (the "Memo"). A copy is attached hereto as Exhibit "B". The Memo is incorporated herein by reference as if fully set forth.

44. Jersey Shore agreed to perform pursuant to the terms set forth in the Memo.

45. Chugach represented to Jersey Shore that it agreed to and would perform consistent with these terms.

46. In reliance on Chugach's representations, Jersey Shore continued to perform work at DAFB pursuant to the MSA, as supplemented by the Memo, and to accept additional delivery orders.

47. Chugach failed to honor its agreement.

398310

48. Chugach continued to use RSMEANS wage data rather than UPG data in its estimates, failed to negotiate additional funds and breached other material terms of the MC thus damaging Jersey Shore.

49. Pursuant to applicable law and the SABER Contract terms, Jersey Shore was required to pay the higher, prevailing wage rates to the various trades. At all times, Jersey Shore in fact paid such higher prevailing wage rates required in Labor General Wage Determination DE020009.

50. Despite repeated requests by Jersey Shore, Chugach failed to provide Jersey Shore with the estimates of the work provided to the Air Force for any of the work under the MSA until about December of 2003.

51. Once Jersey Shore reviewed the estimates used by Chugach, Jersey Shore refused to enter into any further delivery orders for work.

52. It was clear to Jersey Shore that the scope of work estimated by Chugach far exceeded the general narrative and description of the scope of work included in the delivery orders to Jersey Shore.

53. Despite the difference in scope of work between the delivery orders and the estimates of work provided to the Air Force, Jersey Shore continued to perform in good faith under the existing delivery orders while attempting to obtain adequate compensation for its greatly increased costs from Chugach.

54. As a result of Chugach's wage rate calculation mistakes, failure to perform as agreed in the Memo and Chugach's other breaches of the MSA by, refusing to accept invoices in accordance with the terms of the MSA section 4.5, denying payment for materials furnished, refusing to make progress payments within the time frame set forth in the MSA, withholding funds in violation of the terms of the MSA, failing to respond to claims by Jersey Shore in violation of the MSA, failing to provide Jersey Shore with its detailed estimates of work to be performed, failing to process invoices for payment in a timely fashion and failing to request or issue change orders, Jersey Shore has been damaged in the amount One Million Five Hundred

and Sixteen Thousand Eight Hundred and Seventy-Nine Dollars and Seventy-Three Cents ($1,516,879.73).

55. As a result of Chugach's breaches and in particular Chugach's failure to pay for work performed, Jersey Shore ceased work on the project on or about July 14, 2004.

56. Despite repeated demands, Chugach has failed to pay Jersey Shore the sums due and owing for work completed in connection with the MSA.

## COUNT I
### Action On The Bond

57. The allegations in paragraph 1 through 56 are incorporated herein by reference as if fully set forth.

58. As a consequence of being the surety under the Bond, Safeco has the obligation and legal duty to pay valid claims, like Jersey Shore's, under the SABER Contract which Chugach fails to pay.

59. Pursuant to the terms of the payment bond and 40 U.S.C. §270 *et.seq.*, Safeco is indebted to Jersey Shore in the sum of One Million Five Hundred and Sixteen Thousand Eight Hundred and Seventy-Nine Dollars and Seventy-Three Cents ($1,516,879.73).

## COUNT II
### Breach of Contract By Safeco

60. The allegations contained in paragraphs 1 through 59 are incorporated herein by referenced as if fully set forth.

61. Safeco has the obligation and legal duty to pay valid claims of subcontractors under the SABER Contract which Chugach fails to pay.

62. Jersey Shore as a subcontractor under the SABER Contract is an intended third-party beneficiary under the Bond.

63. Chugach has failed to pay Jersey Shore the sum of One Million Five Hundred and Sixteen Thousand Eight Hundred and Seventy-Nine Dollars and Seventy-Three Cents ($1,516,879.73) validly due under the MSA.

