IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA<br>for the Use and Benefit of<br>JERSEY SHORE AUTOMATION, INC.<br><br>      Plaintiff,<br><br>vs.<br><br>CHUGACH SUPPORT SERVICES, INC., *et al.*<br><br>      Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)   C. A. No. 04-1416 (JJF)<br>)<br>)<br>)<br>)<br>)<br>) |

**SUPPLEMENTAL BRIEF OF DEFENDANTS
CHUGACH SUPPORT SERVICES, INC.
AND SAFECO INSURANCE COMPANY OF AMERICA
IN SUPPORT OF MOTION TO DISMISS IN PART,
OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT ON,
THE FIRST AMENDED COMPLAINT**

THE LYONS LAW FIRM

Edmund Daniel Lyons (No. 0881)
1526 Gilpin Avenue
P.O. Box 579
Wilmington, DE 19806
Phone (302) 777-5698
Fax (302) 777-5051
Email: elyons@lyonslaw.com

Dated: July 6, 2005

BIRCH, HORTON, BITTNER AND CHEROT

Harvey A. Levin
1155 Connecticut Avenue, N.W., Suite 1200
Washington, DC 20036
Phone (202) 659-5800
Fax (202) 659-1027
Email: hlevin@dc.bhb.com

Counsel for Chugach Support Services, Inc. and
Safeco Insurance Company of America

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................4

INTRODUCTION ...................................................................................................5

SUMMARY OF ARGUMENT .......................................................................................7

STATEMENT OF FACTS ..........................................................................................11

ARGUMENT........................................................................................................16

IV. The Complaint Fails to State a Claim on Which Relief Can Be Granted Because There Is No Set of Facts That Gives Rise to a Contractual, Quasi-Contractual or Other Obligation of Chugach to Jersey Shore with Respect to the Pricing of the Government's Award of the SABER Contract to Chugach ..........................................................................17

A. There Is No Provision in Any Agreement Between Chugach and Jersey Shore, or to Which Jersey Shore Was an Intended Beneficiary, Obligating Chugach to Jersey Shore with Respect to Chugach's Pricing Determinations ....................................................17

B. After the Alleged Oral Agreement to Use UPG Prices in Violation of the SABER Contract, Jersey Shore Agreed to Perform the Work at Issue for Fixed, Lump-Sum, All Inclusive Prices in Written Agreements Executed by Jersey Shore.  Under Long-Standing Law, Jersey Shore Cannot Rely on the Alleged Prior Oral Agreement, Even if True, to Alter the Terms of the Subsequent, Written, Unconditionally Accepted DO/NTPs ..............................................................18

C. Even Had Chugach Entered Into the Alleged Agreement for Pricing, Jersey Shore Has No Claim to Enforce that Alleged Agreement Because it Was Impossible for Chugach to Perform ..................................................................................................19

D. Even Had Chugach Entered Into the Alleged Agreement for Pricing, Jersey Shore Has No Claim to Enforce that Alleged Agreement Because it Was Illusory ..........................................................................20

E. Even Had Chugach Entered Into the Alleged Agreement for Pricing, Jersey Shore Has No Claim to Enforce that Alleged Agreement Because Performance Was Forbidden Under Government Contracting Law.........................................................................20

V. In the Alternative, the Complaint Must be Dismissed Because on the Undisputed Facts and as a Matter of Law, Chugach Had No Contractual, Quasi-Contractual or Other Obligation to Jersey Shore with Respect to the Pricing of the Government's Award of the SABER Contract to Chugach ...........................................................................................................21

CONCLUSION.............................................................................................................22

## TABLE OF AUTHORITIES

*Burns v. Ferro*, 1991 WL 53834 (Del. Super. 1991) ...............................................21

*Concord Mall, LLC v. Best Buy Stores, L.P.*,
2004 WL 1588248 (Del. Super. 2004)...............................................................19

*Dawejko v. Grunewald*, 1988 WL 140225 (Del. Ch. 1988).......................................20

*Floss v. Ryan's Family Steak Houses, Inc.*,
211 F.3d 306, 316 (6th Cir. 2000)...................................................................20

*Interactive Corp. v. Vivendi Universal, S.A.*,
2004 WL 1572932 (Del. Ch. 2004)..................................................................19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).........................22

*Shackelford v. Latchum*, 52 F. Supp. 205 (D. Del. 1943)..........................................19

*UCAR Int'l Inc. v. Union Carbide Corp.*,
2004 WL 137073 (S.D.N.Y. 2004)..................................................................21

*USH Ventures v. Global Telesystems Group, Inc.*,
796 A.2d 7 (Del. Super. 2000)......................................................................19

