# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**UNITED STATES OF AMERICA**, for
the Use and Benefit of **JERSEY SHORE
AUTOMATION, INC.**, a New Jersey
corporation,

        *Plaintiff,*

   v.

**CHUGACH SUPPORT SERVICES,
INC.**, an Alaska corporation, and **SAFECO
INSURANCE COMPANY OF AMERICA**,
a Washington corporation,

        *Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. NO.  04-1416 (JJF)

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION AND SUPPLEMENTAL BRIEF TO DISMISS IN PART, OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT

CONNOLLY BOVE LODGE & HUTZ LLP

_____*/s/ James D. Heisman*_____
James D. Heisman (# 2746)
M. Edward Danberg (# 2245)
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Plaintiff Jersey Shore
Automation, Inc.*

August 24, 2005

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

I.     NATURE OF PROCEEDINGS ................................................................ 2

II.    SUMMARY OF ARGUMENT ................................................................ 3

III.   STATEMENT OF FACTS ...................................................................... 5

IV.    ARGUMENT .......................................................................................... 10

       A.   Standard of Review .................................................................... 10

       B.   The Complaint States Cognizable Claims For Breach Of Contract
            Upon Which Relief Can Be Granted ............................................ 11

       C.   The Terms Of The MSA Required The Use Of The Wage Rates
            Contained In The SABER Contract ............................................ 14

       D.   The MSA Through The SABER Contract Pricing Formula
            Accounted For Payment Of Wages In Accordance With The
            Davis-Bacon Act ........................................................................ 21

       E.   Chugach Violated The Delaware Prompt Pay Act ...................... 22

       F.   Chugach's Oral Modifications Of The MSA Are Enforceable ...... 24

       G.   The Amendment In The Pricing Is Not Deemed Illusory Simply
            Because Defendants Would Have To Pay More To Jersey Shore .... 25

       H.   The Amendment Did Not Require Defendants To Defraud The
            United States Government But To Pay More Of Their Share Of
            The Profits Or To Obtain Adequate Compensation For The Work .... 26

       I.   The Agreements Made By Jersey Shore Are Enforceable .............. 26

       J.   Jersey Shore Is Unable To Present All Facts To Oppose The
            Motion Without Further Discovery .............................................. 27

V.     CONCLUSION ...................................................................................... 29

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Alaska Diversified Contractors, Inc. v. Lower Kuskokwin School District,*
    778 P.2d 581 (Alaska 1989)...................................................................20

*Alaska Northern Dev., Inc. v. Alyeska Pipeline Serv. Co.,*
    666 P.2d 33 (Alaska 1983), *cert. denied,* 464 U.S. 1041,
    104 S.Ct. 706, 79 L.Ed.2d 1709 (1984) ...............................................19,20

*Alexander v. Whitman,*
    114 F.3d 1392 (3rd Cir. 1997) .........................................................10

*Alyeska Pipeline Service Company v. O'Kelley,*
    645 P.2d 767 (Alaska 1982)...........................................................15,19,20

*Austin Elcon Corp. v. Avco Corp.,*
    590 F.Supp. 507 (W.D. Tex. 1984)....................................................11

*Betz v. Chena Hot Springs Group,*
    657 P.2d 831 (Alaska 1982)............................................................15

*Casey v. Semco Energy, Inc.,*
    92 P.3d 379 (Alaska 2004)............................................................15

*Barry v. University of Alaska,*
    85 P.3d 1022 (Alaska 2004)...........................................................25

*Cooper v. Ross & Roberts, Inc.,*
    505 A.2d 1305 (Del.Super.Ct. 1986) ..................................................11

*Costlow v. United States,*
    552 F.2d 560 (3rd Cir.1977) ........................................................28

*DeCristofaro v. Sec. Nat'l Bank,*
    644 P.2d 167 (Alaska 1983)...........................................................15

*Earth Movers of Fairbanks, Inc. v. State, Dep't of Transp. and Pub. Facilities,*
    824 P.2d 715 (Alaska 1992)...........................................................15

*H-M Wexford LLC v. Encorp, Inc.,*
    832 A.2d 129 (Del.Ch. 2003)..........................................................12

*Magill v. Nelbro Packing Co.*,
    43 P.3d 140 (Alaska 2001)...............................................................................19

*Manchak, Jr. v. Rollins Environmental Services, Inc.*,
    1996 WL 790100 (D.Del. 1996) ......................................................................10

*Matanuska Elec. Ass'n, Inc. v. Chugach Elec. Ass'n, Inc.*,
    99 P.3d 553 (Alaska 2004)......................................................................14,15,19

*Maull v. Stokes*,
    68 A.2d 200 (Del.Ch. 1949).............................................................................23

*Miller v. Beneficial Management Corp.*,
    977 F.2d 834 (3rd Cir. 1992) .........................................................................28

*Mitford v. De Lasala*,
    666 P.2d 1000 (Alaska 1983)...........................................................................14

*Poulis v. State Farm Fire and Cas. Co.*,
    747 F.2d 863 (3rd Cir. 1984) .........................................................................21

*Pennsylvania Coal Ass'n V. Babbitt*,
    63 F.3d 231 (3rd Cir. 1995) ...........................................................................10

*Petenbrink v. Superior Home Builders, Inc.*,
    1999 WL 1223786 (Del.Super. 1999).............................................................23

*Peterson v. Wirum*,
    625 P.2d 866 (Alaska 1981).............................................................................19

*Rockstad v. Erikson*,
    113 P.3d 1215 (Alaska 2005)......................................................................20,27

*Sames v. Gable*,
    732 F.2d 49 (3rd Cir.1984) ...........................................................................28

*Sonitrol Holding Co. v. Marceau Investments*,
    607 A.2d 1177 (Del. 1992) ..............................................................................15

*Stepanov v. Homer Elec. Ass'n, Inc.*,
    814 P.2d 731 (Alaska 1991).............................................................................14

*Still v. Cunningham*,
    94 P.2d 1104 (Alaska 2004).............................................................................20

*Suburban Trust and Sav. Bank v. University of Delaware,*
    910 F.Supp. 1009 (D.Del. 1995)................................................................11

*Sykes v. Melba Creek Mining, Inc.,*
    952 P.2d 1164 (Alaska 1998)................................................................12

*Szusterman v. Amoco Oil Co.,*
    122 Fed.Appx. 130 (3rd Cir. 2004)................................................................21

*U.S. for Use of U.S. Steel Corp. v. Construction Aggregates Corp.,*
    559 F.Supp. 414 (E.D. Mich. 1983), judgment aff'd in part, rev'd in part on other
    grounds, 738 F.2d 440 (6th Cir. 1984)................................................................11

*Warner Communications Inc. v. Chris Craft Industries, Inc.,*
    583 A.2d 962 (Del.Ch. 1989) *aff'd* 567 A.2d 419 (Del. 1989)....................................15

*Western Waterproofing Co., Inc. v. Springfield Housing Authority,*
    669 F.Supp. 901 (C.D.Ill 1987) ................................................................16

*Wilmington Trust Co. v. Wilmington Trust Co.,*
    24 A.2d 309 (Del. 1942) ................................................................11

## STATUTES

6 *Del.C.* § 3502 ................................................................23

