# EXHIBIT





Login | Register

Back to: Home > Links > Successful Estimating Methods Excerpt

**Products**
Bookstore Home
Cost Data
Reference Books
Seminars
DemoSource
Insurance

**Online Tools**
QuickCost
Calculator
CustomCost
Estimator
Project Reporting
Construction
Dictionary
Links

**Services**
Consulting
Trade Sales

**RSMeans**
Contact Us
About Us
Help / FAQ
Login
Register

Click here to make
this your home page
Click here to
bookmark this page
Printer-friendly
version of this page

**Order The Book**

**Successful Estimating Methods from Concept to Bid**
**John D. Bledsoe PhD, PE**
Learn the best and latest estimating techniques. A highly practical, all-in-one guide to the tips and practices of the successful estimator.
Price (USD): $64.95
Order now!
Or phone 1-800-334-3509

*Excerpted from RSMeans' book "Successful Estimating Methods: From Concept to Bid"*
**Chapter One**

# Types of Estimates, Tools, Data Sources, Methods

A sound understanding of the common types of estimates, tools for estimating, data sources, and methods of estimating forms the basis for more sophisticated estimating concepts. To the novice, this chapter presents the fundamentals of estimating as it is practiced in construction today. For the construction professional, the chapter serves as a review of effective methods. The remainder of Part I is an expansion of the introductory information presented here.

### Types of Estimates

Estimators typically perform at least five different types of estimates, depending on their employer and position. These include preliminary or ballpark estimates, square foot estimates, assembly or conceptual estimates, contractor's bid estimates, and engineer's or owner's estimates. Although these types are generally known by these terms, there are not always clearly defined boundaries between each type. Figure 1.1 shows the general progression from the least to the most accurate estimating types.

Cost analyses for alternative construction methods and materials, and change order and claim estimates are two special types of estimates not shown in Figure 1.1. Life cycle cost analyses, value engineering, and uncertainty analyses are additional types that do not fit the generalized picture. Each of these will be treated in later chapters.

### Preliminary Estimates

Early in the planning stages of a project, both owners and designers need, and often demand, an indication of the cost of the project at completion. Since the project has not yet been designed, estimates prepared at this time have a low expectation of accuracy. Names sometimes used to describe such estimates include preliminary, ballpark, blue sky, seat-of-the-pants, and order of magnitude. One of the important purposes of these preliminary estimates is to provide information to an owner or client so that a decision can be made to proceed with the project. Preliminary estimates are often made in less than two hours. The expected accuracy is no better than within 20-30%.

Project comparison is a method of preparing preliminary estimates when cost data for comparable completed projects is available. If the comparison project differs substantially in size, adjustments need to be made for the economy of scale. Chapter 2 addresses preliminary estimates in detail.

### Square Foot Estimates

Square foot estimating is another method of developing a preliminary estimate based on historical data. This technique is effective in preparing advanced preliminary estimates when features of the proposed project are known, but not yet designed. To use this method, it is only necessary to know the type of building or facility and the proposed number of square feet. Other unit measures such as the number of beds for a hospital, or number of spaces for a parking garage are sometimes used instead of square feet, but the basic method for determining these estimates is the same. Annual cost data

RSMeans
MarketPlace

**The Jobclock**
The Contractor's
Timeclock. Portable,
Rugged and W...

**Excavation
Software**
EarthWorks.
Affordable and easy-
to-use excavation ...

**Construction
Industry Software**
Directory of
construction industry
software produc...

**Bid4Build
Construction
Estimating
Software**
Bid4Build is one of
the most advanced,
easy to use...

**Used Heavy
Equipment**
Buy and Sell. Search
distributor inventory
nationw...

Buy a link now

books are published that provide square foot and other unit costs for a variety of buildings. Square foot estimates are further discussed in Chapter 3.

### Assembly, Conceptual, or Intermediate Estimates

|Assemblies| are groups of the work of several trades combined into a single cost element. For example, construction of a bathroom may require work by plumbers, electricians, tile setters, and carpenters. The assembly cost includes the cost of participation from each trade, including materials. Publishers of cost data produce books and computerized data tabulating assemblies costs that can be used in intermediate or conceptual cost estimates. |Systems| is another term sometimes used for the grouping of cost data into a single estimating unit. See Chapter 4 for a more detailed discussion of the assemblies method.

Assemblies costing is also used in detailed unit price estimates where they may be referred to as Work packages|work packages.| Here, each contributing trade cost is fine-tuned to the local area and type of project. This is a powerful tool that both saves time and improves accuracy for companies doing repetitive work on the same types of projects. A detailed discussion of the preparation and use of this type of assembly for unit price estimating is given in Chapter 7.

