IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA<br>for the Use and Benefit of<br>JERSEY SHORE AUTOMATION, INC.<br><br>　　　Plaintiff,<br><br>vs.<br><br>CHUGACH SUPPORT SERVICES, INC., *et al.*<br><br>　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C. A. No. 04-1416 (JJF) |

**REPLY BRIEF OF DEFENDANTS
CHUGACH SUPPORT SERVICES, INC.
AND SAFECO INSURANCE COMPANY OF AMERICA
IN SUPPORT OF MOTION TO DISMISS IN PART,
OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT ON,
THE FIRST AMENDED COMPLAINT**

THE LYONS LAW FIRM

Edmund Daniel Lyons (No. 0881)
1526 Gilpin Avenue
P.O. Box 579
Wilmington, DE 19806
Phone (302) 777-5698
Fax (302) 777-5051
Email: elyons@lyonslaw.com

Dated: September 12, 2005

BIRCH, HORTON, BITTNER AND CHEROT

Harvey A. Levin
1155 Connecticut Avenue, N.W., Suite 1200
Washington, DC 20036
Phone (202) 659-5800
Fax (202) 659-1027
Email: hlevin@dc.bhb.com

Counsel for Chugach Support Services, Inc. and
Safeco Insurance Company of America

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................4

INTRODUCTION ............................................................................................5

REPLY ARGUMENT .......................................................................................7

1. Jersey Shore Errs By Conflating the Basis for Task Pricing Under the SABER Contract and the Amounts That Contractors Had to Pay to Complete the Tasks ................................................................7

2. Jersey Shore's Brief is Highly Misleading and Flatly Wrong in Suggesting the Existence and Preeminence of a "UPG" Outside of and Contrary to the SABER Contract.....................................................10

3. Jersey Shore's Position That "Because the RSMEANS database specifications and prices apply to a general area or industry, it is necessary to utilize the Unit Price Guide ("UPG") rates in setting the costs and practices for a specific location to ensure adequate compensation to the contractors performing the work," a Process Jersey Shore Terms "Localization," Citing "48 C.F.R. § 5336.9102," Is Categorically Wrong ......................................................................11

4. Jersey Shore's Opposition Misunderstands the Role of the SABER Contract .......................................................................................13

5. With Respect to the Alleged Application of the "UPG," Jersey Shore's Opposition Does Not Comport With and Goes Well Beyond the First Amended Complaint and the October 3, 2003 Memorandum Accompanying the Complaint................................................................................................15

6. Contrary to Jersey Shore's Opposition, the First Amended Complaint Does Not Allege, and Does Not Allow as a Reasonable Inference, That Chugach Promised to Pay Jersey Shore Or to Disgorge to Jersey Shore Amounts Reflecting Generalized Application of a "UPG" or Otherwise Exceeding the Lump Sums of the DO/NTPs ...................................................17

7. The Delaware Prompt Pay Act Does Not Apply .............................................20

CONCLUSION........................................................................................21

TABLE OF AUTHORITIES

<u>Cases</u>

*City of Burbank v. Lockheed Air Terminal, Inc.*,
411 U.S. 624 (1973)…………………………...………………………………………21

*Howard S. Lease Construction Co. v. Holly*,
725 P.2d 712 (Ak. 1986)………………………………………………………..…...18

*Jackson v. Nangle*, 677 P. 2d 242 (Ak. 1984)……………………………………………18

<u>Other Authorities</u>

48 C.F.R. § 52.232.27…………………………………………………………...20, 21

Fed. R. Civ. P. 8(a)…………………………………………………………………..20

## INTRODUCTION

Jersey Shore's answering brief ("JSA Brief") is premised on three foundational misconceptions that exposed, negate Jersey Shore's essential argument.

**First**. Jersey Shore errs by conflating the basis for task pricing under the SABER Contract -- an agreement between Chugach and the Government that guided Chugach's submissions to the Government and the Government's determinations to accept or reduce Chugach's proposed task pricing -- and the amounts that contractors (Chugach as well as Jersey Shore) had to pay to complete the tasks. Chugach had to price its delivery orders with the Government based on the RSMeans task prices, using the limited SABER Contract UPG prices only for non-pre-priced items and services ("NPIs"), meaning *only* items that RSMeans *did not contain*. *See* Argument Point 1 below.

**Second**. The Jersey Shore brief continuously refers to and relies on a "UPG" without ever explaining what the SABER Contract "UPG" is and how it applied. Defendants did that in their Supplemental Brief in support of the motion to dismiss ("Supp. Brief") at 13-14.

