IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA<br>for the Use and Benefit of<br>JERSEY SHORE AUTOMATION, INC. | ) ) ) ) ) | |
| Plaintiff and Counter-Defendant | ) ) | C. A. No. 04-1416 (JJF) |
| vs. | ) ) | |
| CHUGACH SUPPORT SERVICES, INC., *et al.* | ) ) | |
| Defendants and Counter-Plaintiffs | ) ) | |

**BRIEF OF DEFENDANTS
CHUGACH SUPPORT SERVICES, INC.
AND *SAFECO* INSURANCE COMPANY OF AMERICA
IN SUPPORT OF SUPPLEMENTAL MOTION
FOR SUMMARY JUDGMENT ON THE COMPLAINT AND THE COUNTERCLAIM**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7.1.2 and 7.1.3, Defendants

Chugach Support Services, Inc. ("Chugach") and Safeco Insurance Company of America, by

counsel, respectfully supplement their pending motion to dismiss or in the alternative for partial

summary judgment, again move for summary judgment on the First Amended Complaint and move

for summary judgment on Defendants' Counterclaim, on the grounds that there are no genuine

disputes of material fact and Defendants are entitled to judgment as a matter of law.[1]

---

[1] Defendants incorporate herein by reference their pending (i) Motion of Defendants Chugach Support Services, Inc. and Safeco Insurance Company of America to Dismiss in Part or in the Alternative for Partial Summary Judgment (May 3, 2005), (ii) accompanying Brief in Support of Motion of Defendants Chugach Support Services, Inc. and Safeco Insurance Company of America to Dismiss in Part or in the Alternative for Partial Summary Judgment (May 3, 2005) (the "May 3 Brief"), (iii) Supplemental Brief of Defendants Chugach Support Services, Inc. and Safeco Insurance Company of America to Dismiss in Part or in the Alternative for Partial Summary Judgment (July 6,

## INTRODUCTION

This case is a construction dispute between Defendant Chugach Support Services, Inc. ("Chugach"), the general contractor with the United States under the Simplified Acquisition of Base Engineering Requirements Contract F07603-03-D-0002 ("SABER Contract") for construction projects at Dover Air Force Base, Delaware ("DAFB"), and Jersey Shore Automation, Inc. ("Jersey Shore"), subcontractor to Chugach on five of the many buildings at DAFB under a Master Subcontract Agreement dated May 13, 2003 ("MSA").[2]  Under the SABER Contract, the Government would issue a Delivery Order with Notice to Proceed to Chugach for individual building projects at DAFB.

Under the MSA, Jersey Shore had opportunities to be Chugach's subcontractor on certain of the Delivery Orders that the Government issued to Chugach.  Jersey Shore performed only such work as Jersey Shore desired and agreed and only at a price that satisfied Jersey Shore.  Chugach could not compel Jersey Shore to accept any particular project, nor could Chugach compel Jersey Shore to perform the work for a price that Chugach dictated.  If Chugach offered to subcontract a particular building to Jersey Shore under the MSA, Jersey Shore would review the Government's Scope of Work and whatever other documentation the Government had provided, and if Jersey Shore agreed, Chugach would issue to Jersey Shore and Jersey Shore would accept a Delivery Order

2005) (the "July 6 Supp. Brief") and accompanying Supplemental Appendix and (iv) Reply Brief of Defendants Chugach Support Services, Inc. and Safeco Insurance Company of America to Dismiss in Part or in the Alternative for Partial Summary Judgment (Sept. 12, 2005) (the "Sept. 12 Reply Brief").  Collectively, the foregoing are referred to as the "Initial Motion."  To avoid refiling documents already filed, this Brief also relies on documents contained in the Appendix to the May 3 Brief and the Supplemental Appendix, referred to respectively as "Appendix Ex. _" and "Supp. Appendix Ex. __."

[2] Safeco Insurance Company of America is the bonding company that provided the bond

with Notice to Proceed ("DO/NTP") to do the work on that building at a fixed, agreed price, subject only to change orders. For four of the five DO/NTPs at issue, the fixed, agreed prices were, as Jersey Shore and Chugach had agreed, 79% of the prices in the respective Delivery Orders that the Government had issued to Chugach.

In its First Amended Complaint (the "Complaint"), Jersey Shore claims that Chugach breached its contracts with Jersey Shore on five buildings at issue by (i) incorrectly calculating the wage rates used in pricing the construction projects by failing to use the "Unit Price Guide" ("UPG") as the basis for getting the Government to agree to prices for each DO/NTP, (ii) failing to pay for completed work, (iii) failing to process invoices in timely fashion and (iv) failing to issue change orders. In its Counterclaim, Chugach claims that Jersey Shore, which walked off the job leaving all five structures uncompleted, (i) failed to undertake, proceed with and complete the construction for which Jersey Shore was contractually obligated and (ii) wrongfully suspended its work and vacated its construction projects at DAFB on July 14, 2004, leaving Chugach to complete the work.

### ADDITIONAL STATEMENTS OF MATERIAL FACT
### AS TO WHICH THERE IS NO GENUINE DISPUTE

1. On or about February 21, 2003, the United States of America awarded Chugach, and Chugach and the United States of America entered into, the Simplified Acquisition of Base Engineering Requirements Contract F07603-03-D-0002 (together with subsequent amendments, the "SABER Contract"). *See* Exhibit 1, Plaintiff's Responses and Objections to Defendants' First Request for Admissions ("Plaintiff's Admissions"), No. 1.

