IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA<br>for the Use and Benefit of<br>JERSEY SHORE AUTOMATION, INC.<br><br>Plaintiff,<br><br>vs.<br><br>CHUGACH SUPPORT SERVICES, INC., *et al.*<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C. A. No. 04-1416 (JJF) |

**EXHIBIT 3**

**TO**

**BRIEF OF DEFENDANTS
CHUGACH SUPPORT SERVICES, INC.
AND SAFECO INSURANCE COMPANY OF AMERICA
IN SUPPORT OF SUPPLEMENTAL MOTION
FOR SUMMARY JUDGMENT ON THE COMPLAINT AND THE
COUNTERCLAIM**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>for the Use and Benefit of<br>JERSEY SHORE AUTOMATION, INC. | ) ) ) ) | |
|      Plaintiff, | ) ) | C. A. No. 04-1416 (JJF) |
| vs. | ) ) | |
| CHUGACH SUPPORT SERVICES, INC., *et al.* | ) ) | |
|      Defendants | ) ) ) | |

### DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSION TO PLAINTIFF JERSEY SHORE AUTOMATION, INC.

Pursuant to Federal Rules of Civil Procedure 26 & 35, Defendants Chugach Support Services, Inc. and Safeco Insurance Company of America, by counsel, request that Jersey Shore Automation, Inc. respond to the requests for admission set forth below, within 30 days after service hereof or within such shorter time as may be agreed upon or ordered by the Court. In responding, Defendants request that Plaintiff set forth in full each request, followed by the response.

### DEFINITIONS AND INSTRUCTIONS

1. "Chugach" means Chugach Support Services, Inc.

2. "Jersey Shore" and "you" mean Jersey Shore Automation, Inc. and its parents, subsidiaries, brother and sister companies, other affiliates, officers, directors and principals.

3. "Work" means all tasks, labor, materials, construction, renovation, installation, demolition, oversight, inspection, quality control and all work and materials of any and every kind under, pursuant to or with respect to the MSA and every Delivery Order.

4 "DAFB" means Dover Air Force Base, Delaware.

5. "Delivery Order," "Delivery Orders," "DO/NTP" and "DO/NTPs" mean any individual Delivery Order or some or all of the Delivery Orders with Notice to Proceed that Chugach issued to Jersey Shore under the MSA or otherwise for Work at DAFB.

6. "Contracting Officer" means the Contracting Officer for the United States Government and any department or agency thereof as defined in and/or as engaged with respect to the SABER Contract, including Jacqueline J. McGee.

7. "Damages" means all damages and other amounts for which Jersey Shore seeks recovery in this action.

8. "SABER Contract" means the Simplified Acquisition of Base Engineering Requirements Contract F07603-03-D-0002 together with subsequent amendments, more fully described in Request No. 1 below.

8. "UPG prices" means prices determined pursuant to the Unit Price Guide(s) contained in the SABER Contract.

9. "Davis-Bacon Act" means the federal Davis-Bacon Act, 40 U.S.C. § 276a *et seq.*

10. References to any person or party include that person's or party's principals, officers, attorneys, agents and other persons acting for or on behalf of the person or party.

## REQUESTS FOR ADMISSION

1. On or about February 21, 2003, the United States of America awarded Chugach, and Chugach and the United States of America entered into, the Simplified Acquisition of Base Engineering Requirements Contract F07603-03-D-0002 (together with subsequent amendments, the "SABER Contract").

2. Documents that Chugach previously provided Jersey Shore bates-stamped CSS 000001 through CSS 000234 constitute a true, complete and correct copy of the SABER Contract.

3. The SABER Contract was an indefinite delivery, indefinite quantity contract for construction, repair and renovation of various facilities at Dover Air Force Base, Delaware ("DAFB"). Under the SABER Contract, the Government would award individual construction projects by delivery orders on an as-needed basis.

4. Pursuant to the SABER Contract, Chugach and Jersey Shore entered into a Master Subcontract Agreement dated May 13, 2003 (the "MSA").

5. Documents that Chugach previously provided Jersey Shore bates-stamped CSS 000235 through CSS 000253 and CSS 001421 through CSS 001486 together constitute a true, complete and correct copy of the MSA.