398310

64. Notice was provided to Safeco by Jersey Shore of Chugach's default in payment under the MSA.

65. Safeco was obligated to make payment to Jersey Shore pursuant to the terms of the Bond.

66. Safeco has failed to make payment to Jersey Shore.

67. Safeco's failure to make payment to Jersey Shore under the Bond constitutes a breach of contract for which Safeco has been directly damaged in the amount of One Million Five Hundred and Sixteen Thousand Eight Hundred and Seventy-Nine Dollars and Seventy-Three Cents ($1,516,879.73).

68. Safeco is indebted to Jersey Shore in the amount of One Million Five Hundred and Sixteen Thousand Eight Hundred and Seventy-Nine Dollars and Seventy-Three Cents ($1,516,879.73).

## COUNT III
### Breach of Contract By Chugach

69. The allegations contained in paragraphs 1 through 68 are incorporated herein by referenced as if fully set forth.

70. Upon completing certain work in connection with various portions of work under the MSA, Jersey Shore invoiced Chugach for certain amounts due under the contract.

71. Despite repeated requests, Chugach failed to pay Jersey Shore for the aforementioned work.

72. Chugach breached its contract with Jersey Shore by its wage rate calculation mistakes, refusing to accept invoices in accordance with the terms of the MSA section 4.5, denying payment for materials furnished, refusing to make progress payments within the time frame set forth in the MSA, withholding funds in violation of the terms of the MSA, failing to respond to claims by Jersey Shore in violation of the MSA, failing to provide Jersey Shore with its detailed estimates of work to be performed, failing to process invoices for payment in a timely fashion and failing to request or issue change orders, and by failing to perform as agreed in the

Memo Jersey Shore has been damaged in the amount One Million Five Hundred and Sixteen Thousand Eight Hundred and Seventy-Nine Dollars and Seventy-Three Cents ($1,516,879.73).

73.  Chugach is indebted to Jersey Shore for work performed and materials supplied pursuant to the contract in the amount of One Million Five Hundred and Sixteen Thousand Eight Hundred and Seventy-Nine Dollars and Seventy-Three Cents ($1,516,879.73).

## COUNT IV
### Quantum Meruit Claim Against Chugach

74.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 73 and incorporates them herein by reference.

75.  Jersey Shore conferred a benefit upon Chugach in the form of services rendered and materials supplied.

76.  Chugach had an appreciation and knowledge of the benefit conferred by Jersey Shore.

77.  Chugach accepted and/or retained the benefits conferred upon it by Jersey Shore's provision of services and materials supplied.

78.  Chugach's failure to make payment to Jersey Shore leaves Chugach unjustly enriched and Jersey Shore unjustly damaged.

79.  Under the circumstances, it is inequitable for Chugach to retain the benefits conferred upon it by Jersey Shore without payment to Jersey Shore of the fair value of such benefits.

## COUNT V
### Prompt Payment Claim Against Chugach

80.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 79 and incorporates them herein by reference.

398310

81. The MSA is a contract for Jersey Shore to furnish labor and/or materials in connection with the erection, construction, completion, alteration or repair of buildings or for additions to buildings.

82. 6 Del. C. § 3506 et seq. obligates a contractor to pay its subcontractors within 30 days of the date when such amounts are paid to the contractor.

83. Jersey Shore provided monthly invoices and all required documentation to Chugach for payment under the MSA.

84. Chugach did not provide notice to Jersey Shore disputing such invoices at any time.

85. Pursuant to 6 Del. C. § 3508, Chugach is deemed to have accepted each invoice as submitted by Jersey Shore.

86. Upon information and belief, Chugach has been paid in full for the work performed by Jersey Shore as set forth in said Delivery Orders.

87. Chugach has failed to pay Jersey Shore the sum of One Million Three Hundred and Eighty-Four Thousand Eight Hundred and Seventy-Nine Dollars and Seventy-Three Cents ($1,384,879.73) despite the fact that, upon information and belief, it has been paid more than thirty (30) days ago for said services and materials.