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative Federal Rule of Civil Procedure 56, and Local Rules 7.1.2 and 7.1.3, Defendants Chugach Support Services, Inc. and Safeco Insurance Company of America, by undersigned counsel, respectfully supplement their pending motion to dismiss or in the alternative for partial summary judgment on the original Complaint to request the identical relief with respect to the First Amended Complaint (the "Amended Complaint") of Plaintiff Jersey Shore Automation, Inc., dismissing Plaintiff's claims arising out of and with respect to (i) Chugach's alleged mistakes in calculating, and alleged incorrect calculations of, Delivery Order prices and (ii) Chugach's alleged agreement to price and to subcontract work to Jersey Shore under Chugach's SABER Contract with the Government in a manner and in amounts not permitted under the SABER Contract and not obtainable from the Government.[1]

The original Complaint pled claims arising out of Chugach's alleged erroneous pricing of the DO/NTPs under the SABER Contract and the MSA. *See* Defendants' Initial Brief at 10-17; Complaint, ¶¶ 11-16. The Amended Complaint seems to dispense entirely with the notion that Chugach owed Jersey Shore a duty with respect to pricing the DO/NTPs under the SABER Contract or under the MSA as written and agreed to by both parties. Nevertheless, to the extent

---

[1] Defendants incorporate herein by reference, rather than repeat, their initial Brief of Defendants Chugach Support Services, Inc. and Safeco Insurance Company of America in Support of Motion to Dismiss in Part or, in the Alternative for Partial Summary Judgment (May 3, 2005) (the "Initial Brief"), including argument Points I through III and the defined terms therein. As with the Initial Brief, the documents referenced below and included in the Appendix and Supplemental Appendix are, with the noted exceptions, documents that the Amended Complaint cites and on which the Amended Complaint expressly relies. Jersey Shore produced the September 24, 2002 Minutes of the Preproposal Conference held by the Air Force at DAFB, Exhibit 6 in the Supplemental Appendix to this Supplemental Brief (Exhibits 1 through 5 are in the Appendix to the Initial Brief), as indicated by the bates-stamped JSA 349 through JSA 364.

that there may be any remnant of a claim related to pricing under the SABER Contract or the MSA, Chugach relies on its Initial Brief.

In place of the previous basis for its claims, Jersey Shore realleges the pricing requirements under the SABER Contract[2], but the Amedned Complaint now alleges that rather than using the R.S.Means® database multiplied by the two coefficients as the SABER Contract dictates, Chugach agreed with Jersey Shore to use "RS MEANS amended by the Unit Price Guide ("UPG")" to price the Delivery Orders that Chugach received from the Government and subcontracted to Jersey Shore. Jersey Shore then alleges that Chugach's failure to implant the higher UPG prices for the R.S.Means prices in its agreements with the Government (presumably, though the Amended Complaint gives no suggestion of how, the Government would have acceded to the higher UPG prices) breached legal duties that Chugach allegedly owed to Jersey Shore. *See* Amended Complaint, ¶¶ 24, 27, 37 & 42.

---

[2] The SABER Contract called for Chugach's using the R.S.Means® database multiplied by the defined coefficients. *See* Initial Brief at 7, ¶ 9, quoting the SABER Contract, Appendix Exhibit 1, at CSS 000035 (all emphases in original):

> 1.0. In order to be considered for award, each offeror must submit four (4) coefficients, (CLINS 0001 through 0004); and identify that portion of the preceding coefficients attributed to project estimating and preparation of minimal design packages (CLIN 0005). The government uses these multipliers to determine the price of work for each task on individual delivery orders. The prices established in the R.S.Means® database <u>bare costs</u> (which means no markup for overhead and profit (O&P)) column, will be multiplied by the City Cost Index Weighted Average Total for **<u>Dover, Delaware, or geographically closest city listed if Dover, Delaware should be deleted</u>**, and the coefficient to arrive at the actual price for a unit of work. The coefficients shall be represented as "net", a "decrease from" or an "increase to" the prices listed in the R.S.Means®. An offer of "net" would be represented as "1.0". An example of a decrease from the prices in R.S.Means® would be "0.98." An example of an increase above the prices listed in the R.S.Means® would be "1.10". The figure entered for CLIN 0005 shall be represented in the same manner (raw figure) as the coefficient.

Even accepting Jersey Shore's allegations as true (they are not), the Amended Complaint still fails to state a claim on which relief can be granted, for the reasons set forth in the Initial Brief, incorporated herein by reference, and for the additional reasons set for the below.

## SUMMARY OF ARGUMENT

1. Jersey Shore was a subcontractor to Chugach under Chugach's main contract with the Government (the SABER Contract) to undertake construction projects at Dover Air Force Base. The SABER Contract solicitation, incorporated into the SABER Contract, dictated the method by which the contractor and the Government would determine the price that the Government would pay to the contractor for the work, using a common unit price guide known as "R.S.Means®."