6 *Del.C.* § 3503 ................................................................23

6 *Del.C.* § 3504 ................................................................23

6 *Del.C.* § 3509(a) ................................................................23

40 U.S.C. § 271................................................................2

41 U.S.C. § 611................................................................21

## RULES

Fed. R. Civ. P. 12(b) ................................................................3

Fed. R. Civ. P. 12(b)(6)................................................................10

Fed. R. Civ. P. 12(c) ................................................................28

Fed. R. Civ. P. 26(a) ................................................................4,21

Fed. R. Civ. P. 37(a)(2)(A) ............................................................................4,21

Fed. R. Civ. P. 56 ...........................................................................................10

Fed. R. Civ. P. 56(c) .......................................................................................10

Fed. R. Civ. P. 56(f) ....................................................................................10,28

**OTHER AUTHORITIES**

Delaware Prompt Pay Act........................................................2,11,22,23,24

Restatement 2d Contracts § 2 ........................................................................25

Restatement 2d Contracts § 73 ......................................................................25

Restatement 2d Conflict of Laws §187...........................................................11

## I.    NATURE OF PROCEEDINGS

Plaintiff (hereinafter "Jersey Shore") filed this action on November 3, 2004 seeking damages against Defendants Chugach Support Service, Inc. (hereinafter "Chugach") and Safeco Insurance Company of America (hereinafter "Safeco"). Jersey Shore has alleged causes of action against Chugach for: 1) breach of contract; 2) violation of the Delaware Prompt Pay Act; 3) breach of implied covenant of good faith and fair dealing; and alternatively, 4) quantum meruit. Jersey Shore seeks relief from Safeco for payment on the surety bond guaranteeing Chugach's payments to Plaintiff pursuant to the Miller Act, 40 U.S.C. § 271 *et. seq.*

On January 19, 2005, Defendants filed their Answer and Counterclaim.  Jersey Shore submitted its Answer to the Counterclaim on February 11, 2005.  Defendants subsequently filed a Motion for Leave to file a Motion to Dismiss in Part, or in the Alternative for Partial Summary Judgment on May 3, 2005.

Plaintiff requested that the Court withhold consideration of Defendants Motion until it had an opportunity to file an amended Complaint.  The Court granted Jersey Shore's request on May 23, 2005.  Jersey Shore then filed its First Amended Complaint on June 17, 2005. Chugach filed an Answer to the First Amended Complaint and Counterclaims on July 1, 2005. Jersey Shore filed its Answer to Chugach's Counterclaims on August 23, 2005.

In its First Amended Complaint, Jersey Shore, among other things, added a count against Defendant Safeco Insurance Company of America for breach of contract.  On July 2, 2005, Defendants filed a Supplemental Opening Brief in Support of its Motion to Dismiss in Part, or in the Alternative for Partial Summary Judgment.  This is Jersey Shore's Answering Brief.

412106v3

## II.    SUMMARY OF ARGUMENT

Defendants have moved to dismiss in part or for partial summary judgment seeking to dismiss Jersey Shore's claims arising out of (i) Chugach's mistakes in calculating, and incorrect calculations of, wage rates, (ii) Chugach's failing to process invoices in a timely fashion and failing to issue change orders and (iii) Chugach's breach of the contract as supplemented by the parties.. The basis of Defendants' motion is that such claims purportedly fail to state a claim upon which relief may be granted or, alternatively, that judgment as a matter of law should be granted.

Chugach's motion should be denied since, *inter alia*, it is predicated upon the misconception that the "SABER Contract" provisions of Chugach's contract with the government relating to wage rates were not part of its Master Subcontract Agreement ("MSA") with Jersey Shore.  However, the MSA explicitly incorporates the provisions of the SABER Contract.  Accordingly, Chugach's arguments relating to wage rates cannot be resolved by motion to dismiss or on summary judgment.[1]  In addition, accepting Jersey Shore's well pled allegations as true for purposes of the 12(b)(6) motion, Jersey Shore is entitled to a finding that its contract with Chugach was amended to provide express detail regarding pricing and compensation and that Chugach breached this Agreement.  At a minimum there is a genuine issue of material fact whether the MSA was amended requiring the denial of Chugach's claim for summary judgment.

Chugach's motion to dismiss Jersey Shore's claims relating to Chugach's failure to process invoices in a timely fashion and failing to issue change orders is without legal basis. Even assuming that Jersey Shore's initial disclosures failed to comply with the terms of Rule

---

[1] And, Chugach relies only upon Delaware case law in support of its positions.  The MSA requires the application of Alaskan law.  Under the applicable Alaskan case law, Chugach is not entitled to dismissal or summary judgment.

412106v3

26(a), Chugach's remedy is not a motion to dismiss.  Rather, Fed. R. Civ. P. 37(a)(2)(A) provides the appropriate remedy.  In any event Jersey Shore has served Chugach with its First Amended Initial Disclosures, providing further detail of its damages and completely mooting the issue.

412106v3

## III.   STATEMENT OF FACTS

Chugach entered into a contract with the United States Air Force, 436th Contracting Squadron, for the indefinite delivery, indefinite quantity ("IDIQ") construction, alteration or repair of public buildings or public works at the Dover Air Force Base ("DAFB") on or about January 30, 2003 (hereinafter "SABER Contract").   Answer to Amended Complaint ¶ 6 (hereinafter "Answer ¶ __"; See Appendix to Chugach Opening Brief at Exhibit 1 (hereinafter "Appendix at Exhibit __").   The SABER Contract contemplated renovations and repairs to be performed on Buildings 401, 300, 302, 779, 712, 778, 1272, and 781 at the DAFB.   First Amended Complaint ¶ 6 (hereinafter "Complaint ¶ __")

The SABER Contract utilizes a formula for determining the cost of construction which takes into account, among other things, the cost of materials and wage rates.   The formula requires the application of the unit cost of work as identified in the RSMEANS[2] data base multiplied by the City Cost Index Weighed Average Total for Dover, Delaware and the coefficient.  Complaint ¶¶ 23, 24; Answer ¶¶ 23, 24; *See* SABER Contract, Appendix at Exhibit 1.  Because the RSMEANS database specifications and prices apply to a general area or industry, it is necessary to utilize the Unite Price Guide ("UPG") rates in setting the costs and practices for a specific location to ensure adequate compensation to the contractors performing the work.   This step, which is called "localization," is critical to correct pricing under the SABER program.   Complaint ¶ 26; see 48 C.F.R. § 5336.9102.

In furtherance of the SABER Contract, Chugach entered into a Master Subcontract Agreement with Jersey Shore, dated May 19, 2004 ("MSA").   Complaint ¶ 10; Answer ¶ 10.

---

[2] RSMEANS is an estimating tool which reflects costs of construction on a national level.  According to excerpts from RSMEANS' book "Successful Estimating Methods: From Concept to Bid," "The database may contain national averages, or may be based on the developer's city or region. *In either case, it is necessary to modify the labor, equipment, and materials data to fit the estimator's local.*"  (Attached hereto as Exhibit "A", emphasis added.)