### Final Estimate Types

Final detailed estimates can be prepared when the design and contract documents have been completed, or are essentially complete. Generally two types of final estimates are prepared; one by the contractor intending to bid the project, and the other for the owner's use in preparing budgets and evaluating bids for the project. The estimate prepared for the owner is called the |Engineer's Estimate| when the owner is a public agency, and is almost always required for bid comparisons. The owner's estimate is optional for privately funded projects. The major difference between a contractor's bid estimate and an engineer's estimate lies in the information the two estimators have at their disposal. As reviewed in the Introduction (Figure I.1) the Estimatorcontactor\scontractor's estimator normally has much more detailed information at his disposal. The engineer's estimator is forced to rely on more general information, since he does not know which contractor will receive the award and construct the project.

In either case, the final estimate must be as accurate as possible, since it represents the money that will be received or spent when the project is actually constructed. Three methods are often used for these final estimates: unit price estimates, schedule estimates, and previous bid tabulations. These will be discussed later in this chapter.

#### Contractor's Bid Estimates
Contractors competing for work submit firm bids, stating the amount of money they will require to perform the work if awarded the contract. When a contractor receives the award for the work, the bid they submit becomes part of the contract documents and is legally binding. For this reason, contractor's bid estimates receive more attention than most other bid types.

Contractor's estimators use a variety of methods to produce their bids: some use spreadsheets, others use specialized estimating software. Estimators preparing bids for government or municipal authority heavy construction projects may combine the proposed project schedule and the estimate, since meeting the scheduled completion date is often required by the contract.

Regardless of the method the estimator chooses, they all have one thing in common: Utmost attention must be paid to every detail, and multiple checks are necessary to ensure that no item of work is omitted or duplicated. (Chapter 6 covers this type estimate in more detail.)

#### Engineer's or Owner's Estimate

Engineer's or owner's estimates are used both as a basis to evaluate contractor's bids and to provide the owner with the budget needed to pay for the construction project. Most construction administrators believe that the engineer's estimate should not match the low bid, but should fall somewhere between the second and third bidders. An analysis of historical data bears this out. Approximately 235 bid openings were analyzed where both the engineer's estimate and the low bid were known (based on bid tabulation data published in Engineering News Record over a period of about eight years). Figure 1.2 is a histogram showing the distribution of the percent deviation of the low bid from the engineer's estimate. A statistical analysis of the data suggests that the average low bid is 7.6% below the engineer's estimate. These results agree with a comprehensive analysis of engineer's estimates in Europe, Canada, and the United States prepared by Dr. Martin Skitmore of the University of Salford, UK, |Factors Affecting Accuracy of Engineers' Estimates.

Dr. Skitmore's analysis shows that low bids generally fall between 5% and 15% below engineers' estimates. Individual estimators' accuracies range from 8% to 16%, with standard deviations ranging from 9% to 31%. These results support the belief that engineer's estimates are simply not as accurate as those prepared by contractors for bidding purposes. As shown in the introduction, the engineer's, or owner's, estimator is not privy to the detailed information held by the contractor.

### Alternative Analyses

There is usually more than one way to accomplish any given construction task. Alternatives of construction methods, crew, equipment, and material often need to be evaluated to determine which is least expensive, or best matches the project or company objectives. This process should be considered an exciting opportunity rather than a burden. Industry progress can only occur through the adoption of more efficient or more effective methods and materials. In order to test an innovative method on an actual project, however, detailed cost and performance predictions are almost always required to persuade management.

### Change Orders and Claims Estimates

Changes in construction projects are inevitable. No matter how well planned a project may be, there are always a certain number of changes. Each change, whether proposed by the owner or the contractor, requires documentation, negotiation, and an agreement on cost and schedule. The contractor's estimator may provide the cost and schedule projections for the change order proposal, or, as is often the case, the project manager is charged with this task. Here's where the architect or engineer's estimator steps in again to analyze the contractor's change order proposal to decide whether it is "fair and reasonable" within the context of the contract. Chapter 16 provides additional detail on change order and claims estimating.

### Estimating Tools

The rapid development of microcomputers, associated cost estimating and project management software, and accessories such as digitizers and plotters, has made a major impact on construction estimating. Estimating technology has advanced significantly in four areas: quantity survey or Estimatingtoolstakeoff, estimating software, computerized data bases, and availability of unit cost data on computer media. These time-saving advances, described briefly in the following paragraphs, enable contractors to bid on many more jobs than were previously possible with manual estimating. More detail on automated estimating is presented in Chapter 7.

### Quantity Survey

The development of computer aided drafting (CAD) has revolutionized the design/drafting industry. Data previously available only on paper (the drawings) is now duplicated in digital format on magnetic media. Electronic digitizers enable transfer of measurements directly from the plans into the computer, where programs convert

dimensions to the quantities required for estimating. Some cost estimating software products accept data directly from drafting software (CAD) products. This enables direct transfer of dimension and quantity data from the project plans Quantity surveyto the computerized estimating system. As a result, a takeoff formerly requiring weeks can now be done in hours. Future advances will likely link such data directly to project management and other software systems.