Jersey Shore does not and cannot dispute the limited definition of "UPG" and its limited application in the SABER Contract. Rather, Jersey Shore -- in an indirect and suggestive manner only -- fosters the impression that there was a UPG, and that there were UPG prices, generally and comprehensively supplanting the RSMeans pricing and the strictly limited application of the SABER Contract UPG. That is flatly wrong. *See* Argument Point 2 below.

**Third**. Jersey Shore repeatedly states, in these or virtually identical words, "Because the RSMEANS database specifications and prices apply to a general area or industry, it is necessary to utilize the Unit Price Guide ("UPG") rates in setting the costs and practices for a specific

location to ensure adequate compensation to the contractors performing the work," a process Jersey Shore terms "localization," citing "48 C.F.R. § 5336.9102." JSA Brief at 5; *see id.* at 13, 26, 27. But neither these statements nor their purported C.F.R. citation is correct. The UPG is defined, precise and limited to the NPIs that are not in RSMeans. The "localization," an upward adjustment for the Dover locale, is in the SABER Contract in the presence of "the City Cost Index Weighted Average Total for **Dover, Delaware, or geographically closest city listed if Dover, Delaware should be deleted**," a multiplier applied to the RSMeans task prices. Supp. Brief at 6 (emphasis in original SABER Contract). The cited section of the Code of Federal Regulations does not exist. *See* Argument Point 3 below.

One final introductory point: Jersey Shore does not, as it cannot, represent that Chugach did not follow the SABER Contract with its UPG to the letter. To the contrary, Jersey Shore alleges that Chugach, albeit "incorrectly," "used the RSMEANS wage rates in its estimates for all contracts performed by Jersey Shore." First Amended Complaint ¶ 27. Jersey Shore also does not allege, as Jersey Shore in good faith could not allege, that Chugach overlooked or otherwise failed to apply the "the City Cost Index Weighted Average Total for Dover, Delaware" multiplier. Taken together, *i.e.*, what Jersey Shore alleges (Chugach's use of the RSMeans task pricing per the SABER Contract) and what Jersey Shore does not allege (omission of the multiplier for the Dover locale), Jersey Shore makes Chugach's case that the First Amended Complaint fails to state a claim upon which relief can be granted.

## REPLY ARGUMENT

### 1. Jersey Shore Errs By Conflating the Basis for Task Pricing Under the SABER Contract and the Amounts That Contractors Had to Pay to Complete the Tasks

Jersey Shore mixes and confuses the basis for task pricing under the SABER Contract --

an agreement between Chugach and the Government that guided Chugach's submissions to the

Government and the Government's determinations to accept or reduce Chugach's proposed task

pricing -- and the amounts that contractors (Chugach as well as Jersey Shore) had to pay to

complete the tasks. Chugach had to price its delivery orders with the Government based on the

RSMeans task prices, using the limited SABER Contract UPG prices only for non-pre-priced

items and services that RSMeans did not contain.

The prices that Jersey Shore and Chugach had to pay their laborers and had to pay for

materials and supplies, on the other hand, were not dictated or even influenced by RSMeans;

rather, actual costs were market- and situation-driven and in the case of actual wages were

dictated by the federal Davis-Bacon Act.[1]  Whatever materials contractors actually needed to

accomplish the various tasks, the contractors had to acquire; and whatever the actual prices for

these materials were at the times of purchase, the contractors had to pay, all *regardless* of the

materials component of the RSMeans task prices. Likewise, whatever actual manpower and

trades the contractor needed to employ to complete the task, the contractors had to engage; and

---

[1]  As a consequence of Jersey Shore's failures to pay Davis-Bacon wages and fringe benefits, Chugach, as prime contractor, had to pay the United States Department of Labor $72,049.15 for the unpaid wages and fringes Jersey Shore owed its employees for their work under the DO/NTPs. *See* Exhibit 1 to this brief.

7

whatever actual wages and fringe benefits the contractor had to pay for its labor, the contractor had to pay, again *regardless* of the labor component of the RSMeans task prices. Chugach and Jersey Shore had to pay what they had to pay (and in the case of wages, what the federal Davis-Bacon Act required contractors to pay) to get the job done, RSMeans, UPGs, coefficients and all other pricing tools aside.