---

required of Chugach under the SABER Contract.

2. Defendants' documents bates-stamped CSS 000001 through CSS 000234, contained in the Appendix, constitute a true, complete and correct copy of the SABER Contract. *See* Exhibit 1, Plaintiff's Admissions, No. 2.

3. The SABER Contract was an indefinite delivery, indefinite quantity contract for construction, repair and renovation of various facilities at Dover Air Force Base, Delaware ("DAFB"). Under the SABER Contract, the Government would award individual construction projects by delivery orders on an as-needed basis. *See* Exhibit 1, Plaintiff's Admissions, No. 3.

4. Pursuant to the SABER Contract, Chugach and Jersey Shore entered into a Master Subcontract Agreement dated May 13, 2003 (the "MSA"). *See* Exhibit 1, Plaintiff's Admissions, No. 4.

5. Defendants' documents that Chugach previously provided Jersey Shore bates-stamped CSS 000235 through CSS 000253 and CSS 001421 through CSS 001486 together constitute a true, complete and correct copy of the MSA. *See* Exhibit 1, Plaintiff's Admissions, No. 5 and Exhibit 2, a complete copy of the MSA.

6. The MSA incorporated clauses in the SABER Contract such that "the Subcontractor [Jersey Shore] is obligated to Contractor [Chugach] in the same manner that Contractor is obligated to the Owner [defined as the "United States Government and Dover Air Force Base, DE"]." *See* Exhibit 1, Plaintiff's Admissions, No. 6.

7. The MSA did not obligate Jersey Shore to accept any Work or any DO/NTP. *See* Exhibit 1, Plaintiff's Admissions, No. 7.

8. Under the MSA, Chugach could not compel Jersey Shore to accept any DO/NTP or to undertake any Work, except as Jersey Shore agreed to undertake. *See* Exhibit 1, Plaintiff's Admissions, No. 8.

9. Under the MSA, Chugach issued to Jersey Shore and Jersey Shore accepted contracts for several particular construction projects at DAFB, each such contract taking the form of a Delivery Order with Notice to Proceed ("DO/NTP"). *See* Exhibit 1, Plaintiff's Admissions, No. 9.

10. Pursuant to the MSA, Chugach issued to Jersey Shore and Jersey Shore accepted DO/NTPs for, *inter alia*, Building 401 (Delivery Order No. 5001), Building 300 (Delivery Order No. 5010), Building 302 (Delivery Order No. 5018), Building 1272 (Delivery Order No. 5019) and Building 781 (Delivery Order No. 5021). *See* Exhibit 1, Plaintiff's Admissions, No. 10.

11. Attached to and accompanying Defendants' First Set of Requests for Admission to Plaintiff Jersey Shore Automation, Inc. ("Defendants' Requests for Admission") were true, complete and correct copies of the following DO/NTPs, including Change Orders:

A. DO/NTP 5001 for Building 401, Exhibit 1 to Defendants' Requests for Admissions.

B. DO/NTP 5010 for Building 300, Exhibit 2 to Defendants' Requests for Admissions.

C. DO/NTP 5018 for Building 302, Exhibit 3 to Defendants' Requests for Admissions.

D. DO/NTP 5019 for Building 1272, Exhibit 4 to Defendants' Requests for Admissions.

E. DO/NTP 5021 for Building 781, Exhibit 5 to Defendants' Requests for Admissions.

*See* Exhibit 1, Plaintiff's Admissions, No. 11 and Exhibit 3, Defendants' Requests for Admission, No. 11.

12. Jersey Shore accepted and entered into the DO/NTPs referenced in Statement of Fact No. 11 above on the following dates, respectively:

A. Delivery Order No. 5001 for Building 401 dated June 24, 2003, agreed to and accepted by Jersey Shore on July 1, 2003.

B. Delivery Order No. 5010 for Building 300 dated November 12, 2003, agreed to and accepted by Jersey Shore on November 17, 2003.

C. Delivery Order No. 5018 for Building 302 dated November 17, 2003, agreed to and accepted by Jersey Shore on November 20, 2003.

D. Delivery Order No. 5019 for Building 1272 dated November 12, 2003, agreed to and accepted by Jersey Shore on November 20, 2003.

E. Delivery Order No. 5021 for Building 781 dated December 3, 2003, agreed to and accepted by Jersey Shore on December 8, 2003.

*See* Exhibit 1, Plaintiff's Admissions, No. 12.

13. Prior to accepting the Delivery Orders referenced in Statement of Fact No. 12 above, Jersey Shore did its own takeoffs based on the narrative statements of work (the "SOWs") that Chugach received from the Government and supplied to Jersey Shore. *See* First Amended Complaint ¶ 32.

14. In DO/NTP 5010, Chugach and Jersey Shore agreed to a total price of $93,957.00 for all work to be performed under DO/NTP 5010, subject only to change orders that could increase or decrease the total price and thereby establish a new total price for the work to be performed under DO/NTP 5010. *See* Exhibit 1, Plaintiff's Admissions, No. 18.