6. The MSA incorporated clauses in the SABER Contract such that "the Subcontractor [Jersey Shore] is obligated to Contractor [Chugach] in the same manner that Contractor is obligated to the Owner [defined as the "United States Government and Dover Air Force Base, DE"]."

7. The MSA did not obligate Jersey Shore to accept any Work or any DO/NTP.

8. Under the MSA, Chugach could not compel Jersey Shore to accept any DO/NTP or to undertake any Work, except as Jersey Shore agreed to undertake.

9. Under the MSA, Chugach issued to Jersey Shore and Jersey Shore accepted contracts for several particular construction projects at DAFB, each such contract taking the form of a Delivery Order with Notice to Proceed ("DO/NTP").

10. Pursuant to the MSA, Chugach issued to Jersey Shore and Jersey Shore accepted DO/NTPs for, *inter alia*, Building 401 (Delivery Order No. 5001), Building 300 (Delivery Order No.

3

5010), Building 302 (Delivery Order No. 5018), Building 1272 (Delivery Order No. 5019) and Building 781 (Delivery Order No. 5021).

11. Attached to and accompanying these Requests for Admission are true, complete and correct copies of the following DO/NTPs, including Change Orders:

A. DO/NTP 5001 for Building 401, Exhibit 1.

B. DO/NTP 5010 for Building 300, Exhibit 2.

C. DO/NTP 5018 for Building 302, Exhibit 3.

D. DO/NTP 5019 for Building 1272, Exhibit 4.

E. DO/NTP 5021 for Building 781, Exhibit 5.

12. Jersey Shore accepted and entered into the DO/NTPs referenced in Request 11 above on the following dates, respectively:

A. Delivery Order No. 5001 for Building 401 dated June 24, 2003, agreed to and accepted by Jersey Shore on July 1, 2003.

B. Delivery Order No. 5010 for Building 300 dated November 12, 2003, agreed to and accepted by Jersey Shore on November 17, 2003.

C. Delivery Order No. 5018 for Building 302 dated November 17, 2003, agreed to and accepted by Jersey Shore on November 20, 2003.

D. Delivery Order No. 5019 for Building 1272 dated November 12, 2003, agreed to and accepted by Jersey Shore on November 20, 2003.

E. Delivery Order No. 5021 for Building 781 dated December 3, 2003, agreed to and accepted by Jersey Shore on December 8, 2003.

4

13. Prior to accepting the Delivery Orders referenced in Request No. 12 above, Jersey Shore did its own takeoffs based on the narrative statements of work (the "SOWs") that Chugach received from the Government and supplied to Jersey Shore.

14. Jersey Shore accepted and entered into DO/NTP 5010 as of the date set forth in Request 12.B. above without expressing to Chugach any reservation, qualification or concern with respect to (a) the use, inclusion or absence of, (ii) the necessity for, (iii) an understanding or agreement with respect to or (iv) other concern regarding, UPG prices for any of the Work contemplated by or to be performed pursuant to the DO/NTP.

15. Jersey Shore accepted and entered into DO/NTP 5018 as of the date set forth in Request 12.C. above without expressing to Chugach any reservation, qualification or concern with respect to (a) the use, inclusion or absence of, (ii) the necessity for, (iii) an understanding or agreement with respect to or (iv) other concern regarding, UPG prices for any of the Work contemplated by or to be performed pursuant to the DO/NTP.

16. Jersey Shore accepted and entered into DO/NTP 5019 as of the date set forth in Request 12.D. above without expressing to Chugach any reservation, qualification or concern with respect to (a) the use, inclusion or absence of, (ii) the necessity for, (iii) an understanding or agreement with respect to or (iv) other concern regarding, UPG prices for any of the Work contemplated by or to be performed pursuant to the DO/NTP.

17. Jersey Shore accepted and entered into DO/NTP 5021 as of the date set forth in Request 12.E. above without expressing to Chugach any reservation, qualification or concern with respect to (a) the use, inclusion or absence of, (ii) the necessity for, (iii) an understanding or agreement with respect to or (iv) other concern regarding, UPG prices for any of the Work contemplated by or to be performed pursuant to the DO/NTP.