88. Chugach has failed to use or apply the money received as described above in accordance with 6 *Del.C.* § 3504.

89. Chugach does not have a good faith basis for failing to pay said monies to Jersey Shore and is liable to Jersey Shore for said sum plus interest and attorneys' fees as provided in 6 *Del.C.* § 3501, *et seq.*

## COUNT VI
### Breach of Implied Covenant of Good Faith and Fair Dealing

90. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 89 and incorporates them herein by reference.

91. The MSA included an implied covenant of good faith and fair dealing.

92. Chugach's actions in failing to comply with the terms of the Memo, failing to pay Jersey Shore as agreed, failing to provide to Jersey Shore its estimates of the scope of work under individual delivery orders, delaying payments due and owing to Jersey Shore, failing to pay amounts due and owing to Jersey Shore, failing to timely process change orders necessary and requested by Jersey Shore and negotiating directly with Jersey Shore's subcontractors to perform work assigned to Jersey Shore in the MSA prior to termination, *inter alia*, breached the implied covenant of good faith and fair dealing included in the MSA.

**WHEREFORE**, Plaintiff demands:

A. A judgment against Chugach for breach of contract in the amount of One Million Five Hundred and Sixteen Thousand Eight Hundred and Seventy-Nine Dollars and Seventy-Three Cents ($1,516,879.73), the costs of this action, pre and post judgment interest, reasonable attorneys' fees and such further relief as this Court deems just.

B. A judgment against Chugach in an amount equal to the value of the benefits conferred upon Chugach by Jersey Shore, the costs of this action, pre and post judgment interest, reasonable attorneys' fees and such further relief as this Court deems just.

C. A judgment against Chugach for violation of 6 *Del.C.* § 3504 in the amount of One Million Three Hundred and Eighty-Four Thousand Eight Hundred and Seventy-Nine Dollars and Seventy-Three Cents ($1,384,879.73).

D.   A judgment against Safeco requiring it to release One Million Five Hundred and Sixteen Thousand Eight Hundred and Seventy-Nine Dollars and Seventy-Three Cents ($1,516,879.73) from the Bond in satisfaction of all amounts owed to Jersey Shore by Chugach for breach of the Contract, in Quantum Meruit and/or under 6 *Del.C.* § 3504, the costs of this action, pre and post judgment interest, reasonable attorneys' fees and such further relief as this Court deems just.

E.   A judgment against Safeco for breach of contract in the amount of One Million Five Hundred and Sixteen Thousand Eight Hundred and Seventy-Nine Dollars and Seventy-Three Cents ($1,516,879.73), the costs of this action, pre and post judgment interest, reasonable attorneys' fees and such further relief as this Court deems just.

F.   A judgment against Chugach for breach of the implied covenant of good faith and fair dealing included in the MSA in the amount of One Million Five Hundred and Sixteen Thousand Eight Hundred and Seventy-Nine Dollars and Seventy-Three Cents ($1,516,879.73), the costs of this action, pre and post judgment interest, reasonable attorneys' fees and such further relief as this Court deems just.

CONNOLLY BOVE LODGE & HUTZ LLP

/s/ *James D. Heisman*
James D. Heisman (# 2746)
M. Edward Danberg (# 2245)
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Plaintiff Jersey Shore Automation, Inc.*

Dated: June 17, 2005

## CERTIFICATE OF SERVICE

I, James D. Heisman, hereby certify that on this 17th day of June, 2005, I caused a true and correct copy of the foregoing **First Amended Complaint** to be served upon the following individuals in the manner indicated below:

*Via hand-delivery*
Edmund D. Lyons, Jr., Esquire
The Lyons Law Firm
1526 Gilpin Avenue
Wilmington, DE 19806

*Via email and U.S. mail*
Harvey A. Levin, Esquire
Birch, Horton, Bittner and Cherot
115 Connecticut Ave., N.W.
Suite 1200
Washington, DC 20036

/s/ *James D. Heisman*
James D. Heisman (# 2746)