2. In the Chugach-Jersey Shore subcontract (the MSA), Chugach made no express or implied promise to Jersey Shore, and owed Jersey Shore no express or implied contractual obligation, with respect to Chugach's and the Government's determinations on pricing following the formula dictated by the solicitation for, and in, the SABER Contract.

3. Pursuant to the MSA between Chugach and Jersey Shore, Jersey Shore was not obligated to accept any "Work" (as defined), nor could Chugach compel Jersey Shore to accept any Work. Jersey Shore was free to accept only such work as Jersey Shore in its sole and unfettered judgment determined to accept, at a price that Jersey Shore in its sole and unfettered judgment determined to accept.

4. The DO/NTPs between Chugach and Jersey Shore were fixed, lump-sum price agreements, not any type of contract that expressed and determined contract price based on labor rates, material prices or any other discrete criteria. In each DO/NTP, Jersey Shore agreed and

committed to perform the required construction work for an all-inclusive, fixed price, subject only to change orders, and to complete the work by dates certain.

5. Other than the individual, agreed lump-sum amounts for Jersey Shore's work in each DO/NTP, neither the MSA nor the DO/NTPs contained any representation, commitment or agreement by, from or binding Chugach with respect to the determination of the price at which Jersey Shore agreed to accept and complete the Work.  Nor did the MSA or the DO/NTPs contain any representation, commitment or agreement by, from or binding Chugach with respect to the make-up or calculation of the components -- wage rates or otherwise -- of such prices.

6. Under the federal Davis-Bacon Act, Jersey Shore was required to pay (as was Chugach and any other contractor or subcontractor) certain published wage rates regardless of the amount that Jersey Shore agreed to accept for performing the DO/NTPs (wage rates that Chugach, likewise, had to pay its workers regardless of the project price on which Chugach and the Government had agreed).

7. That Jersey Shore seriously underestimated or under-calculated the actual Davis-Bacon wages it had to pay is solely Jersey Shore's fault and not a contractual responsibility of Chugach.[3]

8. Accordingly, Jersey Shore has no claim against Chugach for any decisions Chugach made in its internal determinations and in its pricing of tasks under, and as agreed to by the Government in, the main SABER Contract.

---

[3] The United States Department of Labor recently demanded from Chugach as prime contractor over $72,000 in underpayments by Jersey Shore to its employees at DAFB. According to the USDOL, Jersey Shore paid journeymen workers (*e.g.*, carpenters and drywallers) at lower hourly rates for skilled and unskilled labor, and Jersey Shore denied these workers the fringe benefits to which they were entitled.

9. Additionally, Chugach seeks dismissal of all claims relating to or arising out of Chugach's allegedly failing to process invoices for payment in a timely fashion and allegedly failing to issue change orders, on the grounds that according to Jersey Shore's Initial Disclosures, Jersey Shore suffered no damages and seeks no recovery of damages in this action arising out of such allegations.

10. Jersey Shore's new allegation of an oral agreement made sometime in September or early October 2003, allegedly amending the MSA to require Chugach to depart from the SABER Contract and use higher "UPG" pricing, fails to state a claim for a number of reasons, primarily the following:

**First.** Jersey Shore is mistaken as to pricing based on the "UPG." The UPG included in the SABER Contract, Appendix Exhibit 1 at CSS 000081, CSS 000212 & CSS 000227, was for non-pre-priced items and services ("NPIs") only, meaning items that R.S.Means *did not contain.* Pricing for the ordinary, regular construction functions (*e.g.*, carpentry, drywall, electrical services, etc.) was all contained in the R.S.Means database and, per the SABER Contract, Chugach was required to use the R.S.Means database, multiplied by the specified coefficients, to price these tasks. If that were not clear enough from the SABER Contract solicitation and the SABER Contract itself, Government representatives made that clear at the Preproposal Conference, where two separate officials, in two separate instances, stated that if items were found both in R.S.Means and the UPG, which the Government officials doubted to be the case, the contractors *had* to use R.S.Means to price Delivery Orders.

**Second.** Chugach did not agree as alleged. The MSA expressly requires that (i) all change orders are to be "by written order" (Appendix Exhibit 2 at CSS 000247, ¶ 9) and (ii) all amendments are to be "documents executed specifically as amendments by a representative of

9

Contractor" (Appendix Exhibit 2 at CSS 000252, ¶ 16). There is nothing signed by, or even emanating from, Chugach showing the amendment to the MSA alleged by Jersey Shore.

**Third.** Even had Chugach agreed as alleged, such an agreement was not a lawful or enforceable agreement and at best was illusory and incapable of fulfillment. Chugach could not and did not agree to extract prices from the Government greater than the prices mandated by the SABER Contract, and Chugach could not and did not commit or bind the *Government* as to the *Government's* determination of the proper prices for the Delivery Orders and the amounts the Government would pay. It was the Government's determinations, in the Delivery Orders issued to Chugach under the SABER Contract, that solely set the fixed, lump-sum prices for each Delivery Order from the Government to Chugach.