412106v3

The terms of the MSA provided that all services and work that was to be performed would be detailed in individual delivery orders with notices to proceed ("DO/NTP"). Complaint ¶ 10; See Appendix at Exhibit 2, MSA, § 1.8. The MSA did not provide a pricing structure for wages to be paid under each DO/NTP but instead incorporated the pricing terms of the SABER Contract. See Appendix at Exhibit 2, MSA, § 1.8. The MSA was executed by Mr. Robert H. Hafey, Project Manager, on behalf of Chugach. See Appendix at Exhibit 2, MSA p. 17. The MSA provides for the application of Alaskan law "in all respects" for interpretation of the agreement. Appendix at Exhibit 2, MSA § 17.

The first DO/NTP ("Delivery Order No. 5000") was issued by Chugach on June 4, 2003 for the construction of office space at building 779. Complaint ¶ 16; Answer ¶ 16. Jersey Shore agreed to perform Delivery Order No. 5000. However, in estimates for Delivery Order No. 5000 which Chugach submitted to the United States Government and not to Jersey Shore, Chugach detailed additional work and services far exceeding the scope of work provided to Jersey Shore in the DO/NTP. Complaint ¶ 33. In addition, Chugach incorrectly used only the RSMEANS wage rates in its estimates for Delivery Order No. 5000 despite the fact that the UPG rates reflected local conditions and was required to be used by the MSA through the SABER Contract. Complaint ¶ 27. The scope of the problem is exemplified by wage rates that were required to be paid, for example, to carpenters. By way of example and not by limitation, the wage rate specified in the RSMEANS data for a carpenter was $31.55. The United States Department of Labor General Wage Determination DE020009 required that carpenters actually be paid at a rate of $36.39. In addition, Jersey Shore was required to pay Workman's Compensation, taxes and insurance on top of the carpenter's wage making the true cost per hour $45.01. The UPG rate for carpenters was $54.58. Thus, for each hour a carpenter worked, the

412106v3

pricing was underestimated by $13.46 as a result of Chugach's estimating errors. (Decclaration of Daryl J. Meehan, ¶ 6, attached hereto as Exhibit "B" (hereinafter "Dec. "). Despite repeated requests, Chugach refused to provide Jersey Shore with its estimate for the DO/NTP that was submitted to the United States Government. Complaint ¶ 34. (Dec. ¶ 7).

During performance of DO 5000, Jersey Shore recognized the increased scope of work and services and submitted change orders to reflect the true scope of work. Complaint ¶ 36. During negotiations for the next DO/NTP ("Delivery Order No. 5001) for Building 401, the parties discussed the problems that occurred with Delivery Order No. 5000. It was agreed, by Mr. Hafey, on behalf of Chugach, that Chugach would apply to the government for payment of the extra work, correct wages under Delivery Order No. 5000, and use the correct wage rates in all future DO/NTP. Complaint ¶ 37. Despite its promises, Chugach failed to perform as agreed. Complaint ¶ 38. Jersey Shore, however, performed all work required by Delivery Order 5001 including the additional work and services demanded by Chugach which were contained in the estimate provided by Chugach to the government, but excluded from the DO/NTP's to Jersey Shore. (Dec. ¶ 15).

Thereafter representatives for Jersey Shore and Chugach met a second time in September 2003 seeking to resolve the difficulties encountered by Jersey Shore in obtaining adequate compensation and rectifying the scope of work issues. Complaint ¶ 39. (Dec.¶ 9). Not surprisingly, the meeting coincided with the negotiation of further DO/NTP's for renovations to Buildings 300, 302, 778, 781 and 1272 Complaint ¶ 40. A meeting was held in Jersey Shore's offices. The attendees at this meeting were, Robert Hafey, Terry Wright, Daryl J. Meehan and Michael Sparandera. The purpose of the meeting was to expressly establish the terms under which Jersey Shore would consider accepting new delivery orders from Chugach to perform

renovations on Buildings 300, 302, 778, 781 and 1272 at the DAFB. (Dec. ¶ 10). During the meeting, Chugach and Jersey Shore expressly agreed on the cost structure of DO/NTP's going forward. Complaint ¶ 41. (Dec. ¶ 10). This agreement required, *inter alia*, that Chugach would pay Jersey Shore a coefficient of 1.02 of the final line item[3] on the DO/NTPs. Complaint ¶ 41. (Dec. ¶ 10). In addition, Chugach agreed to use the UPG for all future estimates or to seek additional comparable funding from the United States Government to offset the inadequate wage price structure reflected in RSMEANS. Complaint ¶ 42. (Dec. ¶ 11). Jersey Shore confirmed the agreements reached at this meeting in writing in a memo from Daryl Meehan to Robert Hafey dated October 3, 2003 (the "Memo"). Complaint ¶ 43; Complaint at Exhibit B. (Dec. ¶ 12).

Jersey Shore agreed to perform subsequent delivery orders only pursuant to the terms set forth in the Memo. Complaint ¶¶ 44, 46. (Dec. ¶ 13). Chugach also agreed to perform pursuant to the Memo. Complaint ¶ 45. (Dec. ¶ 13). In reliance upon Chugach's representations, Jersey Shore performed as agreed. Complaint ¶ 46. (Dec. ¶ 14). However, in late December, 2003, Jersey Shore discovered that Chugach had completely disregarded the terms of the Memo by, among other things, using RSMEANS wage data without adjustment by the UPG in its estimates and failing to negotiate additional funds for the work. Complaint ¶ 50. (Dec. ¶ 14). Jersey Shore continued in good faith to perform all existing DO/NTPs, but refused to accept further work from Chugach, while attempting to obtain the contractually agreed compensation from Chugach. Complaint ¶ 53. (Dec. ¶ 15).

Despite Jersey Shore's entitlement to payment, Chugach established a pattern of late payment to Jersey Shore. (Dec. ¶ 16). Eventually, Chugach's delay resulted in the nonpayment

---

[3] It is Jersey Shore's contention that the UPG data should have been used irrespective of the express agreements reached at this meeting.

412106v3

of virtually all progress payments from November, December and January until late February 2004. (Dec. ¶ 17). Subsequently, James Hutton, Divisional Vice President of Chugach, became involved and authorized payment of over $500,000.00 to Jersey Shore. (Dec. ¶ 17). Upon information and belief, Mr. Hutton was terminated by Chugach shortly thereafter. (Dec. ¶ 17).[4]

---

[4] The MSA provides that statutory interest shall be paid to subcontractors, like Jersey Shore, for late payments by the Contractor. Appendix at Exhibit 2, § 4.2.

412106v3

## IV.  ARGUMENT

### A..  <u>Standard Of Review</u>.

Defendants seek dismissal of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) or in the alternative Rule 56.  "To grant a 12(b)(6) motion, a court must determine that the moving party is entitled to relief under the reasonable reading of the pleading assuming the truth of all the factual allegations of the complaint." *Alexander v. Whitman*, 114 F.3d 1392, 1397 (3d Cir. 1997) (internal quotes omitted). The Court can only dismiss the matter if it is clear that no relief could be granted under the set of facts that could be proven consistent with the allegations. *Id.*

If, on a motion to dismiss under Rule 12(b)(6), matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and reviewed under Rule 56. *Fed. R. Civ. P. 12(b).* "A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).*[5] The court must view the underlying facts and all reasonable inferences therefrom in the light most favorable to the non-moving party. *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir. 1995).  Moreover, the court may refuse the application for summary judgment to permit discovery if it appears from the affidavits of the non-moving party that it cannot present by affidavit facts essential to justify the non-moving parties opposition to the motion. *Manchak, Jr., v. Rollins Environmental Services, Inc.,* 1996 WL 790100, at *4 (D.Del. 1996); citing *Fed. R. Civ. P. 56(f).*

---

[5] Pursuant to the Scheduling Order in this case, written discovery shall be completed by September 30, 2005. Thereafter, depositions may be taken. (D.I. 12).