Even the simple quantity survey tools have advanced. The time proven polar planimeter used to measure areas on drawings is now available with built-in scale factors that will present area measurements in the units needed, such as square feet, square yards, or square meters instead of square inches or square centimeters. A few of the more advanced planimeters can transmit area measurements directly into a computer for use in an estimating program. Modern versions of the simple roller wheel for measuring length of lines are now battery powered and can be rolled along the perimeter of the plans to read lengths in feet, yards, or meters, once the drawing scale is entered into the instrument.

## Spreadsheets

Spreadsheets have been used for estimating for decades. Most cost data publishers, as well as architectural, engineering, and contracting companies use printed estimating spreadsheet forms, although they usually go by another name ("estimate sheet," "estimate summary," "Materials listmaterials list," etc.). Although these are, in some ways, the spreadsheet of the past, they still serve a useful purpose. Some calculations and estimates are simply too small to bother with a computer. The forms also serve as handy worksheets for recording data gathered out of the office or over the telephone.

For larger projects, currently available spreadsheet software presents the well known columns and rows with automated calculations and a host of additional capabilities. This now makes alternative analyses (the "what if?" feature) possible. Analyzing the cost ramifications of many different methods and materials are too time consuming to consider without a computerized spreadsheet. Many design and construction professionals today calculate all their estimates on personal computer-based spreadsheets. Spreadsheets that import cost data from a base of construction costs are fast becoming the trend of the future.

Well-designed spreadsheets organize the estimate and present it in a neat and orderly manner, whether done with a pencil on a data pad or with a computer. The advantage of using the computerized spreadsheet is that it virtually eliminates computation errors.

Additional applications of spreadsheets may well be more important than the preparation of complete estimates. Spreadsheets can be created for a myriad of supporting calculations such that they are a ready time saver. This alone makes the spreadsheet the "estimator's workhorse." Chapter 7 shows several typical applications.

## Estimating Software

A feature article published in ENR (formerly Engineering News Record) in September 1989 stated that 173 software packages for computerized estimating were available2. This number is growing constantly.

The basic components of a complete estimating software package are a database of costs coupled with a calculation module. The simplest programs contain little more. The power of the system increases when it is interfaced with other software for importing quantity data directly from drafting (CAD) packages or digitizers, or for exporting estimate data to accounting, scheduling, or other project management packages. Cost and complexity Estimating software also increase when these interfacing features are included. The time required to become proficient with the software also generally increases with the complexity.

At least two Federal agencies, the Naval Facilities Engineering Command (NAVFAC)

and the U. S. Corps of Engineers, require both designers and bidding contractors to prepare and submit estimates on their specified system. Both of these estimating software systems, complete with databases, are available on optical disks (CD-ROM) from the National Institute of Building Sciences in Washington, DC4. Both the Corps of Engineers and NAVFAC design manuals and specifications are also included as part of the set.

### Project Management Software

Project management programs were originally limited to scheduling, usually either Critical Path Method (CPM) or Program Evaluation and Review Technique (PERT). Current programs can account for resources, both fixed and variable, and provide many more features. Project management software today implements a complete management system, including scheduling, cost estimating, cash flow projection, and tracking.

### Programmable Databases

Database software is much more efficient than spreadsheets in managing the large volumes of cost data needed for estimating. Database software packages have evolved to the point where both the price database and the calculations required for estimating can be included in the same package. Recent developments in both spreadsheet and database software enable data transfer between the two programs. This allows each software program to perform the function it does best.

### Data Sources

All estimating methods, whether manual or computerized, require cost data. The data may include labor wage rates, equipment rates, material prices, complete compilations of unit prices, time required (duration) to complete previous projects or tasks, tabulations of bids submitted for previous projects, and markup or overhead information. All of the data needed for small projects might be kept in a looseleaf notebook. However, most estimators dealing with medium- to large-size projects need databases consisting of thousands of items. The various types of data sources are described in the following paragraphs.

### Unit Price Data Sources

Most suppliers of estimating software supply a cost database, normally of unit prices, for initial use with the product. The database may contain national averages, or may be based on the developer's city or region. In either case, it is necessary to modify the labor, equipment, and materials data to fit the estimator's own locale. Implementation of this type of system can be a major undertaking; to the point where packages are occasionally purchased and then never used properly.

Estimators and managers of estimating departments must realize that the cost of maintaining current valid cost data is the largest cost element in procuring estimating software. The cost of maintaining an accurate current cost database may actually exceed the cost of retaining a senior engineer or cost estimator on the payroll to provide these functions instead. The advantages and disadvantages of purchasing estimating software Data sourcesshould be carefully weighed...what are you really getting for the cost? Roughly eight to ten companies compile, publish, and market books containing cost data. Types of data include material, equipment, labor, individual line item unit costs, assemblies unit costs, and others. At least two of these companies now prepare and market specialized databases to vendors of estimating software. RSMeans Co. offers inexpensive versions of their annual cost data books on magnetic media (disks) for computerized applications.

### Previous Bid Tabulations

Unit price Bid openings from previous bid openings can be obtained upon request for

public works and heavy construction projects, although generally not for private projects. Previous bid tabulations can be especially useful to engineer's estimators, and are readily available since owners, especially those in the public domain, retain an archive of past bid data. Generally the data from previous bids should be limited to the lowest three bidders for any given project. The higher bidders may not have understood the job requirements or they might have been merely submitting courtesy bids.