This error in the basic premise of Jersey Shore's suit can be readily seen by looking at RSMeans. Attached to this brief as Exhibit 2 are the cover page and introductory portions of the 2003 RSMeans Building Construction Cost Data with representative pages 186 through 198 that set out the task pricing for Rough Carpentry and Finished Carpentry, a matching example to the one in the First Amended Complaint ¶ 28 and the JSA Brief at 6. RSMeans prices tasks on an all-inclusive, labor-and-materials basis. Thus, for example, RSMeans will set a single price for wood framing tasks in Rough Carpentry (at pp. 186-191), just as RSMeans will establish set task prices for installation of plumbing fixtures, hardware, roofs, etc., as other examples. These set task prices include labor, materials, etc., based on the RSMeans determination of the nature and cost of labor, the amount of time the task will take, the cost of materials, etc. If a contractor accomplishes the task by buying materials at the prices RSMeans used in its calculations and by taking the time and paying the wage rates RSMeans used in its calculations, then the contractor makes the profit anticipated in the coefficient.[2] If a contractor can complete the job at a lower cost, *e.g.*, by paying less for the materials, by paying less for the labor or by completing the job

---

[2] The SABER Contract provides that the contractor multiplies the RSMeans task prices by two coefficients, the City of Dover cost index and another that includes overhead and profit. *See* SABER Contract §§ 1.0 & 3.0, Defendants' Appendix Exhibit 1, at CSS 000035. Section 3.0 begins: "Offered coefficients must contain all allowable contractor costs, including contingencies and profit."

in less time than the time RSMeans used, then the contractor makes more profit.  If the contractor takes longer, pays more for materials or pays more for labor, then the contractor makes a less-than-anticipated profit or possibly none at all.  But in any case, this is true: the per-task prices that Chugach *had to use* under the SABER Contract -- the only prices to which the Government would agree -- are not necessarily or as a matter of promise the individual labor and materials prices that the contractors, Chugach and Jersey Shore alike, actually had to pay to complete the projects.  It was up to Jersey Shore, as with any subcontractor, to price its jobs profitably based on what Jersey Shore estimated the jobs actually would cost.[3]

Properly understanding RSMeans, which Jersey Shore's brief avoids, shows a corollary error in Jersey Shore's underlying presumptions.  Jersey Shore's argumentative premise, itself based on the unidentified "UPG" supposedly overriding RSMeans, is that Chugach "used incorrect calculations of wage rates" and agreed with Jersey Shore "to use the correct wage rates in all future DO/NTP [*sic*]."  JSA Brief at 13 & 7.  But as the SABER Contract provides and as RSMeans shows, RSMeans prices by individual *task*, inclusive of all labor, materials, etc., *not* on the separate or segregable basis of "wage rates."  Jersey Shore is mixing apples and oranges to advance an argumentative position that does not compute.

---

[3] Jersey Shore in fact did its own takeoffs before agreeing to the lump-sum DO/NTPs.  *See* Jersey Shore's First Amended Complaint ¶ 32.

9

**2. Jersey Shore's Brief is Highly Misleading and Flatly Wrong in Suggesting the Existence and Preeminence of a "UPG" Outside of and Contrary to the SABER Contract**

The Jersey Shore brief continuously refers to and relies on a "UPG" without explaining what the SABER Contract "UPG" is and how it applied.   Defendants did that in their Supplemental Brief in support of the motion to dismiss ("Supp. Brief") at 13-14:

18.  The UPG attached to the SABER Contract established prices *only* for items not in the R.S.Means database or otherwise not ascertainable under ¶ 8.0 quoted immediately above.  *See* SABER Contract at CSS 000046 ....[4]

19.  If it were not clear enough from the SABER Contract and from other government contract work (which it was to Chugach), the DAFB Contracting Officer (Jacqueline McGee) and the DAFB Chief of the SABER Management Element (Kim Shore) made it crystal clear at the Preproposal Conference that the UPG did *not* supplant R.S.Means.   *See* the Minutes of the Preproposal Conference, Supplemental Appendix Exhibit 6 (accompanying this Brief), JSA 349, 351 & 354 ....

Both the DAFB Contracting Officer (Jacqueline J. McGee; *see* the SABER Contract, Defendants' Appendix Exhibit 1, at CSS 000011) and DAFB Chief SABER Management Element (Kim Shore; *see id.* at CSS 000012) made it clear from the outset (per the Minutes of the Preproposal Conference that Jersey Shore produced) that the UPG was only as expressly contained in the SABER Contract and that it did not override or replace RSMeans:

Attachment 6 is the Unit Price Guide (UPG).  These are the items Dover AFB utilizes that are not included in the Means.  With the exception of the line item for rubbish hauling/handling, if items are found in Means, they should use that item in lieu of the item listed in Attachment 6. [Per Ms. McGee].

---

[4] The explicit, limited SABER Contract UPG is in the SABER Contract, Defendants' Appendix Exhibit 1, at CSS 000081, CSS 000212 and CSS 000227. The SABER Contract UPG is minimal -- infinitesimal compared to RSMeans -- and could not possibly serve as a unit price guide for any DO/NTP or otherwise in the nature of RSMeans or other similar unit price guides.