15. Pursuant to Change Order No. 1 to DO/NTP 5010 dated January 29, 2004, Chugach and Jersey Shore changed the total price to $158,474.00 and changed the completion date to no later than March 1, 2004. *See* Exhibit 1, Plaintiff's Admissions, No. 19.

16. In DO/NTP 5018, Chugach and Jersey Shore agreed to a total price of $800,000 for all work to be performed under DO/NTP 5018, subject only to change orders that could increase or decrease the total price and thereby establish a new total price for the work to be performed under DO/NTP 5018. *See* Exhibit 1, Plaintiff's Admissions, No. 20.

17. Pursuant to Change Order No. 1 to DO/NTP 5018 dated March 31, 2004, Chugach and Jersey Shore changed the total price to $803,323.91. *See* Exhibit 1, Plaintiff's Admissions, No. 21.

18. Pursuant to Change Order No. 3 to DO/NTP 5018 dated May l0, 2004, Chugach and Jersey Shore changed the total price to $828,823.91. *See* Exhibit 1, Plaintiff's Admissions, No. 22.

19. Pursuant to an email from Terry Wright of Jersey Shore to George Molina of Chugach dated June 11, 2004, Jersey Shore confirmed that it was "transfer[ring] back" to Chugach the SSMR roof and the brick-face project, reducing the total price of DO/NTP 5018 by $279,150, to $549,673.91. *See* Exhibit 1, Plaintiff's Admissions, No. 23.

20. Attached to and accompanying Defendants' Requests for Admission as Exhibit 6, bates-stamped CSS 001778, is a true, complete and correct copy of the email referenced in Statement of Fact No. 19 above, except for the unidentified handwriting at the top reading "Jersey Shore File." *See* Exhibit 1, Plaintiff's Admissions, No. 24.

21. Pursuant to Change Order No. 4 to DO/NTP 5018 dated July 13, 2004, Chugach changed the total price to $549,673.91 as Jersey Shore had requested and as Jersey Shore had confirmed in the email referenced in Statement of Fact No. 19 above. *See* Exhibit 1, Plaintiff's Admissions, No. 25.

22. In DO/NTP 5019, Chugach and Jersey Shore agreed to a total price of $230,000.00 for all work to be performed under DO/NTP 5019, subject only to change orders that could increase or decrease the total price and thereby establish a new total price for the work to be performed under DO/NTP 5019.  *See* Exhibit 1, Plaintiff's Admissions, No. 26.

23. In DO/NTP 5021, Chugach and Jersey Shore agreed to a total price of $328,179.00 for all work to be performed under DO/NTP 5021, subject only to change orders that could increase or decrease the total price and thereby establish a new total price for the work to be performed under DO/NTP 5021.  *See* Exhibit 1, Plaintiff's Admissions, No. 27.

24. Pursuant to Change Order No. 1 to DO/NTP 5021 dated April 20, 2004, Chugach and Jersey Shore changed the total price to $330,959.00.  *See* Exhibit 1, Plaintiff's Admissions, No. 28.

25. Jersey Shore suspended all work under the MSA and the DO/NTPs on July 14, 2003 and after that performed no work and provided no materials or services under the MSA and the DO/NTPs.  *See* Exhibit 1, Plaintiff's Admissions, No. 30.

26. The fixed, agreed prices in the foregoing DO/NTPs 5010, 5018, 5021 and 5019 were, as Jersey Shore and Chugach had agreed, 79% of the respective prices in the Delivery Orders that the Government issued to Chugach for DAFB Buildings 300, 302, 781 and 1272.  *See* Exhibit 4, Deposition of Robert Hafey ("Hafey Dep."), at 77:8-10; 84:18 through 85:1; 105:20-22; 108:3-6; Complaint, ¶¶ 41 & 43 & Ex. B thereto.

27. The procedures for change orders to all DO/NTPs between Chugach and Jersey Shore was set forth in ¶ 9 of the MSA between Chugach and Jersey Shore, which provided as follows:

9.      CHANGES

Contractor may, at any time by written order ("Change Order"), without in any way invalidating this Agreement, make changes, revisions, additions, or

8

deletions (the "Changes") in the work which are required by changes ordered by Owner under the Delivery Order or Prime Contract. Contractor's determination (i) that a change ordered by Owner is a change within the general scope of this Agreement, and (ii) that such changes require Subcontractor to make a Change of the Work, shall be conclusive as to Subcontractor's obligation to perform such Change. If any Change causes an increase or decrease in the cost of, or time required for their performance of any part of the Work, whether changed or not, Subcontractor's compensation, the period of performance, or both, shall be adjusted in accordance with changes in the Delivery Order or Prime Contract, and the Delivery Order with NTP shall be modified in writing accordingly. The Subcontractor shall proceed with the performance of the Work as Changed immediately upon its receipt or in accordance with the terms of the Change Order. Any claim for an adjustment to Subcontractor's compensation or time for the performance of the Work not covered by a Change Order or other written modification shall be made in writing to Contractor in accordance with paragraph 8 [*sic*; should be 10].

*See* Exhibit 1, Plaintiff's Admissions, No. 31 and Exhibit 2, the MSA.

28. The only change orders, if any, to DO/NTP 5010, DO/NTP 5018, DO/NTP 5019 and DO/NTP 5021 are contained with and are part(s) of the DO/NTPs, attached to Exhibit 3, Defendants Requests for Admission, as Exhibits 1 through 5, respectively, and referenced in Statement of Fact No. 11 above. *See* Exhibit 1, Plaintiff's Admissions, No. 32.