18. In DO/NTP 5010, Chugach and Jersey Shore agreed to a total price of $93,957.00 for all the Work to be performed under DO/NTP 5010, subject only to change orders that could increase or decrease the total price and thereby establish a new total price for the Work to be performed under DO/NTP 5010.

19. Pursuant to Change Order No. 1 to DO/NTP 5010 dated January 29, 2004, Chugach and Jersey Shore changed the total price to $158,474.00 and changed the completion date to no later than March 1, 2004.

20. In DO/NTP 5018, Chugach and Jersey Shore agreed to a total price of $800,000 for all the Work to be performed under DO/NTP 5018, subject only to change orders that could increase or decrease the total price and thereby establish a new total price for the Work to be performed under DO/NTP 5018.

21. Pursuant to Change Order No. 1 to DO/NTP 5018 dated March 31, 2004, Chugach and Jersey Shore changed the total price to $803,323.91.

22. Pursuant to Change Order No. 3 to DO/NTP 5018 dated May 10, 2004, Chugach and Jersey Shore changed the total price to $828,823.91.

23. Pursuant to an email from Terry Wright of Jersey Shore to George Molina of Chugach dated June 11, 2004, Jersey Shore confirmed that it was "transfer[ring] back" to Chugach the SSMR roof and the brick-face project, reducing the total price of DO/NTP 5018 by $279,150, to $549,673.91.

24. Attached to and accompanying these Requests for Admission as Exhibit 6, bates-stamped CSS 001778, is a true, complete and correct copy of the email referenced in Request No. 23 above, except for the unidentified handwriting at the top reading "Jersey Shore File."

25. Pursuant to Change Order No. 4 to DO/NTP 5018 dated July 13, 2004, Chugach changed the total price to $549,673.91 as Jersey Shore had requested and as Jersey Shore had confirmed in the email referenced in Request No. 23 above.

26. In DO/NTP 5019, Chugach and Jersey Shore agreed to a total price of $230,000.00 for all the Work to be performed under DO/NTP 5019, subject only to change orders that could increase or decrease the total price and thereby establish a new total price for the Work to be performed under DO/NTP 5019.

27. In DO/NTP 5021, Chugach and Jersey Shore agreed to a total price of $328,179.00 for all the Work to be performed under DO/NTP 5021, subject only to change orders that could increase or decrease the total price and thereby establish a new total price for the Work to be performed under DO/NTP 5021.

28. Pursuant to Change Order No. 1 to DO/NTP 5021 dated April 20, 2004, Chugach and Jersey Shore changed the total price to $330,959.00.

29. There is no uncertainty or ambiguity with respect to the fixed dollar prices in (i) DO/NTP 5010; (ii) DO/NTP 5018; (iii) DO/NTP 5019; and (iv) DO/NTP 5021.

7

30. Jersey Shore suspended all work under the MSA and the DO/NTPs on July 14, 2003 and after that performed no work and provided no materials or services under the MSA and the DO/NTPs.

31. The procedures for change orders to all DO/NTPs between Chugach and Jersey Shore was set forth in ¶ 9 of the MSA between Chugach and Jersey Shore, which provided as follows:

9.    CHANGES

Contractor may, at any time by written order ("Change Order"), without in any way invalidating this Agreement, make changes, revisions, additions, or deletions (the "Changes") in the work which are required by changes ordered by Owner under the Delivery Order or Prime Contract. Contractor's determination (i) that a change ordered by Owner is a change within the general scope of this Agreement, and (ii) that such changes require Subcontractor to make a Change of the Work, shall be conclusive as to Subcontractor's obligation to perform such Change. If any Change causes an increase or decrease in the cost of, or time required for their performance of any part of the Work, whether changed or not, Subcontractor's compensation, the period of performance, or both, shall be adjusted in accordance with changes in the Delivery Order or Prime Contract, and the Delivery Order with NTP shall be modified in writing accordingly. The Subcontractor shall proceed with the performance of the Work as Changed immediately upon its receipt or in accordance with the terms of the Change Order. Any claim for an adjustment to Subcontractor's compensation or time for the performance of the Work not covered by a Change Order or other written modification shall be made in writing to Contractor in accordance with paragraph 8 [*sic*].