**Fourth.** There are five DO/NTPs at issue in this litigation: (i) Delivery Order No. 5001 for Building 401, dated June 24, 2003, (ii) Delivery Order No. 5010 for Building 300, dated November 12, 2003, (iii) Delivery Order No. 5018 for Building 302, dated November 17, 2003, (iv) Delivery Order No. 5019 for Building 1272, dated November 12, 2003 and (v) Delivery Order No. 5021 for Building 781, dated December 3, 2003. *See* Initial Brief at 6-7, ¶ 7, citing Appendix Exhibit 3 at CSS 000874-898 (DO/NTP for Building 401); at CSS 000915-919 (DO/NTP for Building 300); at CSS 000900-904 (DO/NTP for Building 302); at CSS 000928-932 (DO/NTP for Building 1272) and at CSS 000943-946 (DO/NTP for Building 781). The DO/NTP for Building 401 preceded the alleged agreement, and therefore is not subject to or otherwise affected by the alleged agreement. The DO/NTPs for the other four buildings, fixed-price, lump-sum agreements that Jersey Shore accepted without reservation, condition or equivocation, and for which Jersey Shore did its own rough takeoffs before accepting, *followed* the alleged agreement by at least six weeks, and in the case of Building 781 followed the alleged

agreement by several months. Even had Chugach agreed as alleged, Jersey Shore's unequivocal, unconditional, post-agreement acceptance of the fixed-price DO/NTPs, and Jersey Shoe's performance of work and acceptance of compensation for that work pursuant to the DO/NTPs, superseded and subsumed such agreement and/or waived conditions precedent contained in such agreement.

## STATEMENT OF FACTS[4]

16. The SABER Contract required Chugach to use the R.S.Means® database for pricing, applying certain coefficients as multipliers against the R.S.Means® base to determine the prices for the individual tasks comprising each delivery order that the Government would issue to the successful contractor and for the delivery orders that Government did issue to Chugach for the individual projects.[5]  *See* SABER Contract, Appendix Exhibit 1, ¶ 1.0 at CSS 000035 (all emphases in original):

> In order to be considered for award, each offeror must submit four (4) coefficients, (CLINS 0001 through 0004); and identify that portion of the preceding coefficients attributed to project estimating and preparation of minimal design packages (CLIN 0005).  The government uses these multipliers to determine the price of work for each task on individual delivery orders.  The prices established in the R.S.Means® database <u>bare costs</u> (which means no markup for overhead and profit (O&P)) column, will be multiplied by the City Cost Index Weighted Average Total for **Dover, Delaware, or geographically closest city listed if Dover, Delaware should be deleted**, and the coefficient to arrive at the actual price for a unit of work.  The coefficients shall be represented as "net", a "decrease from" or an "increase to" the prices listed in the R.S.Means®.  An offer of "net" would be represented as "1.0".  An example of a decrease from the prices in R.S.Means® would be "0.98."  An example of an increase above the prices listed in the R.S.Means® would be "1.10".  The figure

---

[4] Defendants incorporate ¶¶ 1-15 from the Statement of Facts in the Initial Brief and accordingly resume here with ¶ 16.

[5] R.S.Means prices individual tasks, *e.g.*, installation of a vanity, based on a determination of material costs, labor costs and time to complete the task in the particular geographic locale.

entered for CLIN 0005 shall be represented in the same manner (raw figure) as the coefficient.

*See also id.* at CSS 000045, ¶13.0 ("The R.S.Means® database shall serve as the basis for establishing the value of the work to be performed on a unit price basis."); and at CSS 000090, ¶ 1.b.(2)(a) ("The 'Bare Cost' unit price data (most recent version) provided by the R.S.Means® Company shall serve as the basis for establishing the value of the work performed on a unit price basis. Pulsar (or approved equal) shall be utilized as the software program for estimating purposes.").