412106v3

Applying these standards, Defendants' motion to dismiss and motion for summary judgment should be denied. A reasonable reading of the First Amended Complaint, which assumes the truth of the factual allegations, demonstrates unequivocally that Jersey Shore has sufficiently pled claims for breach of contract.[6] Additionally, even if this Court does consider matters outside the pleadings, despite the fact that deposition discovery has not commenced, there are genuine issues of material fact that preclude Summary Judgment. Alternatively, as set forth herein, Jersey Shore believes that further discovery will establish the existence of genuine issues of material fact that justify denial of Defendants' motion for summary judgment.

**B.    The Complaint States Cognizable Claims For Breach Of Contract Upon Which Relief Can Be Granted.**

Viewing the Complaint as a whole, in the light most favorable to Jersey Shore and accepting all well pleaded allegations, it plainly provides a basis for the Court to award damages to Jersey Shore due to Chugach's breach of the MSA.

MSA § 17 provides for the use of Alaskan law in interpreting the agreement.[7] The standard elements of a cause of action for breach of contract are the existence of a contract (offer, acceptance, consideration and mutual intent to be bound), Jersey Shore's performance or excuse for nonperformance, a breach by the defendant and damage to the plaintiff resulting from

---

[6] Jersey Shore also seeks relief in its Complaint through claims for quantum meruit, violations of the Delaware Prompt Pay Act and breach of implied covenant of good faith and fair dealing. Defendants' do not challenge the sufficiency of these claims in its Motion.

[7] The Miller Act does not replace generally accepted principles of commercial litigation, and in an action under the Act involving issues that do not require construction of the statute, such as ordinary contract issues, the proper law to apply is state law. *U.S. for Use of U.S. Steel Corp. v. Construction Aggregates Corp.*, 559 F.Supp. 414, 424 (E.D. Mich. 1983), judgment aff'd in part, rev'd in part on other grounds, 738 F.2d 440 (6ᵗʰ Cir. 1984); *Austin Elcon Corp. v. Avco Corp.*, 590 F.Supp. 507, 512 (W.D. Tex. 1984). Delaware courts and the District of Delaware generally honor choice of law provisions selected by contracting parties, so long as some material connection links the chosen jurisdiction to the transaction. *Suburban Trust and Sav. Bank v. University of Delaware*, 910 F.Supp. 1009, 1013 (D.Del. 1995); *Wilmington Trust Co. v. Wilmington Trust Co.*, 24 A.2d 309, 313 (Del. 1942); *Cooper v. Ross & Roberts, Inc.*, 505 A.2d 1305, 1306 (Del.Super.Ct. 1986). See Restatement 2d Conflict of Laws § 187 (1971). Because Alaska is the residence and principal place of business of Chugach (Counterclaim ¶ 1.) the material connection is satisfied. *Suburban Trust and Sav. Bank, 910 F. Supp. at 1013* (citing defendant's state of incorporation as satisfying connection).

defendant's breach. *Sykes v. Melba Creek Mining, Inc.*, 952 P.2d 1164, 1168 fn 29 (Alaska 1998); *see also, H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del.Ch. 2003)("Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff.") Jersey Shore has pled each of these elements. The existence of a contract as supplemented by the parties has been pled. Complaint ¶ 10; Answer ¶ 10. Jersey Shore has pled its performance of its obligations under the contract. See, e.g., Complaint 46. Jersey Shore has pled Chugach's breaches of the contract and the damages flowing therefrom. See, e.g., Complaint ¶ 54. Thus, as a matter of law, Jersey Shore has pled its breach of contract claim.

Nevertheless, Chugach asserts that Jersey Shore has failed to allege facts upon which a breach of contract may be predicated because no provision in the MSA created a duty by Chugach to Jersey Shore with respect to pricing of the contract between Chugach and the Government. Chugach mischaracterizes the nature of Jersey Shore's breach of contract claims. To the extent that Jersey Shore's claims rest on the terms of the SABER Contract (and that constitutes only a portion of Jersey Shore's claims of breach), it is on the basis that the terms and conditions of the SABER Contract were fully incorporated into the MSA. Appendix at Exhibit 2, MSA §§ 1.8, 16; *see also*, MSA at page 1.

It is undisputed that on May 19, 2004, Chugach and Jersey Shore entered into a contract for work at the DAFB, referred to as the MSA. Complaint ¶10; Answer ¶10. It is similarly indisputable that the MSA explicitly incorporated the terms of the SABER Contract and conditioned performance upon compliance with those terms. Complaint ¶¶10,11; OB p. 6; Appendix at Exhibit 2, MSA §§ 1.8, 16; *see also*, MSA at page 1.

412106v3

In determining the actual prices for a unit of work, including wage rates, the SABER contract utilized a formula that applied the RSMEANS database price for the unit of work performed multiplied by the City Cost Index Weighed Average Total for Dover, Delaware and the coefficient. *See* SABER Contract, Appendix at Exhibit 1. Because the RSMEANS database specifications and prices apply to a general area or industry, it is necessary to utilize the Unit Price Guide ("UPG") rates in setting the costs and practices for a specific location to ensure adequate compensation to the contractors performing the work. This step, which is called "localization," is critical to correct pricing under the SABER program. Complaint ¶ 26. See 48 C.F.R. 5336.9102.

In addition to the terms of the contract, Chugach consistently represented to Jersey Shore that the DO/NTP's issued under the MSA would be profitable to Jersey Shore. Complaint ¶¶ 22 and 29. (Dec. ¶ 5). Chugach also induced Jersey Shore to accept further work by agreeing on two separate occasions to correct its incorrect calculations of wage rates and to seek reimbursement for additional work performed by Jersey Shore. Complaint ¶¶ 36-48. (Dec. ¶¶ 8,9).

Chugach breached the MSA standing alone and as supplemented by the parties by:

1) forcing Jersey Shore to perform work beyond the scope of work set forth in the DO/NTP's provided to Jersey Shore. Complaint ¶¶ 30-34;

2) refusing to pay change orders and/or refusing to submit the change orders to the United States Government for payment to correct its errors as it agreed. Compl ¶ 35;

3) improperly coercing Jersey Shore to complete work by threatening to withhold payments that were lawfully due to Jersey Shore. Compl.¶ 35;

412106v3

4) agreeing to correctly apply to the United States Government to add skilled laborers to the existing wage rates classifications and to utilize the UPG rates to reflect local conditions in all future estimates provided to the Government and to seek compensation for the inadequate RSMEANS wage rates used but failing to perform as agreed. Complaint ¶ 37; See Dec. ¶ 14; and

5) agreeing to modifiy the terms of the MSA to require Chugach to pay a coefficient of 1.02 of the final line items, to use the UPG in its estimates, and to negotiate additional funds to offset the inadequate price structure used on Delivery Order Nos. 5000 and 5001 but failing to do so. Complaint ¶¶ 41,42; Exhibit B to Complaint; See Dec. ¶ 10.