Local bid tabulation data from state, county, and city jurisdictions are usually available to any estimator who makes a serious effort to obtain them. More detail on application of previous bid tabulations is provided in Chapter 14.

### Methods

Estimating methods and procedures vary according to the type of estimate prepared and the quantity and quality of design information available to the estimator. These range from very simple procedures which can be accomplished in a hour or so for preliminary estimates, to complex measurements and analyses requiring weeks for complex projects.

### Preliminary Estimates

Initial preliminary estimates are often requested and prepared with no design information other than a general concept, such as a "three-story building of about 60,000 square feet." Obviously, for such a rough description, only a "ballpark" or order of magnitude estimate can be prepared. This can be done using a project comparison, as explained in Chapter 2, or square foot type estimate as explained in Chapter 3.

Intermediate or conceptual estimates require additional information about the project, although very little actual design work may have been done. At this stage, the proposed three-story building may be further described. For example, it might have:

- 20,000 square foot area for each floor
- Basement parking equal to the floor area
- One elevator
- Concrete column construction with elevated floor slabs
- Curtain wall
- Drywall interior

This higher degree of detail allows estimators with the above basic information to use published assemblies and systems cost data. Like the unit price data tabulations, these prices can then be factored to account for differences between the base used in the published data book and local area costs. Assembly estimating is explained in Chapter 4.

### Detailed Estimates Unit Price and Bid Estimates

Complete or nearly complete contract documents are necessary to produce the final detailed estimate. Plans and technical specifications must be available to the estimator. The general estimating procedure for unit price estimating is:

- Prepare or obtain a quantity survey.
- Divide the work into individual line items or assemblies according to the coding system used (typically MASTERFORMAT).
- Obtain unit prices for each line item or assembly and calculate the extension to obtain the line item or assembly costs.
- Decide or obtain all markups, overhead, and profit factors.
- Group into bid or invoice items according to the type of contract.
- Arrange the estimate into the format required for bid or submittal.

This general procedure is modified when a combined schedule and estimate is

prepared using project management software. Resource groupings (crews), task durations, and material costs replace the line items or assemblies shown above. Additional manipulation may be required to handle markup, overhead, and profit depending on the software available and the type of bid or submittal required. Chapter 6 provides a detailed overview of both unit price and schedule estimates.

## Distribution of Effort

Pareto's Law (Vilfredo Pareto, Italian economist 1848-1923) states that 80% of the effort is spent on 20% of the work. In cost estimating, this is sometimes known as the "Law of Triviality" in which 80% of the effort is spent on the 20% of the items contributing the lowest cost. Likewise, when an estimate is nearly 90% complete, the estimator may then spend much too much time perfecting the final 10%. This is the stage at which estimate preparation runs over the budgeted time period, and estimators should be aware of this trap. When starting an estimate, the estimator should search for the few items with the highest cost, and concentrate on them. The remaining time is devoted to items of decreasing priority. Many estimates have a few insignificant items which contribute only a fraction of 1% to the total project cost. A standard figure, or even a wild guess, is adequate for these very low cost items. It is much better to spend the time where the dollars are.

## Summary

This chapter presented types of estimates, tools, data sources, and methods of preparing estimates, and showed in general terms when each type should be used. There is considerable overlap, both in methods and preparation time, for both preliminary and intermediate estimates. Likewise, a variety of tools, data sources, and methods are available for the estimator's consideration. The choices for any one estimate depend on the project, degree of accuracy required, time given the estimator for preparation, and the data sources and tools available.

Following chapters (Chapters 2 through 4 and Chapter 6) show the estimating methods in increasing detail. Chapter 5 provides a detailed discussion of data sources and methods.

## Questions to Consider

Chart a sequence of cost estimates needed from the time a client wants "a three-story office building" to the contractor who bids on the project.

Given an engineer's estimate of $10,000,000, what would a typical first (low), second, and third bid be?

When would a schedule estimate prepared with project management software be preferred over a unit price estimate?

What are the advantages and disadvantages of using published cost data, either on paper or on disk? (Save your answer, and compare it to the same question in Chapter 5.)

## References

Martin Skitmore, Factors Affecting Accuracy of Engineer's Estimates, Cost Engineering, v30, n10, October, 1988, pp 16-23, American Association of Cost Engineers, Morgantown, West Virginia.

Estimators Evaluate Automation, pp. 32-34, Engineering News-Record, September 14, 1989, McGraw-Hill, New York.

The Bid Reporter, Semi-Monthly, (Alabama, Florida, Georgia, Illinois, Louisiana,

Mississippi, North Carolina, South Carolina, Tennessee, Virginia), The Bid Reporter,
1109 Alpine Hills Court, Stone Mountain, GA 30083.