****

Mr [*sic*] Shore stated he does not feel the items, as specified, in the UPG are included in Means, and if they are in Means as we specify, we would like to know. With the exception of the rubbish handling/hauling, if items are in both Means and the UPG, the contractor should use Means.

Supp. Brief at 14-15.[5]

Jersey Shore does not and cannot dispute the limited definition of "UPG" and its limited application in the SABER Contract. Rather, Jersey Shore -- in an indirect and suggestive manner only -- fosters the impression that there was a UPG, and that there were UPG prices, generally and comprehensively supplanting the RSMeans pricing and the strictly limited application of the SABER Contract UPG. That is wrong and, furthermore, without foundation.

**3. Jersey Shore's Position That "Because the RSMEANS database specifications and prices apply to a general area or industry, it is necessary to utilize the Unit Price Guide ("UPG") rates in setting the costs and practices for a specific location to ensure adequate compensation to the contractors performing the work," a Process Jersey Shore Terms "Localization," Citing "48 C.F.R. § 5336.9102," Is Categorically Wrong**

Jersey Shore repeatedly states, in these or virtually identical words, "Because the RSMEANS database specifications and prices apply to a general area or industry, it is necessary to utilize the Unit Price Guide ("UPG") rates in setting the costs and practices for a specific location to ensure adequate compensation to the contractors performing the work," a process

---

[5] Continuing the carpenter example that Jersey Shore selected, Chugach must use RSMeans for all the Rough Carpentry and Finished Carpentry tasks that RSMeans prices; the UPG would come into play only as part of an NPI, *i.e.*, as part of a task that RSMeans does not price. The Rough Carpentry and Finished Carpentry tasks reflected in Exhibit 2 to this brief are not exclusive, moreover, as other tasks priced in RSMeans functionally may apply. The important consideration is the task to be performed.

11

Jersey Shore terms "localization," citing "48 C.F.R. § 5336.9102." JSA Brief at 5; *see id.* at 13, 26, 27. But neither these statements nor their purported C.F.R. citation is correct:

(i) As the SABER Contract makes crystal clear, the UPG is defined, precise and limited and has only an explicitly limited application, for the NPIs that are not in RSMeans.

(ii) The SABER Contract expressly includes "localization," an upward adjustment for the Dover locale, multiplying the RSMeans task prices by "the City Cost Index Weighted Average Total for **Dover, Delaware, or geographically closest city listed if Dover, Delaware should be deleted**." Supp. Brief at 6 (emphasis in original SABER Contract). Jersey Shore actually concurs. *See* Jersey Shore's First Amended Complaint ¶ 23:

> As part of the SABER Contract, and prior to issuance of individual delivery orders to Jersey Shore, Chugach was charged with, *inter alia*, computing the price for which the work was to be performed using set formulas under SABER, using RSMeans® database costs multiplied by (1) the City Cost Index Weighted Average Total for Dover, Delaware ....

(iii) The cited section of the Code of Federal Regulations does not exist. *See* 48 C.F.R. Apparently, Jersey Shore is referring to the Department of the Air Force's "Informational Guidance," which the Air Force labels "IG5336.91."[6] The IG provides general information only. It is not a provision of the SABER Contract and otherwise creates no binding legal obligation or standard for Chugach.

(iv) Jersey Shore misquotes and materially distorts IG5336.91. IG5336.91 generalizes that a SABER Contract contains a unit price guide ("The significant features of a SABER contract are: (1) *Unit Price Guides (UPG)*"), with "standard unit prices" that are multiplied by

---

[6] *See* http://farsite.hill.af.mil/reghtml/regs/far/2afmc/fars/af_afmc/affars/IG5336.91.htm. The Air Force's IG5336.91 is attached to this brief as Exhibit 3.

coefficients to obtain actual delivery order pricing -- precisely how the SABER Contract reads and operates.  *See* Supp. Brief at 6 n.2, quoting the SABER Contract, Defendants' Appendix Exhibit 1, at CSS 000035.  IG5336.91 further states, "Examples of commercially available UPGs are those published by … RSMEANS, Inc." -- again, precisely how the SABER Contract reads and operates.  *See id.*

Thus, when Jersey Shore relies on IG5336.91 and the UPG discussed therein, Jersey Shore (though it omits to say so) *relies on RSMeans as the UPG*, just as the SABER Contract and Chugach do.  Recognizing that the "UPG" in IG5336.91 and RSMeans are one and the same, the statement from page 5 of the Jersey Shore brief quoted above correctly should be (emphasis added to show the correction), "Because the RSMEANS database specifications and prices apply to a general area or industry, it is necessary to utilize **RSMeans** rates in setting the costs and practices for a specific location to ensure adequate compensation to the contractors performing the work."  Thus, Jersey Shore is chasing its own tail.  And Jersey Shore's exposed tail-chasing proves that in using RSMeans and the SABER Contract UPG strictly in accordance with the SABER Contract and Air Force IG5336.91, Chugach did not make "incorrect calculations of wage rates" as Jersey Shore argues.  JSA Brief at 13.