29. As of the date and time that Jersey Shore suspended all work at DAFB under the MSA and the DO/NTPs, Jersey Shore had not submitted any request for a Change Order to Chugach requesting, asserting, demanding or referencing any right to or interest in additional compensation or other payments based on UPG prices or Davis-Bacon Act wage and/or benefit rates. *See* Exhibit 1, Plaintiff's Admissions, Nos. 32 & 33.

30. As of the date and time that Jersey Shore suspended all work at DAFB under the MSA and the DO/NTPs, Chugach had not issued to Jersey Shore any Change Order regarding or referencing any right to or interest in additional compensation or other payments based on UPG prices or Davis-Bacon Act wage and/or benefit rates. *See* Exhibit 1, Plaintiff's Admissions, Nos. 32 & 34.

31. The SABER Contract and the Davis Bacon Act, 40 U.S.C. § 276a *et seq*., required Jersey Shore to pay all of its workers at DAFB the wages and fringe benefits determined by and under the Davis-Bacon Act, regardless of the amounts that Jersey Shore (or Chugach) received from the Government for the work performed. *See* SABER Contract, Appendix Ex. 1, at CSS 000025; Exhibit 5, CSS 000649-656, at 651 ("Employees that cannot meet all of the circumstances noted above must be paid in accordance with the Davis-Bacon Act. They must be properly classified and properly paid.").

32. Jersey Shore failed and refused to pay all of its workers at DAFB the wages and fringes that the SABER Contract and the Davis-Bacon Act required, one consequence of which was that Chugach had to pay to the Government, through the U.S. Department of Labor, $72,049 to compensate Jersey Shore's workers as the SABER Contract and the Davis-Bacon Act required. *See* Exhibit 1 to the Sept. 12 Reply Brief (correspondence between counsel for Chugach and the U.S. Department of Labor with Chugach's payment); Exhibit 5, CSS 000649-656; Exhibit 6, JSA 391-392.

33. Paragraph 10 of the MSA provides as follows:

10.    CLAIMS

In the event Subcontractor claims additional compensation or a further extension for the performance of the Work, as a result of a Change Order pursuant to

10

Paragraph 7 [*sic*; should be 9], it shall submit its claim in writing to Contractor not later than twenty (20) days after issuance of the Change Order or other act or occurrence giving rise to the claim.  Any claim not submitted within such time period shall be barred.  Contractor shall submit such written information with its claim as shall reasonably substantiate its claim or as Contractor or Owner shall reasonable request.  Contractor will notify Subcontractor in writing of Contractor's decision on the claim within 30 days after receipt, including whether, in accordance with the applicable provisions of the Prime Contract, Contractor will pursue the claim on Subcontractor's behalf.

*See* Exhibit 1, Plaintiff's Admissions, No. 35 and Exhibit 2, the MSA.

34.  As of the date and time that Jersey Shore suspended all work at DAFB under the MSA and the DO/NTPs, Jersey Shore had not submitted any claim in writing to Chugach requesting, asserting, demanding or referencing any right to or interest in additional compensation or other payments based on UPG prices or Davis-Bacon Act wage and/or benefit rates.  *See* Exhibit 1, Plaintiff's Admissions, No. 36.

35.  Attached to and accompanying Defendants' Requests for Admission as Exhibit 7 is a true, complete and correct copy of the written claim that Jersey Shore served on Chugach on July 23, 2004, following Jersey Shore's suspension of work on July 14, 2004.  *See* Exhibit 1, Plaintiff's Admissions, No. 37; Exhibit 3, Defendants' Requests for Admission, Exhibit 7.

36. In Exhibit 7 to Defendants' Requests for Admission, Jersey Shore made no reference to and no claim for additional compensation or other payments based on UPG prices.  *See* Exhibit 1, Plaintiff's Admissions, No. 38.

37.  In Exhibit 7 to Defendants' Requests for Admission, Jersey Shore made no reference to and no claim for additional compensation or other payments based on Davis-Bacon Act wage and/or benefit rates.  *See* Exhibit 1, Plaintiff's Admissions, No. 39.

11

38. Jersey Shore has no documents and is aware of no documents generated or dated in the period beginning October 4, 2003 and ended July 13, 2004 that reference, reflect or relate to any alleged agreement or commitment by or on behalf of Chugach to compensate Jersey Shore, or otherwise to reimburse or pay Jersey Shore, any amounts based on Davis-Bacon Act wage or benefit rates. *See* Exhibit 1, Plaintiff's Admissions, No. 42.

39. There is no document from or executed by Chugach pursuant to which Chugach committed, agreed or was obligated to compensate Jersey Shore, or otherwise to reimburse or pay Jersey Shore, any amounts based on UPG prices. *See* Exhibit 1, Plaintiff's Admissions, No. 43.

40. There is no document from or executed by Chugach pursuant to which Chugach committed, agreed or was obligated to compensate Jersey Shore, or otherwise to reimburse or pay Jersey Shore, any amounts based on Davis-Bacon Act wage or benefit rates. *See* Exhibit 1, Plaintiff's Admissions, No. 44.