32. The only change orders, if any, to DO/NTP 5010, DO/NTP 5018, DO/NTP 5019 and DO/NTP 5021 are contained with and are part(s) of the DO/NTPs, attached to these Requests as Exhibits 1 through 5, respectively, and referenced in Request No. 11 above.

33. As of the date and time that Jersey Shore suspended all work at DAFB under the MSA and the DO/NTPs, Jersey Shore had not submitted any request for a Change Order to Chugach requesting, asserting, demanding or referencing any right to or interest in additional compensation or other payments based on UPG prices or Davis-Bacon Act wage and/or benefit rates.

8

34. As of the date and time that Jersey Shore suspended all work at DAFB under the MSA and the DO/NTPs, Chugach had not issued to Jersey Shore any Change Order regarding or referencing any right to or interest in additional compensation or other payments based on UPG prices or Davis-Bacon Act wage and/or benefit rates.

35. Paragraph 10 of the MSA provides as follows:

10.    CLAIMS

In the event Subcontractor claims additional compensation or a further extension for the performance of the Work, as a result of a Change Order pursuant to Paragraph 7 [*sic*], it shall submit its claim in writing to Contractor not later than twenty (20) days after issuance of the Change Order or other act or occurrence giving rise to the claim. Any claim not submitted within such time period shall be barred. Contractor shall submit such written information with its claim as shall reasonably substantiate its claim or as Contractor or Owner shall reasonable request. Contractor will notify Subcontractor in writing of Contractor's decision on the claim within 30 days after receipt, including whether, in accordance with the applicable provisions of the Prime Contract, Contractor will pursue the claim on Subcontractor's behalf.

36. As of the date and time that Jersey Shore suspended all work at DAFB under the MSA and the DO/NTPs, Jersey Shore had not submitted any claim in writing to Chugach requesting, asserting, demanding or referencing any right to or interest in additional compensation or other payments based on UPG prices or Davis-Bacon Act wage and/or benefit rates.

37. Attached to and accompanying these Requests for Admission as Exhibit 7 is a true, complete and correct copy of the written claim that Jersey Shore served on Chugach on July 23, 2004, following Jersey Shore's suspension of work on July 14, 2004.

38. In Exhibit 7 to these Requests for Admission, Jersey Shore made no reference to and no claim for additional compensation or other payments based on UPG prices.

39. In Exhibit 7 to these Requests for Admission, Jersey Shore made no reference to and no claim for additional compensation or other payments based on Davis-Bacon Act wage and/or benefit rates.

40. Jersey Shore's first written notification to Chugach of any claim requesting, asserting, demanding or referencing any right to or interest in additional compensation or other payments based on UPG prices or Davis-Bacon Act wage and/or benefit rates came in the present lawsuit.

41. Jersey Shore has no documents and is aware of no documents generated or dated in the period beginning October 4, 2003 and ended July 13, 2004 that reference, reflect or relate to any alleged agreement or commitment by or on behalf of Chugach to compensate Jersey Shore, or otherwise to reimburse or pay Jersey Shore, any amounts based on UPG prices.

42. Jersey Shore has no documents and is aware of no documents generated or dated in the period beginning October 4, 2003 and ended July 13, 2004 that reference, reflect or relate to any alleged agreement or commitment by or on behalf of Chugach to compensate Jersey Shore, or otherwise to reimburse or pay Jersey Shore, any amounts based on Davis-Bacon Act wage or benefit rates.

43. There is no document from or executed by Chugach pursuant to which Chugach committed, agreed or was obligated to compensate Jersey Shore, or otherwise to reimburse or pay Jersey Shore, any amounts based on UPG prices.

44. There is no document from or executed by Chugach pursuant to which Chugach committed, agreed or was obligated to compensate Jersey Shore, or otherwise to reimburse or pay Jersey Shore, any amounts based on Davis-Bacon Act wage or benefit rates.