17. As part of the bid process, the SABER Contract solicitation required Chugach to provide the Government with a hard copy of the R.S.Means® database and specified how Chugach had to develop estimates if a particular item were not included in the R.S.Means® database. *See id.* at CSS 000044, ¶ 8.0 entitled "<u>HARD COPY of Means®</u>" (emphasis added):

> The contractor shall provide, at no additional cost to the government, one (1) hard copy of unit price data to consist of the following R.S.Means® cost data books (one (1) complete set). Contractor shall provide the latest edition of these books to the SABER Chief and the Contract Administrator will only receive a copy of Facilities Construction Cost Data Book, within 30 days of latest release. If an item is not in the Means® Electronic Database used with the PULSAR® System, the contractor shall use the Means® Facility Cost Guide to locate the item. *If the item cannot be found in the computerized version of the Facility Cost Guide, the contractor shall use the first eight (8) of the following books to develop the delivery order estimate. The contractor shall consider the item non-priced ONLY if it cannot be located in any of the first 8 guides.*
> Building Construction Cost Data
> Mechanical Cost Data
> Plumbing Cost Data
> Electrical Cost Data
> Site Work Cost Data
> Concrete Cost Data
> Heavy Construction Cost Data
> Interior Cost Data
> Repair and Remodeling Cost Data (to be used for reference only)
> Light Commercial Cost Data (to be used for reference only)
> Residential Cost Data (to be used for reference only)

12

18. The UPG attached to the SABER Contract established prices *only* for items not in the R.S.Means database or otherwise not ascertainable under ¶ 8.0 quoted immediately above. *See* SABER Contract at CSS 000046:

18.0. Non-prepriced Items (NPIs):

18.1. Items of work not covered by this contract but within its scope and general intent and necessary to complete the requirements of a specific delivery order may be negotiated and incorporated into the delivery order by the contracting officer or his designated representative. Non-prepriced work shall be so noted on each delivery order and shall not exceed fifteen (15) percent of the final negotiated amount for the delivery order.

18.2. To permit recurrent use, a NPI must be incorporated by supplemental agreement into the Unit Price Guide (UPG). This may be done at any time during the contract period.

18.3. Once an item is added to the UPG and becomes a pre-priced item (PPI), an economic adjustment will be applied in subsequent option years if that item is used again. ....

19. If it were not clear enough from the SABER Contract and from other government contract work (which it was to Chugach), the DAFB Contracting Officer (Jacqueline McGee) and the DAFB Chief of the SABER Management Element (Kim Shore) made it crystal clear at the Preproposal Conference that the UPG did *not* supplant R.S.Means. *See* the Minutes of the Preproposal Conference, Supplemental Appendix Exhibit 6 (accompanying this Brief), JSA 349, 351 & 354 (emphasis added):[6]

### DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 439TH AIRLIFT WING (AMC)

FROM: LGCA (302-677-5012)

SUBJECT: Minutes of the Preproposal Conference

---

[6] As the "JSA" designation indicates, Jersey Shore had and produced these minutes.

13

CONTRACT NUMBER: F07603-02-R-0009

PROJECT NUMBER AND TITLE: Simplified Acquisition of Base Engineer Requirements (SABER)

DATE/TIME: 24 September 2002, 1300 hrs

LOCATION: Bldg 639, Base Supply Training Room, Room No. 224, Building 639

****

18. Attachment 6 is the Unit Price Guide (UPG). These are the items Dover AFB utilizes *that are not included in the Means*. With the exception of the line item for rubbish hauling/handling, *if items are found in Means, they should use that item in lieu of the item listed in Attachment 6*. Ms McGee added that contractor must review the pricing included in Attachment 6 and should they consider any of them to be inadequate, she must received notification with justification within the next few days. Ms McGee [*sic*] *she will not entertain any complaints of inadequacies after award*.

****

10. Question: What is the relationship between the R.S. Means® computerized pricing guide and the UPG at Attachment 6.

Response: The coefficients (your overhead and profit) are applied to the R. S. Means® computerized pricing guide – bare costs. Coefficients are not applied to the UPG, Attachment 6. The items in Attachment 6 are locally developed and include overhead and profit. The items in Attachment 6 are only adjusted in accordance with the economic price adjustment in Section H, pages 14 and 15. Non-prepriced Items (NPIs). Mr Shore added that the items in the UPG are items that are either not included in the Means, or are not covered adequately in the database; i.e., what Dover AFB, Delaware, requires specifically.[7]

11. Question: If an item appears in both the R. S. Means computerized database and the UPG, does the contractor have an option of which to use.

---

[7] Jersey Shore alleges that in the post-MSA modification agreement, Chugach agreed that the coefficients would be based on the current R.S.Means data and would be adjusted for the UPG when applicable. *See* Amended Complaint ¶ 41. That is a *non sequitur* allegation. Coefficients and UPG prices are independent of each other. UPG prices are all inclusive and are not subject to and are not part of the coefficients.

14

Response: Mr Shore stated he does not feel the items, as specified, in the UPG are included in Means, and if they are in Means as we specify, we would like to know.  With the exception of the rubbish handling/hauling, *if items are in both Means and the UPG, the contractor should use Means.*

20. As referenced in ¶ 16 above, quoting ¶ 1.0 from the SABER Contract, the Government determined all prices for and issued all Delivery Orders.