Jersey Shore is entitled to all damages that flow from Chugach's breaches of the MSA as amended, including but not limited to, adjustment of the contract price to correct the erroneous wage rates and payment for the work performed by Jersey Shore that exceeded the scope of DO/NTPs upon which Jersey Shore relied.

### C..    The Terms Of The MSA Required The Use Of The Wage Rates Contained In The SABER Contract.

Defendants contend that the MSA somehow does not create a contractual, quasi-contractual or other obligation for Chugach to pay Jersey Shore the wage rates determined by the SABER Contract. OB p. 11. Defendant's contention is belied by the terms of the MSA and would render the terms of the MSA meaningless.

Under well established Alaskan law, the goal of contract interpretation is to give effect to the parties' reasonable expectations. *Matanuska Elec. Ass'n, Inc. v. Chugach Elec. Ass'n, Inc.*, 99 P.3d 553, 562 (Alaska 2004); *Stepanov v. Homer Elec. Ass'n, Inc.*, 814 P.2d 731, 734 (Alaska 1991).The intentions of the parties are assessed by examining the language of the disputed provisions, the language of other provisions, relevant extrinsic evidence, and case law

412106v3

interpreting similar provisions. *Mitford v. de Lasala*, 666 P.2d 1000, 1005 (Alaska 1983). Extrinsic evidence is always admissible to interpret a contract even where the language of the agreement is otherwise unambiguous. *Matanuska Elec. Ass'n, Inc. v. Chugach Elec. Ass'n, Inc.*, 99 P.3d 553, 562 (Alaska 2004); *Alyeska Pipeline Service Company v. O'Kelley*, 645 P.2d 767, 771 n. 1 (Alaska 1982).

In reaching a reasonable interpretation of a contract, Alaskan courts attempt to give effect to all of its terms, if possible. *Id.* Disputed language is considered within the context of the whole contract and its purposes, and the circumstances surrounding its formation. *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 383 (Alaska 2004). Further, "[a] court should not interpret an agreement in a manner which would give meaning to one part of an agreement at the cost of annulling another part." *Betz v. Chena Hot Springs Group*, 657 P.2d 831, 835 (Alaska 1982); *see also Earth Movers of Fairbanks, Inc. v. State, Dep't of Transp. and Pub. Facilities*, 824 P.2d 715, 717-18 (Alaska 1992).[8] And where as here, Chugach drafted the MSA. The MSA must be construed against it. *DeCristofaro v. Sec. Nat'l Bank*, 664 P.2d 167, 169 (Alaska 1983).

A review of the MSA demonstrates that the parties not only intended to be bound be the specified terms contained in the agreement but also by the terms of the SABER Contract. The MSA provides that "[b]y way of this Agreement, clauses contained in the Prime Contract [between Chugach and the US Government] are incorporated into this Master Agreement and Subcontractor is obligated to Contractor in the same manner that Contractor is obligated to the Owner." MSA, Part II, Section 1.8; OB at 6. Thus, the parties intended to be bound by, among other things, the wages rate formulas contained in the SABER Contract.

---

[8] Similarly, Delaware courts have consistently held that an interpretation that gives effect to each term of an agreement is preferable to any interpretation that would result in a conclusion that some terms are useless or repetitive. *Warner Communications Inc. v. Chris Craft Industries, Inc.*, 583 A.2d 962, 971 (Del. Ch. 1989); *aff'd* 567 A.2d 419 (Del. 1989). Contracts are to be interpreted in a way that does not render any provisions "illusory or meaningless." *Sonitrol Holding Co. v. Marceau Investisements*, 607 A.2d 1177, 1183 (Del 1992). .

The SABER Contract provides that all pricing must use a formula that included identifying the RSMEANS database cost for the unit of work multipled by the City Cost Index Weighed Average Total for Dover, Delaware and the coefficient. See SABER Contract, OB at Appendix Exhibit 1. Because the RSMEANS database specifications and prices apply to a general area or industry, it is necessary to utilize the Unite Price Guide ("UPG") rates in setting the costs and practices for a specific location to ensure adequate compensation to the contractors performing the work. This step, which is called "localization," is critical to correct pricing under the SABER program. Complaint ¶ 26. See 48 C.F.R. 5336.9102. Additionally, the SABER Contract requires that all subcontractors pay wages for labor in accordance with the Davis-Bacon Act. SABER Contract p. 19. The wages required to be paid under the Davis-Bacon Act were established by the Department of Labor in General Decision Number DE020009 and DE030009. See Attachment 4A to SABER Contract. Despite Defendants' claims, the parties and the MSA contemplated the use of the SABER Contract wage rates.[9]

Defendants further argue that the MSA and the DO/NTPs dispel any notion of a contractual obligation arising out of the SABER Contract pricing running between Chugach and Jersey Shore because they make no mention of the pricing formula; that the MSA was a lump-sum agreement, the MSA and DO/NTPs do not and cannot annul the requirements of the Davis-Bacon Act; and that to the extent that a relationship is created it runs the other way—from Jersey Shore to Chugach. OB p. 12. Again, Defendants contentions are belied by the terms of the documents and by the subsequent supplementation of the MSA.

---

[9] Because the MSA provided a direct contractual obligation for the parties to use the SABER Contract wage rates, Jersey Shore does not address Defendants claims that it did not have an implied contractual relationship with Chugach or that it was a third party beneficiary. However, it is true that Chugach necessarily owed Jersey Shore an implied obligation and Jersey Shore was a third party beneficiary to the SABER Contract wage rates as a subcontractor pursuant to the terms of the MSA. See SABER Contract, Appendix at Exhibit 2. See *Western Waterproofing Co., Inc. v. Springfield Housing Authority*, 669 F.Supp. 901, 905 (C.D.Ill. 1987)

412106v3

First, the MSA does mention the use of the SABER Contract wage rates under section 1.8. As noted above, section 1.8 states that "Prime Contract shall mean those agreements between Owner (United States Government) and Contractor (Chugach)." By way of this Agreement, clauses contained in the Prime Contract are incorporated into this Master Agreement and the Subcontractor is obligated to Contractor in the same manner that Contractor is obligated to the Owner. See MSA § 1.8, Appendix at Exhibit 2. Thus, Jersey Shore was obligated to use SABER Contract wage rates in its billings to Chugach as Chugach was required to use these wage rates in its estimates provided to the United States Government. *See* SABER Contract, Part I. In addition, the MSA specifically incorporates the contract clauses of the SABER Contract as part of the agreement. *Id.* ("Part III includes the contract clauses which are incorporated in the contract for the Simplied Acquisition Base Engineering Requirement Number F07603-03-D-002, by and between the United States of America, as owner, and Chugach Support Services, as Contractor, awarded on February 21, 2003, hereinafter referred to as Prime Contract."). Therefore, the contract clauses, including the wage rates in the SABER Contract are specifically incorporated into the MSA.