Construction Criteria Base, Annual Subscription, National Institute of Building Sciences,
1201 L Street, N.W., Suite 400, Washington, DC 20005. 1.1 Relative Accuracy of
Estimate Types

1.2 Percent Variation from Low Bid

**Products:** Bookstore • Cost Data • Reference Books • Seminars • DemoSource **Online Tools:** QuickCost Calculator • CustomCost Estimator
Project Reporting • Construction Dictionary • Links **Services:** Research • Trade Sales **RSMeans:** Contact Us • About Us
©2004 Reed Business Information • Use of RSMeans.com is subject to its Terms and Conditions of Use and Privacy Policy.

# EXHIBIT

# B

# EXHIBIT



# Petenbrink v. Superior Home Builders, Inc.

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

**Paul PETENBRINK and Wilma Petenbrink, his wife, Plaintiffs,**
v.
**SUPERIOR HOME BUILDERS, INC.,
a Delaware Corporation, Defendant.**

**No. Civ.A.97C-12-010.**
Nov. 1, 1999.

Dennis L. Schrader, Wilson, Halbrook & Bayard, P.A., Georgetown, Delaware, for the Plaintiff.

Brian D. Shirey, Sergovic, Ellis & Shirey, P.A., Georgetown, Delaware, for the Defendant.

MEMORANDUM OPINION

LEE, J.

Post-Trial Decision

*INTRODUCTION*

--------- **1999 WL 1223786 \*1** ---------

This matter is currently before the Court on the Post-Trial Memorandum of the Defendant, Superior Home Builders, Inc. ("Defendant"). The Plaintiffs, Paul and Wilma **Petenbrink** ("Plaintiffs"), filed this action against the Defendant to recover money paid to the Defendant during the initial phase of constructing their home. After a trial, this Court made a preliminary ruling on the disputed fees. The Court ruled that the Plaintiffs were not responsible for a referral fee paid by the Defendant to their realtor and that the Defendant's claim for "compensation" was not properly before the court. In post-trial briefing, the Defendant claims that: (1) the Plaintiffs are not entitled to a refund of the referral fee paid by the Defendant to the Plaintiffs' realtor, and (2) that it was not required to specifically plead its claim for "compensation." The Plaintiffs urge the opposite result on both issues.

*STATEMENT OF FACTS*

The Plaintiffs, with the assistance of realtor Tom Carney, bought a parcel of real estate in Dogwood Estates in Dagsboro, Delaware. The Plaintiffs then asked Carney to recommend a suitable builder to construct a home on the property. Carney recommended the Defendant, Superior Home Builders, Inc. On

June 13, 1997, the parties entered into a construction contract calling for a total price of $157,125.00. Pursuant to an agreement with the Defendant, Carney received a $4500.00 "finder's fee" from the Defendant for the referral. The Plaintiffs paid $23,568.45 as a first "draw" to begin construction.

Early on, the parties began to dispute the exact room dimensions and square footage contracted for. On August 5, 1997, the parties met to resolve these issues and agreed on a final draft of the house plans. However, when the Plaintiffs reviewed these plans, they once again objected to room sizes arguing that they did not match the promised square footage. The Plaintiffs made proposed changes to the plans and faxed the changed plans to the Defendant.

On August 13, 1997, the Defendant arrived at the site to begin construction on the Plaintiff's home. The Plaintiffs arrived at the site and inquired about the proposed changes. When the Defendant refused to change the plans from those of August 5th without additional compensation, the Plaintiffs ordered the Defendant off the work site. This effectively terminated their working relationship.

The Plaintiffs brought this action to recover the money from the first "draw." The Defendant returned the "unspent" portion of that money. While the parties originally disputed the Defendant's retention of $10,251.17, at this point in the proceeding, the only amounts still in dispute are the $4500.00 referral fee and a claim by the Defendant to 20% of its expenses as "compensation" for its time spent preparing to construct the Plaintiffs' home.

This matter was tried before this Court on July 8, 1999. Upon completion of the evidence, this Court ruled that the Plaintiffs were not responsible for the $4500.00 referral fee to the realtor. The Court also ruled that the claim for "compensation" sought by the Defendant was not a valid claim. The Court provided a briefing schedule to counsel so that the parties may reargue these two issues. After careful review of the briefs and the applicable law, my final judgment is as follows:

--------- **1999 WL 1223786 \*2** ---------

1. The Defendant-builder was under no pre-existing duty under current Delaware law to disclose to the Plaintiffs the referral fee paid to Carney. Currently, this duty lies squarely on the shoulders of the realtor. Thus, the Plaintiffs are not entitled to a refund of the referral fee.