### 4. Jersey Shore's Opposition Misunderstands the Role of the SABER Contract

Defendants' argument that the SABER Contract pricing obligations flowed from Chugach to the Government was a remnant of the motion to dismiss Jersey Shore's original Complaint, which set out a materially different claim.  There, Jersey Shore alleged generally that Chugach breached a duty to Jersey Shore by misusing and erroneously using RSMeans in Chugach's pricing proposals to the Government.  Defendants logically and naturally read that

Complaint, now superseded, as alleging some amorphous obligation to Jersey Shore in the Chugach-Government relationship, and so Chugach responded accordingly.  As Defendants made clear in their Supplemental Brief, to the extent that any of Jersey Shore's original Complaint in this regard remained, it still was meritless.  *See* Supp. Brief at 7-9, Summary of Argument points 1-9.  With respect to the First Amended Complaint, as Defendants understood it, Jersey Shore's claim was new and different, invoking a hitherto unknown and undisclosed "agreement" to jettison the SABER Contract pricing mechanism in favor of an unidentified "UPG."  *See* Supp. Brief at 9, Summary of Argument point 10 that begins:

> 10.  Jersey Shore's new allegation of an oral agreement made sometime in September or early October 2003, allegedly amending the MSA to require Chugach to depart from the SABER Contract and use higher "UPG" pricing, fails to state a claim for a number of reasons, primarily the following ....[7]

The SABER Contract does indeed impose on Chugach pricing strictures that bind Chugach in its pricing proposals.  *See* Supp. Brief at 11-15, Statement of Fact numbers 16-20; & the Introduction section of this brief above.[8]  Chugach would not, could not *and did not* breach or otherwise depart from these pricing strictures.  Jersey Shore evidently agrees -- Jersey Shore does not allege that Chugach could or did depart from the SABER Contract pricing requirements, only that Chugach, purportedly, agreed that it would, in order to accommodate Jersey Shore's desire to supplant the SABER Contract pricing with some comprehensive "UPG"

---

[7]  As best as Defendants can discern, this summary still accurately describes Jersey Shore's First Amended Complaint.

[8]  The MSA between Chugach and Jersey Shore did incorporate clauses in the SABER Contract, such that "the Subcontractor [Jersey Shore] is obligated to Contractor [Chugach] in the same manner that Contractor is obligated to the Owner [defined as the "United States Government and Dover Air Force Base, DE"]."  *See* the MSA § 1.8, Defendants' Appendix Exhibit 2, at CSS 000242.

14

pricing *in violation of the SABER Contract.* This, of course, Chugach could not do even had it wanted to (Chugach categorically denies wanting or agreeing to inflate its pricing proposals as Jersey Shore alleges). Any such promise would have been futile, unlawful, unenforceable and illusory.

> **5. With Respect to the Alleged Application of the "UPG," Jersey Shore's Opposition Does Not Comport With and Goes Well Beyond the First Amended Complaint and the October 3, 2003 Memorandum Accompanying the Complaint**

With respect to Jersey Shore's arguments about the transcendent applicability of an unidentified "UPG," the Court should not take Jersey Shore's opposition brief at face value because the brief does not reflect accurately, indeed goes well beyond, the allegations of the First Amended Complaint and its accompanying Memorandum, Exhibit B to the First Amended Complaint. Quoting that Exhibit B, ¶ 41 of the First Amended Complaint alleges:

> 41. Chugach and Jersey Shore agreed to modified terms for the MSA which included that "Jersey Shore Automation will perform the required services for a 1.02 coefficient of the final line estimate; this is based upon a .21 deduction from Chugach support Services 1.23 co-efficient [*sic*]. These co-efficients [*sic*] will be based on the then current RSMeans data and adjusted for items included in the Dover AFB Unit Price Book when applicable."