41. Paragraph 16 of the MSA provides as follows:

16.    ENTIRE AGREEMENT

The foregoing and Parts I though V, along with other documents listed below, constitute the entire Agreement between the parties. Terms and/or conditions, whether expressed or implied, other than rates that are stated in the rate schedule, field work orders, invoices, or any other documents, and those documents executed specifically as amendments by a representative of Contractor of the same status as the representative who executed this Agreement, shall neither alter, add to, nor subtract from the terms and conditions of this Agreement. Part III, Part IV and Part V are available for the review of the Subcontractor at the office of Chugach Support Services located at Dover Air Force Base, Building 447, Tuckegge Street.

*See* Exhibit 2, the MSA.

42. There is nothing in the MSA, in the DO/NTPs, in the rates stated in the rate schedule, field work orders, invoices and other documents or in documents specifically executed as amendments to the MSA or to the DO/NTPs (i) that obligates or commits Chugach to pay, (ii) pursuant to which Chugach agreed to pay, (iii) that obligates or commits Chugach to seek from the Government or (iv) pursuant to which Chugach agreed to seek from the Government amounts based on UPG prices.  *See* Exhibit 1, Plaintiff's Admissions, Nos. 2, 5, 11 & 43; Exhibit 2, the MSA; Statements of Fact No. 38-41 above.

43. Paragraph 1.0 of the SABER Contract, at CSS 000035, required Chugach to use the R.S.Means® database for pricing, applying certain multipliers against the R.S.Means® base to determine the prices for the individual tasks comprising each delivery order that the Government would issue to the successful contractor and for the delivery orders that Government did issue to Chugach for the individual projects, as follows (all emphases in original):

> In order to be considered for award, each offeror must submit four (4) coefficients, (CLINS 0001 through 0004); and identify that portion of the preceding coefficients attributed to project estimating and preparation of minimal design packages (CLIN 0005).  The government uses these multipliers to determine the price of work for each task on individual delivery orders.  The prices established in the R.S.Means® database <u>bare costs</u> (which means no markup for overhead and profit (O&P)) column, will be multiplied by the City Cost Index Weighted Average Total for **Dover, Delaware, or geographically closest city listed if Dover, Delaware should be deleted**, and the coefficient to arrive at the actual price for a unit of work.  The coefficients shall be represented as "net", a "decrease from" or an "increase to" the prices listed in the R.S.Means®.  An offer of "net" would be represented as "1.0".  An example of a decrease from the prices in R.S.Means® would be "0.98."  An example of an increase above the prices listed in the R.S.Means® would be "1.10".  The figure entered for CLIN 0005 shall be represented in the same manner (raw figure) as the coefficient.

*See* Exhibit 1, Plaintiff's Admissions, No. 45 and Appendix Ex. 1, the SABER Contract.

44. Paragraph 8.0 of the SABER Contract, at CSS 000044, required Chugach to provide the Government with a hard copy of the R.S.Means® database and specified how Chugach had to develop estimates if a particular item were not included in the R.S.Means® database, as follows:

> The contractor shall provide, at no additional cost to the government, one (1) hard copy of unit price data to consist of the following R.S.Means® cost data books (one (1) complete total). Contractor shall provide the latest edition of these books to the SABER Chief and the Contract Administrator will only receive a copy of Facilities Construction Cost Data Book, within 30 days of latest release. If an item is not in the Means® Electronic Database used with the PULSAR® System, the contractor shall use the Means® Facility Cost Guide to locate the item. If the item cannot be found in the computerized version of the Facility Cost Guide, the contractor shall use the first eight (8) of the following books to develop the delivery order estimate. The contractor shall consider the item non-priced ONLY if it cannot be located in any of the first 8 guides.
> Building Construction Cost Data
> Mechanical Cost Data
> Plumbing Cost Data
> Electrical Cost Data
> Site Work Cost Data
> Concrete Cost Data
> Heavy Construction Cost Data
> Interior Cost Data
> Repair and Remodeling Cost Data (to be used for reference only)
> Light Commercial Cost Data (to be used for reference only)
> Residential Cost Data (to be used for reference only)[.]

*See* Exhibit 1, Plaintiff's Admissions, No. 46 and Appendix Ex. 1, the SABER Contract.

45. As a last resort, to be used only if a task could not be priced from these sources, the SABER Contract contained a relatively short list of task prices called a "Unit Price Guide" ("UPG") that established prices *only* for items not in the RSMeans database or otherwise not ascertainable under ¶ 8.0 quoted immediately above. *See* SABER Contract, Appendix Ex. 1, at CSS 000046:

18.0. Non-prepriced Items (NPIs):

18.1. Items of work not covered by this contract but within its scope and general intent and necessary to complete the requirements of a specific delivery order may be negotiated and incorporated into the delivery order by the contracting officer or his

14

designated representative.  Non-prepriced work shall be so noted on each delivery order and shall not exceed fifteen (15) percent of the final negotiated amount for the delivery order.

18.2.  To permit recurrent use, a NPI must be incorporated by supplemental agreement into the Unit Price Guide (UPG).  This may be done at any time during the contract period.

18.3.  Once an item is added to the UPG and becomes a pre-priced item (PPI), an economic adjustment will be applied in subsequent option years if that item is used again. ….