45. Paragraph 1.0 of the SABER Contract, at CSS 000035, required Chugach to use the R.S.Means® database for pricing, applying certain multipliers against the R.S.Means® base to determine the prices for the individual tasks comprising each delivery order that the Government would issue to the successful contractor and for the delivery orders that Government did issue to Chugach for the individual projects, as follows (all emphases in original):

> In order to be considered for award, each offeror must submit four (4) coefficients, (CLINS 0001 through 0004); and identify that portion of the preceding coefficients attributed to project estimating and preparation of minimal design packages (CLIN 0005). The government uses these multipliers to determine the price of work for each task on individual delivery orders. The prices established in the R.S.Means® database **bare costs** (which means no markup for overhead and profit (O&P)) column, will be multiplied by the City Cost Index Weighted Average Total for **Dover, Delaware, or geographically closest city listed if Dover, Delaware should be deleted,** and the coefficient to arrive at the actual price for a unit of work. The coefficients shall be represented as "net", a "decrease from" or an "increase to" the prices listed in the R.S.Means®. An offer of "net" would be represented as "1.0". An example of a decrease from the prices in R.S.Means® would be "0.98." An example of an increase above the prices listed in the R.S.Means® would be "1.10". The figure entered for CLIN 0005 shall be represented in the same manner (raw figure) as the coefficient.

46. Paragraph 8.0 of the SABER Contract, at CSS 000044, required Chugach to provide the Government with a hard copy of the R.S.Means® database and specified how Chugach had to develop estimates if a particular item were not included in the R.S.Means® database, as follows:

> The contractor shall provide, at no additional cost to the government, one (1) hard copy of unit price data to consist of the following R.S.Means® cost data books (one (1) complete total). Contractor shall provide the latest edition of these books to the SABER Chief and the Contract Administrator will only receive a copy of Facilities Construction Cost Data Book, within 30 days of latest release. If an item is not in the Means® Electronic Database used with the PULSAR® System, the contractor shall use the Means® Facility Cost Guide to locate the item. If the item cannot be found in the computerized version of the Facility Cost Guide, the contractor shall use the first eight (8) of the following books to develop the delivery order estimate. The contractor shall consider the item non-priced ONLY if it cannot be located in any of the first 8 guides.
>     Building Construction Cost Data

11

Mechanical Cost Data
Plumbing Cost Data
Electrical Cost Data
Site Work Cost Data
Concrete Cost Data
Heavy Construction Cost Data
Interior Cost Data
Repair and Remodeling Cost Data (to be used for reference only)
Light Commercial Cost Data (to be used for reference only)
Residential Cost Data (to be used for reference only)[.]

47. The UPG included in the SABER Contract established prices only for items not in the

RSMeans database or otherwise not ascertainable under ¶ 8.0 of the SABER Contract quoted

immediately above.

48. The minutes of the September 24, 2002 Prepoposal Conference (bates-stamped JSA 349,

351 & 354) with respect to the solicitation from the Government that became the SABER Contract

provided as follows with respect to the applications of RSMeans and the UPG:

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 439TH AIRLIFT WING (AMC)

FROM: LGCA (302-677-5012)

SUBJECT: Minutes of the Prepoposal Conference

CONTRACT NUMBER: F07603-02-R-0009

PROJECT NUMBER AND TITLE: Simplified Acquisition of Base Engineer
Requirements (SABER)

DATE/TIME: 24 September 2002, 1300 hrs

LOCATION: Bldg 639, Base Supply Training Room, Room No. 224, Building 639

****

18. Attachment 6 is the Unit Price Guide (UPG). These are the items Dover AFB
utilizes that are not included in the Means. With the exception of the line item for
rubbish hauling/handling, if items are found in Means, they should use that item in

12

lieu of the item listed in Attachment 6. Ms McGee added that contractor must review the pricing included in Attachment 6 and should they consider any of them to be inadequate, she must received notification with justification within the next few days. Ms McGee [*sic*] she will not entertain any complaints of inadequacies after award.

****

10. Question: What is the relationship between the R.S. Means® computerized pricing guide and the UPG at Attachment 6.

Response: The coefficients (your overhead and profit) are applied to the R. S. Means® computerized pricing guide – bare costs. Coefficients are not applied to the UPG, Attachment 6. The items in Attachment 6 are locally developed and include overhead and profit. The items in Attachment 6 are only adjusted in accordance with the economic price adjustment in Section H, pages 14 and 15. Non-prepriced Items (NPIs). Mr Shore added that the items in the UPG are items that are either not included in the Means, or are not covered adequately in the database; i.e., what Dover AFB, Delaware, requires specifically.