21. Chugach did not agree to amend the MSA.  The MSA required that any amendment be in writing, and there is no writing from, signed by or even emanating from Chugach binding Chugach to an amendment of the MSA.  The only writings are the fixed-price DO/NTPs that Chugach issued and that Jersey Shore accepted without amendment, reservation or qualification after the date of the alleged MSA modification.

22. Even were it assumed for purposes of this motion that an agreement existed, as alleged, in September and early October 2003 to supplant R.S.Means-based prices with the higher UPG prices, the agreement preceded and was superseded by Jersey Shore's unconditional and categorical acceptance and performance (albeit deficient) of Delivery Order No. 5010 for Building 300 dated November 12, 2003, Delivery Order No. 5018 for Building 302 dated November 17, 2003, Delivery Order No. 5019 for Building 1272 dated November 12, 2003 and Delivery Order No. 5021 for Building 781 dated December 3, 2003, all committing Jersey Shore to perform the subject work for fixed, lump sums.

23. Prior to accepting these Delivery Orders, Jersey Shore did its own takeoffs based on the narrative statements of work (the "SOWs") that Chugach received from the Government and supplied to Jersey Shore.  *See* Amended Complaint ¶ 39.

**ARGUMENT**

To the extent that the Amended Complaint alleges and seeks recovery (i) based on Chugach's alleged mistaken or incorrect failure to substitute higher UPG rates for the mandated R.S.Means database and/or (ii) based on an alleged agreement whereby Chugach committed to do just that and get the Government to agree to pay and actually to pay for Delivery Orders based on an impermissible and impossible substitution of higher UPG rates for the required R.S.Means rates, the Amended Complaint must be dismissed because it fails to state a claim on which relief can be granted or, in the alternative, Defendants are entitled to judgment as a matter of law on the undisputed facts.

The reason why the Amended Complaint fails to state a claim is essentially the same as the reason why the original Complaint failed to state a claim. The SABER Contract mandated the sole basis on which the contractor had to compute its proposed prices, the same, one-and-only basis on which the Government reviewed the price proposals and the same basis on which the Government issued Delivery Orders after reaching concurrence with the contractor on the process. There was nothing that Chugach could do outside the SABER Contract, even had Chugach so desired, to slip unlawful pricing past the Government. And even if Chugach could have slipped through a price outside the rigid the confines of the SABER Contract, the Government would not have acceded.[8]

---

[8] It appears, though hopefully it is not the case, that Jersey Shore may be proceeding on the theory that there was an agreement to commit fraud, that Chugach failed to fulfill that agreement and that Jersey Shore may enforce that agreement against Chugach and hold Chugach liable for Jersey Shore's failure to realize inflated prices for its subcontract work. Even so, Jersey Shore's action would be premised on Chugach's failure to go along with the agreement. Chugach does concur that it never attempted wrongful pricing and to make matters clear

16

**IV. The Complaint Fails to State a Claim on Which Relief Can Be Granted Because There Is No Set of Facts That Gives Rise to a Contractual, Quasi-Contractual or Other Obligation of Chugach to Jersey Shore with Respect to the Pricing of the Government's Award of the SABER Contract to Chugach[9]**

There is no set of facts that Jersey Shore could prove based on the Amended Complaint to show that Chugach had (i) any ability with respect to, or (ii) any contractual, quasi-contractual or other obligation to Jersey Shore arising out or with respect to, pricing and securing payment from the Government on Delivery Orders, particularly, as now alleged, based on an impermissible and impossible pricing formula.

**A. There Is No Provision in Any Agreement Between Chugach and Jersey Shore, or to Which Jersey Shore Was an Intended Beneficiary, Obligating Chugach to Jersey Shore with Respect to Chugach's Pricing Determinations**

As Defendants showed in their Initial Brief at 11-15 and as the Amended Complaint evidently concedes, Chugach had no obligation to Jersey Shore relating to or arising under the pricing protocols in the SABER Contract. Jersey Shore knows that, both as a practical matter and as a matter of law by virtue of the incorporation of the SABER Contract and the applicability of the federal contracting laws and federal acquisition regulations (known as the "FARs").

Also as Chugach showed in the Initial Brief, the MSA and the DO/NTPs themselves dispel any notion of a contractual obligation arising out of the R.S.Means calculations running from Chugach to Jersey Shore. First, Chugach did not warrant to Jersey Shore that Chugach's pricing with the Government would be error free or otherwise. All that Jersey Shore could

---

categorically denies even a hint of Chugach's agreeing to or participating in impropriety under the SABER Contract.