Conversely, the DO/NTP does not reference the wage rates to be used under the MSA because the DO/NTPs are simply orders authorizing the subcontractor to perform a specific scope of work for a specific price. See MSA, Part II, Section 1.5, Appendix at Exhibit 2. Instead, the DO/NTPs reference to the MSA for all governing terms and conditions between the parties. See DO/NTP dated November 12, 2003, Appendix at Exhibit 3 (stating "This Delivery Order with Notice to Proceed is issued in accordance with and subject to the terms and conditions of the subject Master Subcontractor Agreement."). As the MSA incorporates the SABER Contract wage rates, so do the DO/NTPs.

412106v3

Second, although both the MSA and the SABER Contract are nominally referred to as fixed price contracts, they are based upon established variables that include wage rates. These variables are established by RSMEANS, City cost index weighted average total, coefficients, and the UPG.[10]    As noted in the Air Force Guide, Simplified Acquisition of Base Engineer Requirements (SABER), a "SABER contract" generally means a fixed-price, indefinite-delivery/indefinite-quantity (IDIQ) contract."). *See* Air Force Guide, Simplified Acquisition of Base Engineer Requirements (SABER), 48 C.F.R. § 5336.9102.    Similarly, the MSA incorporates the contract clauses of the SABER Contract.    Yet although they are nominally labeled fixed price contracts, the pricing is dependent upon many variables established in the RSMEANS database multiplied by set figures in the City Cost Index Weighed Average Total for Dover, Delaware , the UPG and the coefficient. *See* SABER Contract, Appendix at Exhibit 1.

Third, Jersey Shore does not argue that the MSA and DO/NTPs annul or supercede the Davis-Bacon Act.    In fact, both the MSA and DO/NTPs required Jersey Shore to pay wages in accordance with the Act.    That is one reason why Chugach's suggestion that the MSA does not incorporate the SABER wage rates makes no sense.    It is inconceivable that Jersey Shore would knowingly violate the Davis-Bacon Act when it was clearly obvious from all documents involved with the project that it had to pay wages in accordance with the Act.    Chugach utilized the wrong formula for calculating the wage rates by failing to include the UPG to localize the rates and now seeks to escape the consequences of its mistake.    Chugach as much as concedes that it has done so, but insists that Jersey Shore bear the loss of its mistake.

Furthermore, although Jersey Shore concedes that the terms of the MSA indicate that the terms apply from Jersey Shore to Chugach, if the terms did not apply from Chugach back to

---

[10]    Defendants incorrectly refer to them as lump sum contracts.  They are not lump sum contracts but instead fixed fee contracts based upon variables contained in the SABER Contract. *See* SABER Contract, Appendix at Exhibit 1.

412106v3

Jersey Shore relative to the wages rates the MSA would be void.  Nowhere in the MSA does it establish wage rates, except as incorporated in the SABER Contract.  It has been long held in Alaska that a contract is void unless it is founded on valid consideration.  *See, Magill v. Nelbro Packing Co.,* 43 P.3d 140, 141 (Alaska 2001).  Under Chugach's theory, the MSA fails to provide any consideration for Jersey Shore's promise.  Such a contract is void.

Equally important for the present motion, Chugach's argument that the DO/NTPs created lump-sum, all inclusive prices that were not altered and could not be altered by the Memo or other understandings of the parties is wrong as a matter of fact and law.  First, the amendment to the MSA took place prior to the DO/NTP's being issued and accepted by Jersey Shore for the work in issue, except for the first Delivery Order.  (Dec. ¶ 9).  Thus, Chugach could have but chose not to comply with its agreement reflected in the Memo.

Notably, Chugach cites only Delaware case law on the Parol Evidence Rule.  *See* OB at 18-19.  Under applicable law, however, the modified pricing arrangements between the parties are properly considered by the Court.  "In interpreting a contract, the object is to give effect to the reasonable expectations of the parties." *Peterson v. Wirum,* 625 P.2d 866, 872 n. 10 (Alaska 1981).  Under Alaskan law extrinsic evidence is always admissible to interpret a contract.  *Matanuska Elec. Ass'n, Inc. v. Chugach Elec. Ass'n, Inc.*, 99 P.3d 553, 562 (Alaska 2004)*; Alyeska Pipeline Service Company v. O'Kelley,* 645 P.2d 767, 771 n. 1 (Alaska 1982).  The Parol Evidence rule does not apply in Alaska to bar admission of evidence of the meaning of a contract:

> The parol evidence rule is a rule of substantive law which holds that an integrated written contract may not be varied or contradicted by prior negotiations or agreements.  Before the parol evidence rule can be applied, three preliminary determinations must be made: (1) whether the contract is integrated, (2) what the contract means, and (3) whether the prior agreement conflicts with the integrated agreement.  *Alaska Northern Dev., Inc. v. Alyeska*

*Pipeline Serv. Co.*, 666 P.2d 33, 37-40 (Alaska 1983), cert. denied, 464 U.S. 1041, 104 S.Ct. 706, 79 L.Ed.2d 170 (1984). Extrinsic evidence may always be received on the question of meaning. *Alyeska Pipeline Serv. Co. v. O'Kelley*, 645 P.2d 767, 771 n. 1 (Alaska 1982). Once the meaning of the written contract is determined, however, the parol evidence rule precludes the enforcement of prior inconsistent agreements. *Alaska Northern*, 666 P.2d at 37.

*Still v. Cunningham,* 94 P.3d 1104, 1109 (Alaska 2004) *citing Alaska Diversified Contractors, Inc. v. Lower Kuskokwim School District*, 778 P.2d 581, 583-84 (Alaska 1989) (footnotes omitted) (emphasis added).

Chugach can establish none of these "three preliminary determinations" as a matter of law. Chugach cannot establish that the contract between the parties was integrated. The DO/NTP's are not stand alone contracts. Each DO/NTP was explicitly premised upon the terms of the MSA incorporating the SABER Contract. *See e.g.*, DO/NTP NO. 5001, ¶ 1 (Appendix, Exhibit 3A)(" ... issued in accordance with and subject to the terms and conditions of the subject Master Subcontract Agreement."). Further, the integration clause included in the MSA specifically references numerous other documents constituting a part of the parties agreement and explicitly permits subsequent amendments. MSA § 16. Nor can Chugach establish as a matter of law the meaning of the DO/NTPs pricing without reference to the MSA and the SABER Contract or without introduction of extrinsic evidence. *Still v. Cunningham, supra.* Not having established the integration of the contract or its meaning, Chugach's evaluation of any conflict between the DO/NTP's and the extrinsic evidence is unnecessary.

Under well established Alaskan substantive law, Jersey Shore is free to introduce evidence relating to the agreement reached by the parties which is memorialized in the Memo. *Id.* Accordingly, at best, Chugach has merely raised an issue of fact concerning the parties' intentions for which summary judgment is inappropriate under Alaskan law. *See Rockstad v.*

412106v3

*Erikson,* 113 P.3d 1215, 1219 (Alaska 2005)("[t]he intent of the parties when entering a contract is a question of fact …").

### D.    Jersey Shore Has Been Damaged By Chugach's Failure To Timely Pay And Failure To Process Change Orders.

Chugach's motion to dismiss Jersey Shore's claims relating to Chugach's failure to process invoices in a timely fashion and failing to issue change orders is without basis in the Federal Rules of Procedure.  Chugach asserts that Jersey Shore has failed to produce in its initial disclosures under Fed. R. Civ. P. 26(a) a claim for damages relating to late payment or the failure to issue change orders.   Jersey Shore has served Chugach with its First Amended Initial Disclosures, completely mooting this issue.