2. The Defendant's claim for 20% of its expenses as "compensation" is not properly before the Court and is denied.

*DISCUSSION*

I. The Duty of a Contractor and a Realtor to Disclose "Finder's Fees."

This case presents a very important issue, the answer to which is certainly not clear under existing statutory law and common law legal theories. The question, in a nutshell, is: "Who, in the triangular relationship between a realtor, a builder,

and a landowner. Can a builder owe a duty to disclose that the realtor's recommendation of the contractor may have been influenced by the receipt of a "finder's fee" from the builder?" The importance of this question is illustrated by restrictions currently in place on the payment of finder's fees or referral fees by or to the various parties involved in a real estate transaction. For instance, the Real Estate Settlement Procedures Act ("RESPA") severely limits the payment of referral fees in "business incident to or a part of a real estate settlement service involving a federally related mortgage loan." 12 U.S.C.A. § 2607(1989). Moreover, the Delaware Lawyers' Rules of Professional Conduct prevent lawyers from paying referral fees for business, *Prof. Cond. R.* 7.2(c), and restricts the splitting of fees with either other lawyers or nonlawyers. *Prof. Cond. R.* 5.4. These restrictions evince the strong concern that regulating authorities have for the potential mischief that referral fees and finder's fees may have on the various relationships between the parties to a real estate transaction. Any discussion of this issue must necessarily begin with an analysis of the relationships of the parties and their attendant duties.

Duties that persons owe to one another are defined by the nature of the relationships between and among those persons. Here, three relationships and their attendant duties must be considered. The first, is the relationship between a builder and the landowner for which he is building. The second relationship is that between a realtor and his client. Finally, there is the relationship between the realtor and the builder who have contracted for a "finder's fee ."

Primarily, the relationship between a builder and a landowner for whom he is to build is contractual in nature. These two parties come together for a specific purpose and a specific commercial project. Generally, this commercial relationship will not carry with it any fiduciary obligations. 37 C.J.S. Fraud § 6(b) (1997). However, "the law will recognize a fiduciary duty arising out of a commercial contract if the transaction involved facts and circumstances indicative of the imposition of trust and confidence, rather than facts and circumstances indicative of an arms length commercial contract." *Id.* Moreover, where the party in whom "trust and confidence" is placed has superior knowledge of or a high degree of expertise in the matter covered by the contract, then the relationship between those parties is fiduciary in nature. 37 C.J.S. Fraud § 6(a) (1997). Under these common law principles, a builder would appear to owe the landowner for whom he is to build fiduciary duties. Most landowners are not schooled in the art of homebuilding and rely on the builder to build a house that meets all their aesthetic and functional requirements; is habitable, sturdy, and safe; and is within the fiscal parameters established by their contract. (FN1) *See also Murphy v. Berlin Constr. Co.*, Del.Super., C.A. No. 98C-01-097 WTQ, Quillen, J. (June 17, 1999), Letter Opinion at 4 ("It is no answer to say the relationship [between a builder and landowner] was contractual, not fiduciary. When people contract to build a two million dollar house, they have a legitimate expectation to special treatment and special attention."). For these reasons, the landowner reposes a great deal of trust in the judgment and expertise of the builder. That builder would then be a fiduciary of the landowner and is charged with the duties that arise under such a relationship. The

Court of Chancery of Delaware has also found that builders and landowners have a fiduciary relationship that is statutory in origin. *Maull v. Stokes,* Del. Ch., 68 A.2d 200, 202 (1949). The Chancery Court found this fiduciary relationship existed because the Delaware Code provides that payments made to a builder are held in trust. *Id.* ("While this language does not create a trust in the true sense of that term, the statute when read as a whole clearly creates a fiduciary relation of that nature between the contractor and the owner."). (FN2)

---------- 1999 WL 1223786 *3 ----------

Like the relationship discussed above, that of the realtor to the landowner or client, is defined by both common law principals and legislative enactments. This relationship, however, is somewhat more established than that existing between the builder and the landowner.

"Real estate brokers and salesman are fiduciaries, who are charged with full disclosure of all material facts to those who repose confidence in them." *Stella v. Delaware Real Estate Comm'n .,* Del.Super., C.A. No. 85A-JN-9, O'Hara, J. (March 6, 1986), Letter Op. at 5; *Desmond v. Lucks,* Del.Super., C.A. No. 87C-AP-20, Lee, J. (June 12, 1989), Mem. Op. at 4. Moreover, the realtor is duty-bound to act with the "utmost good faith and loyalty" in advancing the interests of his principal. *Desmond* at 4. Realtors are also subject to certain statutory measures which create fiduciary duties. For instance, 24 Del. C. § 2912(a)(9), prohibits a realtor from accepting "any referral fees or other valuable consideration for referring potential buyers to homebuilders unless the potential buyers are timely informed of the fee arrangement in writing between the real estate licensee and the home-builder." Payment of Referral Fees to Real Estate Licensees, Op. Att'y Gen., 94-I005 (Jan. 31, 1994). Thus, the relationship shared by a realtor with his client is fiduciary in nature.

Finally, the relationship between the realtor and the builder may be marked by fiduciary duties. Generally, these two parties will be bound by a contract for the payment of a finder's fee. The terms and provisions of that contract will dictate whether the realtor is acting as an agent for the builder when the realtor is referring business to the builder. If the realtor is an agent of the builder, then their relationship is fiduciary in nature.