*See id.* ¶ 43. Thus, according to the First Amended Complaint (i) Pricing will be based on RSMeans and (ii) The UPG comes into play only "when applicable." Defendants have no quarrel with that, assuming the "Dover Air Force Base UPG" refers to the SABER Contract UPG.[9]

---

[9]  Another reason why Jersey Shore is wrong and why the alleged agreement is futile, unlawful and unenforceable is that the SABER Contract prohibited contractors from applying any coefficient to any UPG price, as such prices were all inclusive. *See* the SABER Contract § 18.3, Defendants' Appendix Exhibit 1, at CSS 000046:

Paragraph 1 of Jersey Shore's Memorandum accompanying the First Amended Complaint confirms the preeminence of RSMeans (emphasis added): "Jersey Shore Automation will assist in the creation of line item pricing for electrical and general construction estimates *based on the then current RSMeans data* and will supply these estimates to Chugach at no charge." Jersey Shore itself eschewed any reference to, let alone any primacy of, a "UPG" in Jersey Shore's own line-item pricing. The purported agreement on which the First Amended Complaint is premised and reflected in this Memorandum does not raise any "UPG" to ubiquity or supremacy.[10]

But that is not the position of Jersey Shore's opposition brief, which repeatedly argues that "it is necessary" and that Chugach committed "to utilize the Unit Price Guide ("UPG") rates in setting the costs and practices for a specific location to ensure adequate compensation to the contractors performing the work. This step, which is called 'localization,' is critical to correct pricing under the SABER program." JSA Brief at 5; *see id.* at 13, 26, 27. As set forth above, that position is wrong -- in fact not just wrong, but unsupportable. Jersey Shore resorts to this erroneous and unsupportable argument most likely because without this overextension and gratuitous embellishment, the First Amended Complaint cannot withstand Defendants' motion to dismiss. On the allegations of the First Amended Complaint based on the accompanying

---

[S]ince NPIs are originally negotiated for the actual cost of installation and all other overhead and profit, neither the contractor's coefficient nor any other adjustment factor will be additionally applied.

[10] Defendants doubt the *bona fides* of Jersey Shore's construction of and reliance on this Memorandum in part because Jersey Shore evidently never did prepare line item estimates as this ¶ 1 of the Memorandum provides. Chugach does not have them, and Jersey Shore did not produce any in response to document production requests and interrogatories.

Memorandum, *Chugach did nothing wrong* -- Chugach used RSMeans, as the SABER Contract required, and Chugach used the UPG "when applicable," *i.e.*, for NPIs that were not in RSMeans.[11]

This is not the only departure from the Exhibit B Memorandum purportedly reflecting the post-MSA, pre-DO/NTPs agreement[12] -- and from the SABER Contract -- in Jersey Shore's expansive, wishful brief. Other departures include the brief's premise that Chugach "agreed to use the UPG for all future estimates or to seek additional comparable compensation." JSA Brief at 8. There is nothing in the Memorandum even suggesting some form of "additional comparable compensation," nor is that a discernible concept or conceivable, let alone permissible, under the SABER Contract.

> **6. Contrary to Jersey Shore's Opposition, the First Amended Complaint Does Not Allege, and Does Not Allow as a Reasonable Inference, That Chugach Promised to Pay Jersey Shore Or to Disgorge to Jersey Shore Amounts Reflecting Generalized Application of a "UPG" or Otherwise Exceeding the Lump Sums of the DO/NTPs**

Jersey Shore argues that Chugach promised to pay Jersey Shore -- or in the words of Jersey Shore's opposition, "agreed to disgorge some of those profits" in the amount of -- the purported "new wage rates" (again confusing apples and oranges) determined by a universal

---

[11]   Jersey Shore seeks to delay consideration of the First Amended Complaint on the ground that Jersey Shore needs depositions to prove its allegations. The request is of no consequence under Fed. R. Civ. P. 12(b)(6), which accepts as true the well pleaded allegations and reasonable inferences flowing from such allegations. The depositions have no evident use even under Fed. R. Civ. P. 56. For the reasons set forth, Defendants are entitled to partial summary judgment on the First Amended Complaint even giving effect to Mr. Meehan's purported Memorandum of October 3, 2003 and Declaration.

[12]   "[T]he agreement reached by the parties ... is memorialized in the Memo." JSA Brief at 20. *See id.* at 8; First Amended Complaint ¶ 43.

application of the unidentified UPG.  JSA Brief at 25, 26.  But the First Amended Complaint --

as opposed to Jersey Shore's brief -- does not allege any promise, commitment or obligation to

pay, and none flows from the First Amended Complaint as a reasonable inference.  Giving full

credence to the October 3, 2003 Memorandum, Exhibit B to the First Amended Complaint, the

only reference relating to compensation to Jersey Shore -- and it is indirect, not even mentioning

Chugach -- is the following, in ¶ 5: "Jersey Shore Automation will perform the required services

for a 1.02 coefficient of the final line item estimate."

> But prior to that, according to ¶ 4 of the Jersey Shore Memorandum,

> Upon issuance of a Delivery Order to Chugach Support Services from Dover AFB
> Contracting, Jersey Shore Automation will review the final line item estimate
> with Chugach Support Services to determine the scope of work to be awarded to
> Jersey Shore Automation based on that final line item estimate.