46.  The UPG included in the SABER Contract established prices only for items not in the RSMeans database or otherwise not ascertainable under ¶ 8.0 of the SABER Contract quoted immediately above.  *See* Exhibit 1, Plaintiff's Admissions, No. 48; Supp. Appendix Ex. 6, the Minutes of the September 24, 2002 Preproposal Conference (bates-stamped JSA 349, 351 & 354) with respect to the solicitation from the Government that became the SABER Contract, which provide as follows with respect to the applications of RSMeans and the UPG:

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 439TH AIRLIFT WING (AMC)

FROM: LGCA (302-677-5012)

SUBJECT: Minutes of the Preproposal Conference

CONTRACT NUMBER: F07603-02-R-0009

PROJECT NUMBER AND TITLE: Simplified Acquisition of Base Engineer Requirements (SABER)

DATE/TIME: 24 September 2002, 1300 hrs

LOCATION: Bldg 639, Base Supply Training Room, Room No. 224, Building 639

****

18. Attachment 6 is the Unit Price Guide (UPG).  These are the items Dover AFB utilizes that are not included in the Means.  With the exception of the line item for

15

rubbish hauling/handling, if items are found in Means, they should use that item in lieu of the item listed in Attachment 6. Ms McGee added that contractor must review the pricing included in Attachment 6 and should they consider any of them to be inadequate, she must received notification with justification within the next few days. Ms McGee [*sic*] she will not entertain any complaints of inadequacies after award.

**\*\*\*\***

10. Question: What is the relationship between the R.S. Means® computerized pricing guide and the UPG at Attachment 6.

Response: The coefficients (your overhead and profit) are applied to the R. S. Means® computerized pricing guide – bare costs. Coefficients are not applied to the UPG, Attachment 6. The items in Attachment 6 are locally developed and include overhead and profit. The items in Attachment 6 are only adjusted in accordance with the economic price adjustment in Section H, pages 14 and 15. Non-prepriced Items (NPIs). Mr Shore added that the items in the UPG are items that are either not included in the Means, or are not covered adequately in the database; i.e., what Dover AFB, Delaware, requires specifically.

11. Question: If an item appears in both the R. S. Means computerized database and the UPG, does the contractor have an option of which to use.

Response: Mr Shore stated he does not feel the items, as specified, in the UPG are included in Means, and if they are in Means as we specify, we would like to know. With the exception of the rubbish handling/hauling, if items are in both Means and the UPG, the contractor should use Means.

*See also* Exhibit 4, Hafey Dep., at 19:11-18; 31:3-7; 73:3-7; 84:4-6; 95:8-23.

47. The UPG included in the SABER Contract set forth a relatively small and limited list of prices, in contrast to RSMeans, which was hundreds of pages long and established prices for virtually every task to be performed under the SABER Contract at DAFB. *See and compare* the UPG in the SABER Contract, Appendix Ex. 1, as revised in Contract amendments, at CSS 000081-85, CSS 000212-216 & CSS 000227-232, *with* the excerpt from RSMeans previously filed as Exhibit 2 to the Sept. 12 Reply Brief.

48. Mr. Hafey was Chugach's project manager for the SABER Contract from March 18,

2003 until a date in May, 2004. Jersey Shore approached Mr. Hafey for subcontracting possibilities under the SABER Contract. Mr. Hafey agreed to offer certain work to Jersey Shore and was the person executing the MSA and the subject DO/NTPs for Chugach. *See* Exhibit 4, Hafey Dep., at 109:20 through 110:1; 34:19-23.

49. Jersey Shore alleges that Mr. Hafey agreed in September and October 2004 to submit to and require of the Government UPG prices instead of RSMeans prices. Mr. Hafey denies the allegation, and there is no documentary support for the allegation. *See id.* at 32:11-18; 71:19 through 72:14;73:3-7; 79:16-18; 79:24 through 80:8; 95:8-23; 98:4 through 99:9; 101:14 through 108:6; Statements of Fact Nos. 29-42 above.

50. Chugach overpaid Jersey Shore for its work on the five buildings at issue by at least $349,000, as follows:

 (i) On building 401, Chugach paid Jersey Shore in excess of $776,000, which was 68% of the total contract price of approximately $1,141,000. But Jersey Shore had completed only 47% of the building, which translates to approximately $536,000, meaning that Chugach overpaid Jersey Shore by some $240,000 on building 401. Chugach also paid Jersey Shore's subcontractors and suppliers an additional $31,520 before termination, so that Jersey Shore received actually and constructively approximately $808,000, over 70% of the contract price, for 47% of the work and was overpaid more than $270,000 on building 401.

(ii) On building 302, Chugach paid Jersey Shore $398,000, which was more than 72% of the total contract price of approximately $550,000 (originally $803,000 but reduced by change orders to just under $550,000). Chugach also paid some $144,000 to Jersey Shore's subcontractors and suppliers before termination, for a total of $542,000, 98.5% of the total DO/NTP price. Jersey Shore

had completed approximately 53% of the work, taking 76% of the time, a completion percentage that translates to approximately $291,500 including the payments to Jersey Shore's subcontractors and suppliers that Chugach paid. Thus, on building 302, though behind, Jersey Shore was overpaid by some $250,000.

(iii) On building 300, Chugach paid Jersey Shore directly approximately $147,500 on a contract of $158,500. Jersey Shore did not complete building 300 but received 93% of the contract amount.

(iv) On building 1272, Chugach paid Jersey Shore $177,325 on the contract amount of $230,000, or 77%. Again, Jersey Shore did not compete the building prior to walking off the site.