11. Question: If an item appears in both the R. S. Means computerized database and the UPG, does the contractor have an option of which to use.

Response: Mr Shore stated he does not feel the items, as specified, in the UPG are included in Means, and if they are in Means as we specify, we would like to know. With the exception of the rubbish handling/hauling, if items are in both Means and the UPG, the contractor should use Means.

49. As referenced in Request No. 45 above, quoting ¶ 1.0 from the SABER Contract, the

Government determined all prices for all work to be done pursuant to the SABER Contract.

13

BIRCH, HORTON, BITTNER AND CHEROT


_Harvey A. Levin_ (signature)

Harvey A. Levin
1155 Connecticut Avenue, N.W., Suite 1200
Washington, DC 20036
Phone (202) 659-5800
Fax (202) 659-1027
Email: hlevin@dc.bhb.com

        and


THE LYONS LAW FIRM

Edmund Daniel Lyons (No. 0881)
1526 Gilpin Avenue
P.O. Box 579
Wilmington, DE 19806
Phone (302) 777-5698
Fax (302) 777-5051
Email: elyons@lyonslaw.com


Counsel for Chugach Support Services, Inc. and
Safeco Insurance Company of America

14

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Defendants' First Set of Requests for Admission to Plaintiff Jersey Shore Automation, Inc. was served by electronic mail and by first class mail, postage prepaid this 22d day of November 2005 on:

James D. Heisman, Esquire
M. Edward Danberg, Esquire
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899

g:\505986\4\hal9303.doc

15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>for the Use and Benefit of<br>JERSEY SHORE AUTOMATION, INC.<br><br>     Plaintiff,<br><br>vs.<br><br>CHUGACH SUPPORT SERVICES, INC., *et al.*<br><br>     Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C. A. No. 04-1416 (JJF) |

**DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSIONS
TO PLAINTIFF JERSEY SHORE AUTOMATION, INC.**

**EXHIBIT 1**



*Chugach Support Services, Inc.*

Date: June 24, 2003

Sub Name:    Jersey Shore Automation, Inc.
Sub Address: 1500 Meeting House Road
Sub Address: Sea Girt, New Jersey 08750

Subject:    **Delivery Order with Notice to Proceed**
**Master Subcontract Agreement No.: 70-JSA-005**
**Dover AFB SABER Contract Number: F07603-03-D0002**
**Subcontractor's Delivery Order No.: 5001**
**Project Title: Repair Dormitory 401,**
**Accounting Code: 700376.500.0925.400.4000 S.**

1. This Delivery Order with Notice to Proceed is issued in accordance with and subject to the terms and conditions of the subject Master Subcontract Agreement.

2. The subcontractor shall provide all equipment, labor, material, and transportation necessary to do the following portions of the work as shown on the Technical Description and project drawings. This shall include daily cleanup of your work area and final cleanup of your portion of the work in order to maintain a neat appearance.

WORK IN DORMITORY ROOMS (93 EA)

➢ Bathroom area: Remove all existing toilets, shower units, shower doors, exhaust fan, light fixtures, ceramic floor and wall tile including thresholds, access panels, and metal door frames. Dressing and living room area: demo existing closet area wood framing, metal framing on the ceiling, partition wall and plumbing chase between the bathrooms and dressing area and replace with all new metal framing. Remove exterior metal doors, jambs and threshold. Remove existing vinyl composition tile (VCT) flooring in the dressing area and main entrance.
Install new toilets (complete with water closet, seat and angle valves), shower units with mixing valve, shower head and shower doors, ceramic floor tile over water proof membrane (2nd and 3rd floor bathrooms only), ceramic wall tile, bathroom accessories (toilet tissue holder, towel bar (2 ea) and robe hook (2 ea), floor drain and clean out caps, threshold at each bathroom door, suspended ceiling system (ceiling tiles with vinyl finish for bathroom area), one surface mount fluorescent light fixture (recessed fluorescent light fixture to be installed in "C" Wing bathrooms) and exhaust fan on independent switches.
➢ Dressing area: Install new metal framing for construction of closet/storage/ refrigerator compartment, plumbing chase ( between bathroom and dressing room), and wall partition ( between dressing area and living area), hardwood faced vanity base, cultured marble (single bowl) sink top, and single lever center faucet, medicine cabinet w/light mounted on wall above the sink, full length mirror mounted on back of closet door, hardwood cabinet face with doors (for storage compartment above refrigerator), suspended ceiling grid with tegular 2' x 2' ceiling tiles, VCT finish flooring in dressing area and at the main entrance. Carpet will be installed on floor throughout living area. Existing walls in the Living area will be repaired by re-securing loose metal framing, installing new framing members, and installing top and bottom plate to existing metal framing. We will construct pipe chase in left or right front corner of room and soffit above area of