[9] Defendants incorporate Points I, II and III from the Initial Brief and accordingly begin this Supplemental Brief with Point IV.

expect was Government pricing based on the formula in the SABER Contract. Second, the MSA and the DO/NTPs do not link Jersey Shore's lump-sum-price agreements to any contractual agreement regarding Jersey Shore's pricing or the amounts Jersey Shore would have to pay workers. Third, the MSA and the DO/NTPs do not, as they cannot, alter the SABER Contract. Fourth, the MSA and the DO/NTPs do not, as they cannot, annul the Davis-Bacon Act. Fifth, to the extent that the MSA and the DO/NTPs create a contractual obligation relating to the SABER Contract itself, that obligation is to adhere to the SABER Contract, as Chugach did, and expressly imposes an obligation of Jersey Shore to Chugach, not of Chugach to Jersey Shore. *See* the MSA, Exhibit 2 at CSS 000242, ¶ 1.8: "[T]he Subcontractor is obligated to Contractor in the same manner that Contractor is obligated to the Owner."

Furthermore, as the SABER Contract indicates, the Government independently must agree, as the Government did agree, on the formulae, propriety and amounts of the pricing. In reality, therefore, there cannot be an alleged error on Chugach's part.

> **B. After the Alleged Oral Agreement to Use UPG Prices in Violation of the SABER Contract, Jersey Shore Agreed to Perform the Work at Issue for Fixed, Lump-Sum, All Inclusive Prices in Written Agreements Executed by Jersey Shore. Under Long-Standing Law, Jersey Shore Cannot Rely on the Alleged Prior Oral Agreement, Even if True, to Alter the Terms of the Subsequent, Written, Unconditionally Accepted DO/NTPs**

After Chugach allegedly made the oral commitment to Jersey Shore in September or early October 2003 to use the impermissible and unlawful UPG prices instead of the required R.S.Means database multiplied by the two coefficients, Jersey Shore accepted and agreed to the four DO/NTPs at issue, for Buildings 300, 302, 718 and 1272, without reservation, limitation or condition. Even were Jersey Shore's allegations about the modified pricing true (which Chugach

18

denies), the later-executed, written DO/NTPs supersede the earlier alleged pricing agreement, as

a matter of long-standing law.  *See, e.g., Shackelford v. Latchum*, 52 F. Supp. 205, 206 (D. Del.

1943); *Concord Mall, LLC v. Best Buy Stores, L.P.*, 2004 WL 1588248 at *4 (Del. Super. 2004);

*Interactive Corp. v. Vivendi Universal, S.A.*, 2004 WL 1572932 at *15 & n. 72 (Del. Ch. 2004).[10]

### C. Even Had Chugach Entered Into the Alleged Agreement for Pricing, Jersey Shore Has No Claim to Enforce that Alleged Agreement Because it Was Impossible for Chugach to Perform

Even had Chugach allegedly made the oral commitment to Jersey Shore in September or

early October 2003 to use the impermissible UPG prices instead of the required R.S.Means-

based prices, Chugach's promise was impossible for Chugach to perform.  *See generally USH*

*Ventures v. Global Telesystems Group, Inc.*, 796 A.2d 7, 19 (Del. Super. 2000).  All pricing had

to be in strict compliance with the SABER Contract.  And the pricing was not anything in

Chugach's control, not anything that Chugach could produce.  Chugach submitted proposed

prices to the Government, but the Government alone determined the actual, final prices at which

the Government priced Delivery Orders.  So long as the prices comported with the formula in the

SABER Contract, Chugach was bound under the SABER Contract to perform the work for the

Government-issued price.

---

[10]  *See also* the Initial Brief at 13 (emphasis in original in Brief): "*In the case of these lump-sum DO/NTPs, with their all-inclusive prices, Jersey Shore committed to do the work for the set price regardless of the particular costs – higher or lower – of an individual task, worker or item.*"  This point is no less true if the word "prices" were substituted for "costs," so that the sentence read: "In the case of these lump-sum DO/NTPs, with their all-inclusive prices, Jersey Shore committed to do the work for the set price regardless of the particular *prices* – higher or lower – of an individual task, worker or item."

**D. Even Had Chugach Entered Into the Alleged Agreement for Pricing, Jersey Shore Has No Claim to Enforce that Alleged Agreement Because it Was Illusory**

The alleged pricing agreement would be unenforceable also because it was illusory. Chugach had no ability to extract prices from the Government in excess of the R.S.Means-times-the-coefficients prices for any and every task contained in R.S.Means. The SABER Contract, as Jersey Shore well knew, dictated strictly and categorically the manner of computing prices. And only the Government, a party wholly independent of Chugach, had the power over the public purse, another fact that Jersey Shore knew (that fact is as common knowledge as one may find anywhere). These facts "compel[] the conclusion" that the alleged contract was illusory and is unenforceable. *Dawejko v. Grunewald*, 1988 WL 140225 at *3 (Del. Ch. 1988). *See Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 316 (6th Cir. 2000), where the Sixth Circuit, citing Williston on Contracts, held that where the promisor retains the right to decide the nature and extent of performance, the promise is too indefinite to enforce. Here the situation is -- if this is possible conceptually -- even more illusory. An independent third party, the Government, retained the right to decide all the prices that it would pay for the Delivery Orders under the SABER Contract.