Chugach failed to pay Jersey Shore in a timely fashion even on those invoices which Chugach elected to pay.  That Jersey Shore was damaged by these delays is beyond question. The rate of interest payable to Jersey Shore for Chugach's failure to comply with the payment terms of the MSA is established in the MSA at section 4.2.  The rate is that specified by the Secretary of the Treasury under Section 12 of the Contract Disputes Act of 1978 (41 U.S.C. § 611).  This rate is currently set at 4.5%.  70 F.R. 38253, July 1, 2005.  Moreover, Jersey Shore has actual damages in excess of $48,000 for interest paid on obligations incurred in connection with the MSA due to Chugach's failure to pay as required by the MSA.

Even assuming that Jersey Shore's initial disclosures failed to comply with the terms of Rule 26(a), a point Jersey Shore does not concede, Chugach's remedy is not by motion to dismiss. Fed. R. Civ. P. 37 (a)(2)(A) sets forth the appropriate remedy.

Moreover, only in rare cases does a failure to make an initial disclosure result in exclusion of the withheld evidence.  See, *Szusterman v. Amoco Oil Co.*, 112 Fed.Appx. 130, (3d Cir. 2004); *Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863, 868 (3d Cir.1984) ("In

exercising our appellate function to determine whether the trial court has abused its discretion in dismissing, or refusing to lift a default, we will be guided by the manner in which the trial court balanced the following factors, which have been enumerated in the earlier cases, and whether the record supports its findings: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense."). Typically, this exclusion of evidence occurs only when subsequent full disclosure on the issue in discovery is also lacking. This is not a case where an application of the cited factors demands the exclusion of evidence of Jersey Shore's damages. In fact, the parties are still engaged in written discovery and are precluded by the scheduling order to take deposition discovery until after September 30, 2005. Chugach has suffered no prejudice at this early stage in the proceedings.

**E.    Chugach Has Violated The Prompt Pay Act.**

In an to attempt to avoid its obvious violation of the Delaware Prompt Pay Act ("Prompt Pay Act"), Chugach contends that Jersey Shore suffered no injury and seeks no damages so the claim should be dismissed. OB at 17. Defendants are incorrect in their assertion. As noted in the Complaint, Jersey Shore was damaged in the amount of $1,384,879.73 due to Chugach's violation of the Delaware Prompt Pay Act. Complaint ¶ 87. In addition, Jersey Shore has expended substantial amounts of money in paying legal costs to prosecute its rights and incurred finance charges as a result of financially carrying the project. And, Jersey Shore is entitled to statutory interest on the last payments. Even assuming Jersey Shore did not suffer any injury or

damage, which it clearly has, Chugach's action nonetheless constitute a violation of the Prompt

Pay Act.

The Prompt Pay Act provides that "[a]ll money or funds received by a contractor in

connection for the erection, construction, completion, alteration or repair of any building or for

additions to a building . . . shall be trust funds in the hands of the contractor." 6 *Del. C.* § 3502;

See, *Maull v. Stokes*, 68 A.2d 200, 202 (Del.Ch. 1949) (construing previous statute). "No

contractor, or agent of a contractor, shall pay out, use or appropriate any moneys or funds

described in § 3502 of this title until they have first been applied to payment of the full amount

of all moneys due and owing by the contractor to all persons (including surveyors and engineers)

furnishing labor or material . . ." 6 *Del. C.* § 3503. A failure by the contractor to pay or cause to

be paid, in full or pro rata, the lawful claims of all persons or companies who furnishing labor or

material within 30 days after receipt of any moneys received in the connection with a project

shall be prima facie evidence of a violation of the Prompt Pay Act. 6 *Del. C.* § 3504. If

litigation is commenced to recover payment under the Prompt Pay Act and it is determined that

the contractor has failed to comply with the terms of the Act, the court shall award damages due

equal to the amount that is determined by the court to have been wrongfully withheld plus

reasonable attorneys fees, costs and expert witness fees. 6 *Del. C.* § 3509(a).

Moreover, Delaware Courts have found the purpose of Section 3503 to be "primarily for

the protection of sub-contractors working on a project." *Petenbrink v. Superior Home Builders,

Inc.*, 1999 WL 1223786, *4 (Del. Super. 1999). (Attached hereto as Exhibit "C").

Chugach's failure to pay the invoices submitted by Jersey Shore irrespective of its

incorrect calculation of wage rates and for work not included in the DO/NTPs within 30 days of

their submission or to timely dispute the invoices, is prima facie evidence of violations of the

Prompt Pay Act. Complaint ¶¶ 31-56; 80-89.  As a result of Chugach's actions, Jersey Shore has

not received payments totaling $1,516,879.73 plus interest, attorneys fees and cost.

###### F.    Chugach's Oral Modifications Of The MSA Are Enforceable.

In a telling turn of events, Defendants attempt to avoid Chugach's recognition of its

errors through oral modifications it agreed to by arguing against itself.  Defendants argue that the

oral modifications could not be binding upon the parties because the terms were impossible for

Chugach to perform.  OB at Supp. p. 19.  Defendants argue further that "[a]ll pricing had to be in

strict compliance with the SABER Contract."  *Id.*  This is a marked change of theory by Chugach

which vehemently argues that the MSA could not incorporate the pricing terms of the SABER

Contract.  OB p. 10-17; OB at Supp p. 16-18.  Defendants also argue that the incorporation

provision of the MSA only work one way—from Jersey Shore to Chugach.  Based upon

Defendant own arguments, this contention must fail.

Despite Defendant's shifting positions, the MSA specifically allows the parties to modify

the terms of the MSA to increase or decrease the costs, irrespective of the terms of the SABER

Contract.  The MSA provides that "[i]f any Change causes an increase or decrease in the cost of,

or time required for their performance of any part of the Work, whether changed or not,

Subcontractor's compensation, the period of performance, or both, shall be adjusted in

accordance with changes in the Delivery Order or Prime Contract, and the Delivery Order with

NTP shall be modified in writing accordingly."  See MSA, Part II, Section 10, Appendix at

Exhibit 2.  In fact, when it suited Chugach, modifications to the SABER Contract were affected.

See, e.g., Appendix at Exhibit 4 [CSS 001069-001093].

Expressly amending the MSA to insure that the UPG rates as called for in the MSA

and/or obtaining additional compensation for the work would not violate federal law or be

impossible of performance in any respect. The MSA amendment did not require that Chugach defraud the government. Rather it expressly set forth the cost of work between the parties. Chugach's contractual obligations under the SABER Contract with the government remain unchanged. Chugach could have, but did not, increase the costs of its estimates to the government to affect the pricing change in the DO/NTP's. Chugach simply elected not to do so.