With these relationships as a backdrop, this Court must consider the various theories under which a builder may have a duty to disclose to a landowner the payment of a finder's fee to the landowner's realtor.

6 Del. C. §§ 3501-3506. In their amended complaint, the Plaintiffs in the present action base their claim for a refund of the referral fee on an alleged violation of Chapter 35 of Title 6 of the Delaware Code concerning Building Construction Payments. 6 Del. C. §§ 3501-3506. As noted above, Section 3502 provides that payments received by a contractor are held in trust. Section 3503 addresses the use and distribution of those funds while held by the contractor. This section provides that:

No contractor, or agent of a contractor, shall pay out, use or appropriate any moneys or funds described in § 3502

of this title upon they have first been applied to the payment of the full amount of all moneys due and owing by the contractor to all persons (including surveyors and engineers) furnishing labor or material (including fuel) for the erection, construction, completion, alteration or repair of, or for additions to, such building, whether or not the labor or material entered into or became a component part of any such building or addition and whether or not the same were furnished on the credit of such building or addition or on the credit of such contractor. 6 Del. C. § 3503.

---------- 1999 WL 1223786 *4 ----------

Paragraph 11 of the Plaintiff's Amended Complaint states that "[t]he referral fee was neither authorized by the Plaintiffs nor contemplated in the building contract and thus, the Defendant violated 6 Del. C. § 3501-3506 by paying the referral fee to Tom Carney." Neither party, however, addresses this issue in their brief. Apparently this theory has been abandoned and rightfully so. Section 3503 is primarily for the protection of sub-contractors working on a project. The statute applies to those "furnishing labor or material" to the project. A realtor making a referral is providing neither labor nor material. Thus, this payment does not fall within this statute. Even if it did, this Court is not convinced the statute would proscribe such a payment.

*Duty of Realtor to Disclose Referral Fee.* As noted above, Realtors have an affirmative duty to disclose to their client any fees they are paid for referring those clients to particular builders. Absent disclosure to their client, the statutes governing the Real Estate profession proscribe the "[r]eceiving or making an arrangement or agreement to receive, directly or indirectly, any form of valuable consideration in exchange for the placement of, or favor in, any business transaction, or transactions incidental thereto, negotiated or handled by said broker, salesperson, or appraiser as agent...." 24 Del. C. § 2912(a)(9). While the language of this section is a bit obtuse and cumbersome, it forces a realtor to disclose to his client the referral fees he receives. *See* Payment of Referral Fees to Real Estate Licensees, Op. Atty. Gen., 94-I005 (Jan. 31, 1994).

The Plaintiffs, in their Response to Post-Trial Memorandum, craft an argument that the Defendant-builder was obligated to disclose the fee because the representative of the builder was also a licensed realtor. This Court is not persuaded that this argument is sound in this case. The language of the statute speaks to the *"receiving* or making an arrangement or agreement to *receive* ..." referral fees. 24 Del. C. § 2912(a)(9) (emphasis added). Thus, the "payment" of a referral fee is not covered. Moreover, and perhaps more importantly, the representative of the builder, while a licensee under the statute, was not acting in his capacity as a realtor in this transaction. The Court was unable to locate, nor was it directed to, any authority for the concept that a realtor always wears that hat and is constantly subject to the regulations of that profession. Thus, the Court declines to expand the coverage of this statute to the present case.

Ultimately, it appears well settled that a realtor has a duty to

disclose this finder's fee. It is much less clear whether the builder who pays the fee has the same duty. The issues pled and briefed by the parties, the contractor's duty regarding money paid to him and the builder's duty to disclose as a licensed realtor, do not support such a duty by this builder. For this reason, the Court finds that the Defendant was under no duty to disclose the referral fee paid to Carney and thus the fee was properly paid and not recoverable by the Plaintiffs.

II. The Defendant's claim to 20% "compensation" or "lost profits" on the construction contract.

---------- 1999 WL 1223786 *5 ----------

The Defendant claims it is entitled to retain 20% of its expenses as "compensation" for "time spent performing its contractual obligations." Defendant's Post-Trial Memorandum at 4. The Plaintiffs, in their Response to Post-Trial Memorandum, characterize this as a claim for damages in the form of lost profits. The Plaintiffs dispute this claim because the Defendant did not raise it in its pleadings; neither in the Answer, nor as a counterclaim. The Defendant argues that even if it was required to raise this claim in the pleadings, those pleadings were effectively amended when evidence of the claim was admitted without objection at trial.

The distinction between "compensation" and "lost profits" is a distinction without a difference in this case. Generally, the profits from a project represent the return on one's investment of time and effort in a project. However, no matter what the nomenclature, the gist of the Defendant's claim is that he was damaged in some way, beyond out-of-pocket expenses, by the Plaintiff's acts.

The proper place to begin any technical evaluation of pleadings and their requirements is the Superior Court Civil Rules as these rules govern such matters. Rule 8 of the Superior Court Civil Rules provides that:

A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim or third-party claim, shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief and (2) a demand for judgment for the relief to which the party deems itself entitled. Super. Ct. Civ. R. 8(a).