Assuming Jersey Shore did its part under ¶ 4 of the Memorandum (as doubtful as that is), Jersey

Shore knew, approved and agreed to the line item estimates to which the 1.02 coefficient

purportedly applied; that is, Jersey Shore knew, approved and agreed to the exact amounts

contained in the DO/NTPs that Jersey Shore accepted.[13]  Therefore, whether Jersey Shore itself

---

[13] Of course, Jersey Shore could have waived, ignored or otherwise not performed ¶ 4, just as
Jersey Shore evidently waived, ignored and/or failed to perform ¶ 1 of the Memorandum, in
which case the consequence would be the same.  Jersey Shore would be deemed to have
acquiesced and agreed to the line item estimates.  *See Howard S. Lease Construction Co. v.
Holly*, 725 P.2d 712, 717 (Ak. 1986); *Jackson v. Nangle*, 677 P. 2d 242, 249 (Ak. 1984).

Additionally, the MSA did not obligate Jersey Shore to accept any work.  Rather, Jersey
Shore's decision to accept the DO/NTPs was wholly voluntary   *See*  the MSA § 2, Defendants'
Appendix Exhibit 2, at CSS 000243:

> [T]his Agreement does not obligate Contractor to order or authorize such Work or
> services, nor does it obligate Subcontractor to accept Work, it being the intent that
> this Agreement together with any applicable Delivery Order with NTP shall
> jointly control and govern all Work and services ordered by Contractor and

followed the Memorandum or dispensed with its conditions and protections, the only reasonable inference regarding Chugach's promise to pay is that Chugach promised to pay 1.02 times the line item estimate *that Jersey Shore reviewed, agreed and accepted* prior to agreeing to and accepting the DO/NTPs. There is no reasonable inference -- and certainly no allegation -- that Chugach promised to pay anything more, from any source, whether its profits or otherwise.[14]

Furthermore, the notion that Chugach promised to pay Jersey Shore based on the uniform application of a "UPG" is inconsistent with the basic premise and construction of the First Amended Complaint. Had Chugach made that promise, the allegations about Chugach's pricing proposals to the Government would be immaterial, as would the rhetoric in Jersey Shore's brief about "adjustment" of RSMeans; much of the First Amended Complaint, including the Exhibit B Memorandum, would be surplusage. Jersey Shore's claim would have been a straightforward statement that Chugach promised to pay (words that do not appear in the First Amended

---

accepted by Subcontractor during the term of this Agreement and define the rights and obligations of Contractor and Subcontractor.

[14] The Memorandum requires that "Jersey Shore Automation will perform the required services." In its brief, Jersey Shore maintains that "Jersey Shore performed all work required by Delivery Order 5001 ...." JSA Brief at 7. That is not correct. Jersey Shore fell woefully short of full performance *especially* on DO/NTP 5001, for Building 401. After Jersey Shore walked off the job, Chugach engaged The Breckstone Group, Inc. to assess the progress on Building 401. Breckstone reported, *inter alia*, that Jersey Shore had used 83% of the time allotted for construction but had completed only *47%* of the work (Chugach produced the Breckstone reports on Buildings 302 and 401 to Jersey Shore, documents CSS 001106 through CSS 001338). According to Jersey Shore's last invoice for Building 401 before walking off, Jersey Shore had collected *68%* of the total agreed price for Building 401 (including change orders) and was billing and entitled to an additional sum for work completed that added to the sums already received totaled *77.6%* of the total DO/NTP price (again, including change orders). Thus, Jersey Shore received 2/3 to 3/4 of the contract price for performing less than 1/2 the work while taking more than 4/5 of the allotted time for completion. Chugach has counterclaimed for its damages on all the buildings subcontracted to Jersey Shore resulting from Jersey Shore's construction failures and other breaches.

Complaint) Jersey Shore at the rates set forth in the UPG.  *See* Fed. R. Civ. P. 8(a): "A pleading

which sets forth a claim for relief … shall contain … (2) a short and plain statement of the claim

showing that the pleader is entitled to relief …."[15]

### 7. The Delaware Prompt Pay Act Does Not Apply

Jersey Shore's reliance on the Delaware Prompt Pay Act fails to state a claim for relief

because the Act does not apply, for two reasons.  First, as Jersey Shore correctly points out,

Alaska law applies.  Delaware law does not.  JSA Brief at 11 & 19-20.  *See* MSA § 17,

Defendants' Appendix Exhibit 2 at CSS 000253.  Second, the Federal Acquisition Regulations

(the "FARs") preempt state law.  The SABER Contract expressly incorporates, *inter alia*, FAR §