(v) On building 781, Chugach paid Jersey Shore $222,800 on the $331,000 contract, again for an incomplete building.

*See* Exhibit 7, Declaration of Lori Clowers in Support of Motion for Summary Judgment ("Clowers Dec."), ¶¶ 7-8.

51. Due to Jersey Shore's lack of progress and defaults under the DO/NTPs, pursuant to the MSA Chugach requested a plan to remedy the defaults from Jersey Shore on July 13, 2004. On July 14, 2004, Jersey Shore informed Chugach that Jersey Shore was suspending performance and walking off the job. Jersey Shore refused to provide any proposal to remedy its defaults as required by the MSA, and therefore pursuant to the MSA Chugach formally terminated Jersey Shore on July 20, 2004 for breach of contract. *See* Exhibit 7, Clowers Dec., ¶ 9 & Exhibits A-C thereto.

52. In addition to the amounts paid to Jersey Shore, Chugach's documented costs to complete the five buildings that Jersey Shore left incomplete, in excess of the contract prices, were $1,916,116 (rounded): $962,312 for building 401, $833,300 for building 302, $56,970 for building 300, $49,241

18

for building 1272 and $14,473 for building 781.  These costs to complete included approximately $395,000 that Chugach paid directly to Jersey Shore's subcontractors and suppliers for labor and materials that the subcontractors and suppliers had provided Jersey Shore for work on the five buildings at DAFB under the MSA but for which Jersey Shore had not paid its subcontractors and suppliers.  *See* Exhibit 7, Clowers Dec., ¶ 10.

53. Under Section 8.3 of the MSA (document CSS 000235 through 000253), Chugach is entitled, in addition to its actual costs incurred in performing the work, to reasonable overhead, profit and attorneys' fees."  Chugach's reasonable overhead and profit aggregate 15% of the $1,916,116, for a total, excluding attorneys' fees yet to be determined, of $2,203,533 for costs to complete.  *See* Exhibit 7, Clowers Dec., ¶ 11.

54. Jersey Shore also owes Chugach a minimum of $349,000 that Chugach overpaid Jersey Shore for work that Jersey Shore failed to complete on the five structures.  In addition, as a consequence of Jersey Shore's failures to pay Davis-Bacon wages and fringe benefits, Chugach as prime contractor had to pay the U.S. Department of Labor $72,049 for the unpaid wages and fringes Jersey Shore owed its employees for their work under the DO/NTPs.

55. Jersey Shore claims damages as follows:

     (i) $685,194.15 allegedly because Chugach incorrectly used RS Means cost data when it should have used UPG cost data.

     (ii) $395,557.99 allegedly for work performed by Jersey Shore's subcontractors and materials delivered by Jersey Shore's suppliers, but not paid by Chugach.

     (iii) $281,767.38 allegedly for balance of unpaid percentage of work completed based upon contract amount.

     (iv) $22,360.21 allegedly for materials purchased and stored on site for use with work.

(v) $132,000.00 allegedly based upon 50% of remaining contract value of services to be provided directly by Jersey Shore.

(vi) Interest in an amount to be established at trial.

(vii) Interest in excess of $48,000 on obligations allegedly incurred by Jersey Shore by reason of Chugach's alleged delays and defaults in payment which caused Jersey Shore to finance the on-going construction.

*See* Exhibit 8, Plaintiff Jersey Shore's Rule 26(a)(1) First Supplemental Initial Disclosures.

## ARGUMENT

### I. Defendants Are Entitled to Summary Judgment for the Reasons Set Forth in the Initial Motion

For the reasons set forth in the pending Initial Motion and supporting Briefs and Exhibits,

Defendants are entitled to summary judgment on the Complaint.

### II. Defendants Are Entitled to Summary Judgment Pursuant to Paragraphs 9 and 10 of the Master Subcontract Agreement

Paragraph 9 of the MSA provides in pertinent part:

Any claim for an adjustment to Subcontractor's compensation or time for the performance of the Work not covered by a Change Order or other written modification shall be made in writing to Contractor in accordance with paragraph [10].

Paragraph 10, in turn, provides in pertinent part:

In the event Subcontractor claims additional compensation or a further extension for the performance of the Work, as a result of a Change Order pursuant to Paragraph [9], it shall submit its claim in writing to Contractor not later than twenty (20) days after issuance of the Change Order or other act or occurrence giving rise to the claim. Any claim not submitted within such time period shall be barred.

Jersey Shore did not submit any claim or other request for payment based on or referencing

the UPG or Davis-Bacon Act wage rates.  Under Alaska law, which applies according to paragraph

17 of the MSA, paragraphs 9 and 10, agreed to by and between two sophisticated, commercial

entities, are enforceable as written. *See Inman v. Clyde Hall Drilling Co.*, 369 P.2d 498, 500-01

(Alaska 1962). Therefore, Jersey Shore's claims for damages based on any alleged failure by

Chugach to use, apply or pay UPG rates and/or based on any alleged failure by Chugach to use,

apply or pay Davis-Bacon wage rates is barred. *See id.* The barred claims include, but are not

limited to, Jersey Shore's particular damages claim set forth in Statement of Fact No. 55 above for

$685,194.15 allegedly caused by Chugach's incorrectly using RS Means cost data when it should

have used UPG cost data.