exterior door and window to conceal existing electrical conduit. The exterior side walls on 33 end rooms will be framed using 3 5/8" metal studs, batt insulation and a layer of polyethylene vapor barrier. All walls in dressing and living area will be covered with ½" thick drywall, prepped, primed and finish painted with 2 coats. Ceilings will also receive 2 finish coats of paint. Wood crown molding will be installed at the top of the walls with wood baseboard at the bottom. Wood stool and apron will trim out window sill. All wood trim and molding will receive a paint finish. All rough plumbing (water supply line) behind walls and above ceilings will be insulated prior to drywall. New metal door and jamb will be installed on the exterior openings, metal jambs with solid core wood doors to be installed for bathroom and closet openings. Door hardware will consist of aluminum threshold, door bumper, door viewers, and weather stripping (on exterior door only), heavy duty hinges, locksets, and dead locks on all room doors. Doors will receive a paint finished.

➢    **Dayroom and Foyer:** Remove existing metal ceiling framing, repair existing wall framing. Soffits on back wall will be reframed to create a straight wall up to the ceiling. Drywall will be installed on all walls and soffit areas, finished, primed, and painted. Suspended ceiling system will be installed in area adjacent to foyer. Remaining ceiling will receive repairs to the textured finish and painted. Crown molding will be installed along area of textured ceiling and rubber cove base along bottom of wall. Wood trim will be painted. Existing aluminum storefront doors sets will be removed and replace with new, to included hardware. A new water cooler will be installed in each day room. Window area will receive a wainscot using an impact resistant drywall with rigid insulation cut into window frame. Floor covering will be carpet with 9 S.F. area of VCT flooring at the water cooler area. Foyer floor will be strip clean.

➢    **Storage room:** A pipe chase will be constructed using metal framing members, covered with drywall and painted to match adjacent areas as close as possible. Existing metal door and jamb will be removed and replaced with new including new door hardware. Door and frame will be paint finished.

➢    **Janitor closet:** Existing wood doors will be removed, and replaced (on existing jamb) with new metal doors including lockset, deadbolt, hinges, and door closure. Doors will be paint finished.

➢    **Kitchen:** Existing metal door and jamb will be removed and replaced with new including lockset, deadbolt, hinges, threshold, door stop, door viewer, and weather stripping. A pipe chase will be constructed using metal framing members, covered with drywall. Drywall will also be installed on existing wall framing, and painted. A suspended ceiling system will be installed in the cooking area and existing textured ceiling will be painted. Crown molding will be installed at top of walls and wood baseboard along bottom of walls. Kitchen cabinets sink with faucet, and exhaust hood will be installed with a counter top running the full length of one wall. Existing ceramic floor tile will be strip cleaned. Existing metal door and jamb will be removed and replaced with new to include door hardware. Door and frame will be paint finished. All rough plumbing (water supply line) behind walls and above ceilings will be insulated.

➢    **Laundry room:** Existing suspended ceiling grid will be removed and replaced with new system to include ceiling tiles. A pipe chase will be constructed using metal framing members, covered with drywall. Drywall will also be installed on existing wall framing and painted. Existing ceramic floor tile will be strip cleaned. Rubber cove base will be installed along bottom of wall. Wall mounted fan and associated framing will be removed and replaced with a window to match adjacent window. Existing metal door and jamb will be removed and placed with new to include door hardware. Door and frame will be paint finished. A utility sink with faucet will be installed. All rough plumbing (water supply line) behind walls and above ceilings will be insulated.