**E. Even Had Chugach Entered Into the Alleged Agreement for Pricing, Jersey Shore Has No Claim to Enforce that Alleged Agreement Because Performance Was Forbidden Under Government Contracting Law**

Fraud by a government contractor against the Government is against the law. If Chugach knowingly and deliberately had submitted inflated prices forbidden by the SABER Contract and without disclosure had induced the Government to pay Chugach more than the SABER Contract

20

permitted, Chugach would have subjected itself to charges of fraud against the Government. That appears to be what Jersey Shore alleges that it and Chugach agreed to do, and it is the profits from that act that Jersey Shore seeks to exact from Chugach in this breach of contract action.[11] Jersey Shore may not do that. *See Burns v. Ferro*, 1991 WL 53834 at \*2 (Del. Super. 1991). Jersey Shore especially cannot sue on this basis here when Jersey Shore itself participated in the (alleged) wrongdoing. *See UCAR Int'l Inc. v. Union Carbide Corp.*, 2004 WL 137073 at \*12 (S.D.N.Y. 2004) (relying on *Burns* for the proposition that "UCAR cannot use its participation in a price-fixing conspiracy as a means to seek recovery for monetary losses it allegedly suffered as a result of its own illegal activities.").[12]

### V. In the Alternative, the Complaint Must be Dismissed Because on the Undisputed Facts and as a Matter of Law, Chugach Had No Contractual, Quasi-Contractual or Other Obligation to Jersey Shore with Respect to the Pricing of the Government's Award of the SABER Contract to Chugach

There is no genuine dispute of material facts. In particular, the SABER Contract, the MSA and the post-MSA, post-alleged-agreement DO/NTPs are irrefutable. For the reasons set forth in Point IV above, Chugach is entitled to judgment as a matter of law as to any and all claims that Chugach wrongfully used R.S.Means unit-price database instead of substituting higher UPG prices for items of work included in the R.S.Means database.

Jersey Shore's claim, moreover, continues to be implausible. Chugach was the party obligated to the Government for all construction under the SABER Contract. If Chugach

---

[11] It is obvious and almost too ironic to note that Jersey Shore accuses Chugach of breaching the covenant of good faith and fair dealing because Chugach failed to act in bad faith, and in fact did act in good faith, by not pricing the Delivery Orders in violation of the SABER Contract.

[12] Jersey Shore alleges that it actually went further and demanded, required and induced the alleged illegal agreement.

21

received and accepted the contract award on the basis of its own underestimated or incorrectly transcribed costs (assuming, *arguendo*, Chugach should and could have substituted impermissible UPG prices for items in the R.S.Means database), Chugach harmed itself more than Chugach harmed anyone else, in two ways. First, Chugach received less money than it could or would have received. Second, Chugach subjected itself to the risk of termination of the SABER Contract and other, more severe penalties. It makes no sense that Chugach would do that. Without plausibility, Jersey Shore's claim must fail. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 n.6, 591 n.15, 595-96 (1986).

## CONCLUSION

WHEREFORE, for the foregoing reasons and for the reasons set forth in Defendants' Initial Brief, Defendants Chugach Support Services, Inc. and Safeco Insurance Company respectfully pray that the Court dismiss the Complaint, or in the alternative grant partial summary judgment on the Complaint, dismissing with prejudice Plaintiff's claims arising out of and with respect to Chugach's Delivery Order calculations and prices and Plaintiff's claims arising out of Chugach's allegedly failing to process invoices for payment in a timely fashion and failing to request or issue change orders.

Dated: July 6, 2005

Respectfully submitted,

BIRCH, HORTON, BITTNER AND CHEROT

/s/ Harvey A. Levin
Harvey A. Levin
1155 Connecticut Avenue, N.W., Suite 1200
Washington, DC 20036
Phone (202) 659-5800
Fax (202) 659-1027
Email: hlevin@dc.bhb.com

22

and

THE LYONS LAW FIRM

/s/ Edmund Daniel Lyons
Edmund Daniel Lyons (No. 0881)
1526 Gilpin Avenue
P.O. Box 579
Wilmington, DE 19806
Phone (302) 777-5698
Fax (302) 777-5051
Email: elyons@lyonslaw.com

Counsel for Chugach Support Services, Inc. and
Safeco Insurance Company of America

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Supplemental Brief was served by electronic mail and first class mail, postage prepaid this 6th day of July 2005 on:

James D. Heisman, Esquire
M. Edward Danberg, Esquire
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

/s/ Harvey A. Levin

@PFDesktop\::ODMA/WORLDOX/G:/505986/4/HAL9092.doc

24