G.    **The Amendment In The Pricing Is Not Deemed Illusory Simply Because Defendants Would Have To Pay More To Jersey Shore.**

Defendants next argue that even if Chugach did agree to expressly acknowledge the pricing terms of the MSA, which it did, the agreement would be illusory because the SABER Contract detailed the amount the United States Government would pay for the work. OB at Supp p. 20. This argument is similarly flawed. A contract term does not become illusory simply because a party will have to pay more out of their own pocket. Compare, *Barry v. University of Alaska,* 85 P.3d 1022, 1026 (Alaska 2004). Clearly, despite the figures it paid or agreed to pay Jersey Shore, Chugach was still making a profit under the terms of the SABER Contract. The fact that they agreed to disgorge some of those profits to rectify their mistakes in the DO/NTPs and to obtain agreements for Jersey Shore to perform future work does not make the agreement illusory. *See* Restatement 2d Contracts § 2, comment e; Restatement 2d Contracts § 73.

Moreover, Chugach merely needed to use the UPG rates with the concomitant increase in the cost of estimates presented to the government to obtain adequate pricing for the work as contemplated by the SABER contract scheme and the MSA. By way of example, by using the UPG carpenter rate of $54.58 per hour rather than the $31.55 per hour provided in RSMEANS , Chugach could have, but did not seek, additional funds for the project.

412106v3

**H.    The Amendment Did Not Require Defendants To Defraud The United States Government But To Pay More Of Their Share Of The Profits Or To Obtain Adequate Compensation For The Work.**

Defendants next argue that the amendments to the MSA would have caused Chugach to commit fraud upon the United States Government which is against the law.  OB at Supp. p. 20. Again, this argument cuts against Defendants previous argument that the MSA did not and could not incorporate the terms of the SABER Contract.  OB p. 10-17; OB at Supp p. 16-18.  If the MSA did not incorporate the wage rates of the SABER Contract, the parties could not be defrauding the United States Government.  Chugach cannot have it both ways.

Despite the problems of aligning Defendants arguments, the amendments which expressly clarified the terms of the MSA in no way sought to defraud the United States Government.  Nowhere in the Memo does it suggest that Chugach was supposed to or intended to submit the new wage rates to the United States Government for payment retroactively. Instead, the Memo contemplates, *inter alia*, that Chugach will pay the new wage rates either from the profits that it has earned on the job, despite what it received from the United States Government, or increase its estimates on subsequent work to reflect local conditions as contemplated by the UPG.

**I.    The Agreements Made By Jersey Shore Are Enforceable.**

It is clear from a review of the MSA that it incorporated the wage rates of the SABER Contract.  The SABER Contract utilizes the UPG to localize the task specifications and pricing to reflect costs in a specific location ("localization").  *See* 48 C.F.R. § 5336.9120.  Therefore, it is not only plausible but in fact correct that Chugach's failure to use the UPG to localize the wage rates  used at the DAFB is a breach of the MSA standing alone and clearly a breach of thte MSA as supplemented by the parties.

412106v3

Despite Chugach's statements to the contrary, it made perfect sense for Chugach to agree to the amended terms of the MSA. The SABER Contract specifically provided a timeline for completion of all work. If the work was not performed within the timelines, Chugach was subject to liquidated damages. Chugach knew that it did not have the resources to perform the work itself nor the time to find another subcontractor to perform the work. Consequently, Chugach agreed to amend the MSA and pay Jersey Shore some of its profits or seek increased compensation from the government in order to avoid having to pay liquidated damages. Furthermore, the SABER Contract was based upon one year renewable option periods. If Chugach did not complete work on time, it risked having its SABER Contract terminated which could cost Chugach millions of dollars. Finally, it is a possibility Chugach agreed to the amendments simply to have Jersey Shore continue work with no intention of paying the amended rates. Thus, it is completely plausible that Chugach agreed to modify the terms of the MSA to avoid risking losing millions more.

In any event, whether the amendment was agreed to by Chugach and/or whether its agreement is enforceable under Alaskan law is ultimately a question of fact for which summary judgment is unavailable. Jersey Shore is entitled to present all of its evidence relating to the MSA and subsequent amendments thereto. *See Rockstad v. Erikson,* 113 P.3d at 1219.

### J.     Jersey Shore Is Unable To Present All Facts To Oppose The Motion Without Further Discovery.

Defendants challenge Jersey Shore's contention that the intention of the parties was to pay wages based upon the RSMEANS database plus the UPG to localize the rates. OB p. 9. Defendants also dispute that Chugach ever agreed to correct the payment of wages and use the RSMEANS rates plus UPG for localization when the error was brought to its attention. OB p. 9. This alone creates genuine issues of material fact. However, in order for Jersey Shore's to

412106v3

completely demonstrate these two critical points, Jersey Shore should be entitled to further limited discovery including deposing current and former employees of Chugach. See attached affidavit. Through this discovery, Jersey Shore will be able to fully demonstrate that Chugach agreed to the above noted wage rates and agreed to prospectively submit estimates that did utilize the proper wage rates, i.e., UPG.

Rule 56(f) should be liberally construed to permit a party defending a motion for summary judgment (or as here a Rule 12(c) motion involving matters in addition to the pleadings) a full opportunity to discover facts necessary to make a complete record. *See* 11 Moore's Federal Practice 3d, 56.10[8][a]. Where necessary facts are in the possession of the party moving for summary adjudication, a Rule 56(f) motion for discovery should be granted "almost as a matter of course." *See Miller v. Beneficial Management Corp.,* 977 F.2d 834 (3d Cir. 1992); *Costlow v. United States,* 552 F.2d 560, 564 (3d Cir.1977)); *Sames v. Gable,* 732 F.2d 49, 51 (3d Cir.1984) (reversing grant of summary judgment while answers to certain discovery requests remained outstanding).

Jersey Shore has not had the opportunity to depose any of the Chugach employees who were decision-makers vis-à-vis the SABER Contract or the MSA. As indicated above, through its discovery Jersey Shore anticipates that it will be able to fully demonstrate that Chugach agreed to the above noted wage rates and agreed to correct the invoices that did not utilize these wage rates. The opportunity for full discovery should be afforded before any decision on summary judgment is made.

412106v3

## V.    CONCLUSION

For all the foregoing reasons, Plaintiff, Jersey Shore Automation, Inc., respectfully requests that the Court deny Defendant's Motion to Dismiss in Part or for Partial Summary Judgment in this case.

CONNOLLY BOVE LODGE & HUTZ LLP

_/s/ James D .Heisman_
James D. Heisman (# 2746)
M. Edward Danberg (# 2245)
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE 19899
(302) 658-9141
_Attorneys for Plaintiff Jersey Shore_
_Automation, Inc._

Dated:  August 24, 2005

412106v3

## CERTIFICATE OF SERVICE

I, James D. Heisman, hereby certify that on this 24th day of August, 2005, I caused a true and correct copy of the foregoing **Plaintiff's Answering Brief in Opposition to Defendants' Motion and supplemental Brief to Dismiss in Part, or in the Alternative for Partial Summary Judgment** to be served upon the following individuals in the manner indicated below:

*Via efile and hand-delivery*
Edmund D. Lyons, Jr., Esquire
The Lyons Law Firm
1526 Gilpin Avenue
Wilmington, DE 19806

*Via efile*
Harvey A. Levin, Esquire
Birch, Horton, Bittner and Cherot
115 Connecticut Ave., N.W.
Suite 1200
Washington, DC 20036


_____ */s/ James D. Heisman* _____
James D. Heisman (# 2746)