Moreover, Rule 9 of the Superior Court Civil Rules provides that:

(g) *Damages.* A pleading, whether a complaint, counterclaim, cross-claim or a third-party claim, which prays for unliquidated money damages, shall demand damages generally without specifying the amount, except when items of special damage are claimed, they shall be specifically stated. Super. Ct. Civ. R. 9(g).

Thus, one seeking relief of any type in the Superior Court must set forth that claim through a "short and plain statement" of the claim and must demand the relief which he seeks. That relief, in the form of damages, can be averred generally and need not be set forth as a specific amount.

When the defendant in a civil action is seeking damages, the vehicle for such a claim is through a counterclaim. Counterclaims may be either mandatory or permissive. Super. Ct. Civ. R. 13(a) and (b). The rule covering compulsory counterclaims states:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the Court cannot acquire jurisdiction. Super. Ct. Civ. R. 13(a).

The failure of a defendant to raise a compulsory counterclaim in its answer is not, however, fatal. For, "[w]hen a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, the pleader may by leave of court set up the counterclaim by amendment." Super. Ct. Civ. R. 13(f). Rule 15 of the Superior Court Civil Rules provides the vehicle for amending pleadings. One way the pleadings may be amended is where evidence of such omitted claim is presented without objection at trial. (FN3)

As noted above, the Defendant's claim to this 20% fee is really in the nature of a claim for damages resulting from a perceived wrong by the Plaintiff. This goes beyond the Defendant's general denial of the Plaintiff's claim in the Answer. As such, this claim should have been set forth in the answer as a counterclaim against the Plaintiff. Moreover, because this claim arises out of the same transaction or occurrence as the claim against the Defendant, it would be a compulsory counterclaim. The Defendant failed to include this claim in its original pleadings and has not affirmatively sought to have the pleadings amended. Instead, the Defendant asserts that the pleadings were automatically amended under Rule 15 to conform to the evidence of the claim produced without objection at trial.

Ultimately, this Court finds that the Defendant's request for 20% of the expenses, regardless of whether called "lost profits" or "compensation," is really a claim for damages that should have been raised as a counterclaim. Rule 13(f) states that a pleader omitting a counterclaim may, "by leave of court," assert the counterclaim as an amendment to the pleadings. The language of Rule 15(b) states that amendments such as those urged by the Defendant "may be made upon *motion* of any party at any time...." Del.Super. Ct. Civ. R. 15(b) (emphasis added).

Leave to amend a pleading "shall be freely given when justice so requires." Super. Ct. Civ. R. 15(a). "Justice may not so require if the party seeking to amend has been inexcusably careless or if the amendment would unfairly prejudice an opposing party." *Annone v. Kawasaki Motor Corp.*, Del.Supr., 316 A.2d 209, 211 (1974).

This Court has discretion whether to allow an amendment to the pleadings at this point in the litigation of this case. *See PNC Bank, Delaware v. Turner*, Del.Super., 659 A.2d 222, 225 (1995). Here, justice does not require the Court to allow the amendment. First, the Defendant has never formally moved to have the pleadings amended. Its Post-Trial Memorandum addresses the issue but stops short of formally moving for the amendment. Second, even if the Post-Trial Memorandum satisfied the requirements of the Rule, the Court still believes that the Defendant's failure to raise this claim in its original pleadings, or at least by a timely motion, is sufficiently prejudicial to the Plaintiffs to deny the claim for 20% of the expenses as compensation.

## CONCLUSION

This case has presented an issue to the Court that is relatively new and thus, by no means, settled law. The realtor's duty to disclose referral fees, however, is settled and "black-letter" law. However, for this Court to place the same duty on the builder, it would be creating a clear duty where none previously existed. The current duties to disclose in real estate transactions are primarily statutory or rule based. Currently, no statute or rule exists placing such a duty on a builder. However, as noted in the opening paragraphs, this is an important issue and such a statute may be forthcoming. Until that time, though, this Court declines to impress upon a builder the duty to disclose to a landowner a referral fee paid to a real estate agent. Thus, the referral fee paid by the Defendant to Carney was properly paid and may not be recovered by the Plaintiffs. Finally, this Court finds that it would be injudicious and prejudicial to amend the pleadings at this late date to include an omitted compulsory counterclaim. For these reasons, the Defendant's claim for 20% of its expenses as compensation is disallowed.

IT IS SO ORDERED.

(FN1.) In Delaware, the sale of a new home is accompanied by an implied warranty of good quality and workmanship. *See Council of Unit Owners of Breakwater House Condominium v. Simpler*, Del.Super., 603 A.2d 792 (1991).

(FN2.) The Court was interpreting the predecessor statute to 6 Del. C. § 3502, a statute at issue in the present litigation. This section provides that: "All monies or funds received by a contractor in connection with a contract for the erection, construction, completion, alteration or repair of any building ... shall be trust funds in the hands of the contractor."

(FN3.) "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues." Super. Ct. Civ. R. 15(b).