52.232.27, 48 C.F.R. § 52.232.27, entitled "Prompt Payment for Construction Contracts."  The

MSA, in turn, incorporates the SABER Contract.  *See* the SABER Contract, Defendants'

Appendix Exhibit 1, at CSS 000004; MSA § 1.8, Defendants' Appendix Exhibit 2, at CSS

000242.  FAR § 52.232.27 is federal law, in the uniquely federal matter of federal government

contracts (here more so because the contract pertains to a federal military installation) that

provides pervasive and comprehensive requirements, standards and remedies with respect to,

*inter alia*, a prime contractor's payments to its subcontractors (and for first-tier subcontractor

payments to second-tier subcontractors, provisions that Jersey Shore violated[16]) and these

pervasive  requirements, standards and remedies govern precisely the same circumstances and

---

[15] Jersey Shore apparently recognizes this.  Tucked into Jersey Shore's brief is this small-print
footnote: "It is Jersey Shore's contention that the UPG data should have been used irrespective
of the express agreements reached at the meeting."  JSA Brief at 8 n.3.

[16] After Jersey Shore walked off the job, Chugach had to pay more than $395,500 to Jersey
Shore's subcontractors and suppliers that Jersey Shore had not paid from the sums Jersey Shore
had received from Chugach.  As Alaska law does not govern Jersey Shore's arrangements with

conditions as the Delaware Prompt Pay Act. Accordingly, FAR § 52.232.27 preempts the state law. *See generally City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 638-39 (1973).

## CONCLUSION

In the end, Jersey Shore's opposition brief is simply wrong in all material respects. There is not some amorphous, overarching "UPG" that trumps the SABER Contract. The "UPG" to which the Jersey Shore brief refers, as Jersey Shore concedes by its repeated reliance on the Air Force's IG5336.91, is in fact RSMeans. RSMeans priced tasks to the exclusion of any other pricing mechanism. The SABER Contract requires, and its chief Government administrators made clear, that (i) RSMeans multiplied by, *inter alia*, the City of Dover coefficient to achieve "localization" was exclusive and preclusive except for items that were not included in RSMeans, to which the SABER Contract's internal, limited UPG applied without any application of the City of Dover coefficient and (ii) in the event of an overlap, RSMeans prevailed. Chugach did not promise to pay Jersey Shore, and the First Amended Complaint does not allege that Chugach promised to pay Jersey Shore, any amounts over and above the amounts contained in the DO/NTPs in general, let alone specifically amounts calculated under an undefined and undifferentiated "UPG." Assuming the validity of the agreement as reflected in Exhibit B to the First Amended Complaint, Jersey Shore itself "assist[ed] in the creation of line item pricing for ... general construction estimates," "review[ed] line item pricing ... prior to negotiation with Dover AFB Contracting" and "review[ed] the final line item estimate ... to determine the scope of work to be awarded to Jersey Shore," or else knowingly waived these opportunities, before

its subcontractors, Jersey Shore cooks its own goose under the Delaware Prompt Pay Act.

categorically accepting all DO/NTPs at issue (these exclude DO/NTP 5000, which preceded the alleged agreement and therefore is not at issue). The Delaware Prompt Payment Act is not a fallback as both Alaska law and federal law preempt that Delaware act.

WHEREFORE, for the foregoing reasons and for the reasons set forth in Defendants' Initial Brief and Supplemental Brief, Defendants Chugach Support Services, Inc. and Safeco Insurance Company respectfully pray that the Court dismiss, or in the alternative grant partial summary judgment on, the First Amended Complaint and grant Defendants such other relief as may be warranted.

Dated: September 12, 2005

Respectfully submitted,

BIRCH, HORTON, BITTNER AND CHEROT

/s/ Harvey A. Levin
Harvey A. Levin
Yuliya Andresyuk
1155 Connecticut Avenue, N.W., Suite 1200
Washington, DC 20036
Phone (202) 659-5800
Fax (202) 659-1027
Email: hlevin@dc.bhb.com

and

THE LYONS LAW FIRM

/s/ Edmund Daniel Lyons
Edmund Daniel Lyons (No. 0881)
1526 Gilpin Avenue
P.O. Box 579
Wilmington, DE 19806
Phone (302) 777-5698
Fax (302) 777-5051
Email: elyons@lyonslaw.com

Counsel for Chugach Support Services, Inc. and
Safeco Insurance Company of America

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Reply Brief was served by electronic mail and first class mail, postage prepaid this 12th day of September 2005 on:

James D. Heisman, Esquire
M. Edward Danberg, Esquire
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

/s/ Harvey A. Levin

g:\505986\4\hal9207.doc