### III. Defendants Are Entitled to Summary Judgment Pursuant to Paragraph 16 of the Master Subcontract Agreement

Paragraph 16 of the MSA, titled "Entire Agreement," provides in pertinent part:

> The foregoing and Parts I through V, along with other documents listed below, constitute the entire Agreement between the parties. Terms and/or conditions, whether expressed or implied, other than rates that are stated in the rate schedule, field work orders, invoices, or any other documents, and those documents executed specifically as amendments by a representative of Contractor of the same status as the representative who executed this Agreement, shall neither alter, add to, nor subtract from the terms and conditions of this Agreement. Part III, Part IV and Part V are available for the review of the Subcontractor at the office of Chugach Support Services located at Dover Air Force Base, Building 447, Tuckegge Street.

Jersey Shore has no "documents specifically executed as amendments" -- or any other documents,

for that matter -- committing Chugach to obtain from the Government or obligating Chugach to pay

to Jersey Shore anything other than what Chugach promised in the MSA and the DO/NTPs, based on

the actual price of the delivery order that Chugach received from the Government. Based on the

contract language, giving full effect to paragraph 16's possibility of extrinsic documents becoming

part of the integrated contract, Defendants are entitled to summary judgment on all claims premised

on or arising out of an alleged agreement by Chugach to pay Jersey Shore based on UPG prices or

Davis-Bacon Act wage rates.  *See, e.g., Neal & Co. v. Ass'n of Village Housing*, 895 P.2d 497, 502

(Alaska 1995).

### IV. Defendants Are Entitled to Summary Judgment on All of Plaintiffs' Remaining Claims for Damages

Chugach overpaid Jersey Shore by at least $349,000, giving Jersey Shore the benefit of every

doubt, for all the work that Jersey Shore did complete and for all the materials that Jersey Shore did

supply.  Accordingly, Chugach is entitled to summary judgment on Jersey Shore's claims for

$281,767.38, allegedly the balance of unpaid percentage of work, and for $22,360.21, allegedly for

materials purchased and stored on site.  Chugach paid Jersey Shore this money, and more.

Chugach is entitled also to summary judgment on Jersey Shore's claim for $132,000

allegedly based upon 50% of some undefined remaining contract value of services to be provided

directly by Jersey Shore.  There is no contractual basis for this percentage-based claim in the MSA,

the DO/NTPs or otherwise, and there is no other basis in law.

In addition, Chugach paid the $395,557.99 that Jersey Shore claims for work performed by

its subcontractors and materials directly to such subcontractors and suppliers, and therefore Jersey

Shore is not entitled to damages in that amount.

### V. Defendants Are Entitled to Summary Judgment on Their Counterclaim

Jersey Shore made demands for payments that were illegal, impossible to perform and not

anything to which Chugach had agreed or was obligated.  Jersey Shore walked off the job, leaving

buildings significantly uncompleted, even though Chugach had overpaid Jersey Shore by at least

$349,000, giving Jersey Shore the benefit of every doubt, for all the work that Jersey Shore had

completed and for all the materials that Jersey Shore had supplied.  Jersey Shore walked off the job

without even responding to Chugach's request for MSA compliance by providing a plan for

proposed completion, leaving Chugach high and dry on the five projects at issue. Jersey Shore walked off the job leaving its subcontractors and suppliers unpaid on almost $400,000 of invoices for work performed and materials provided, again leaving Chugach holding the bag and having to step in and pay Jersey Shores subcontractors and suppliers. Jersey Shore failed to pay its workers the wages and fringe benefits that the Davis Bacon Act required, once again leaving Chugach to pick up the pieces of Jersey Shore's misconduct. Clearly and unequivocally, Jersey Shore materially breached the MSA and the DO/NTPs. As a consequence of Jersey Shore's breaches, Chugach suffered documented damages in the amount of $2,552,533, not including attorneys fees and other recoverable costs and expenses.

Accordingly, Chugach is entitled to summary judgment on its counterclaim against Jersey Shore in the amount of $2,552,533 plus attorneys fees and other recoverable costs and expenses to be determined.

## CONCLUSION

For the reasons set forth above and in Defendants' pending Initial Motion, incorporated herein by reference, Defendants respectfully pray for summary judgment on the First Amended Complaint and for summary judgment on the counterclaim, both in favor of Defendants and against Jersey Shore, and for such other relief as may be proper.

BIRCH, HORTON, BITTNER AND CHEROT

/s/ Harvey A. Levin
Harvey A. Levin
1155 Connecticut Avenue, N.W., Suite 1200
Washington, DC 20036
Phone (202) 659-5800
Fax (202) 659-1027
Email: hlevin@dc.bhb.com

       and

THE LYONS LAW FIRM

Edmund Daniel Lyons (No. 0881)
1526 Gilpin Avenue
P.O. Box 579
Wilmington, DE 19806
Phone (302) 777-5698
Fax (302) 777-5051
Email: elyons@lyonslaw.com

Counsel for Chugach Support Services, Inc. and
Safeco Insurance Company of America

24

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by electronic filing and by first class

mail, postage prepaid this 30th day of January 2006 on:


James D. Heisman, Esquire
M. Edward Danberg, Esquire
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899



/s/ Harvey A. Levin


g:\505986\4\hal9390.doc