➢    **Interior Electric work:** All existing switches, outlets, light fixtures and exhaust fans located in bath and living rooms, kitchen, laundry room, dayrooms and foyers, will be removed and replace with new switches, outlets, light fixtures, and exhaust fans to include associated boxes, wiring, conduit, and cover plates. Remove existing conduit and switchboxes at room entrances on first floor and install new MC Cable, switchboxes, and reconnect to branch source. Remove

abandoned electrical cable, strap up and secure existing electrical cables in areas to be demoed, junction boxes, and conduit. Install cover plate on existing junction boxes. Install new circuits for water coolers in dayrooms.

> **Exterior lighting:** Remove 86 existing exterior light fixtures and replace with new 70 watt sodium vapor light fixtures. Remove 14 exit lights, 3 emergency light and remote battery pack sets and install new sets in same location.

> ~~Mechanical: Provide a Trane (brand name) Tracer Summit system. This system includes a Building Control Unit (BCU) with dial up modem capabilities from the existing Tracer summit workstations (located at the CE HVAC shop), provide custom control plans for controlling individual room fan coil units and chiller, graphics software to be installed on the workstations in bldg. 605 (HVAC shop), system start up, checkout, and programming of system controls. The installation of communication and control wiring is to be performed by others. Final hook up and testing of this system will take place once all components (including wiring) are installed.~~
> ~~(Also see attached the four page statement of work from the government for this delivery order).~~

3. It is agreed that the amount of the subcontractor's contract for this project is One million one hundred nine thousand dollars ($1,109,000.00). This price includes tax and all other costs required for completing the specified scope of work.

4. Please note that General Wage Decision No. DE020009. The wage scale attached is the required wage board to be used for this project and should be reflected on your weekly certified payroll submittal.

5. Your portion of the work shall begin no later than June 16, 2003 and shall be completed by ~~April 16, 2003~~ *August 18/2004* unless otherwise directed. Subcontractor is bound by the Contractor's Schedule of Work and Project Schedule. The contractor is advised there is a high probability that there will be at least indefinite suspension of work requirement issued during the performance of work on this project.

6. There shall be no changes to the dollar amount r̶ unless approved in writing by the undersigned. I̶ deletion in the scope of work that results in a co̶ issued to adjust the total contract amount in accord̶ Master Subcontract Agreement.

7. Please note that delays can be experienced while ̶ These delays do not necessarily warrant a Change O̶

8. If you have not already done so, please complete t̶ days of receipt of this Delivery Order and Notice to P̶

a) ~~Sign and return one copy of this Delivery Order wi~~ Support Services.

b) Provide a Site Specific Safety Plan to this office Manager. You are reminded that hardhats will be wo̶

c) Submit a Statement and Acknowledgement (Form ̶̶̶̶) to this office for any lower tier subcontractors.

d) Submit a current **Certificate of Insurance** to this office naming Chugach Support Services, Inc. as additional insured in accordance with the terms of the Master Subcontract Agreement, if you do not have a current certificate already on file.

9. In order to be paid promptly, you must do the following:

   a) Submit a Progress Billing for Subcontractor (Exhibit "A" of Master Subcontract Agreement) with each invoice.

   b) Submit a **Partial and/or Final Release and Waiver of Lien** with each invoice.

   c) During construction, submit **Certified Payroll Reports** to site office no later than 2:00 p.m. of the Tuesday following each pay period.

   c) Submit **MSDS'** and quantities for **all chemicals entering or leaving the base.** These must be submitted to our office at least seven (7) days prior to bringing materials on the base.

10. Our site office is located at Building 447 Tuckegge Street on Dover Air Force Base. Our mailing address is:

   Chugach Support Services, Inc.
   Post Office Box 02049
   DAFB, DE. 19902

11. Please don't hesitate to call or stop by if we can assist you in any way.

12. All terms and conditions in the Master Subcontract Agreement # 70-JSA-005 signed on May 20, 2003 are incorporated herein.

_____
Project Manager

Receipt acknowledged
this _1st_ day of _July_ , 2003.

By: _____
Jersey Shore Automation, Inc.

+ EXCEPT AS NOTED ON Pp 3 OF THE DO AND PAGE 14 OF THE SOW.