IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA<br>for the Use and Benefit of<br>JERSEY SHORE AUTOMATION, INC.<br><br>    Plaintiff,<br><br>vs.<br><br>CHUGACH SUPPORT SERVICES, INC., *et al.*<br><br>    Defendants | C. A. No. 04-1416 (JJF) |

EXHIBIT 4

TO

**BRIEF OF DEFENDANTS
CHUGACH SUPPORT SERVICES, INC.
AND SAFECO INSURANCE COMPANY OF AMERICA
IN SUPPORT OF SUPPLEMENTAL MOTION
FOR SUMMARY JUDGMENT ON THE COMPLAINT AND THE
COUNTERCLAIM**

# In The Matter Of:

## USA v. Chugach

*Robert Hafey*
*November 7, 2005*

*Corbett & Associates*
*1400 N. French Street*
*P.O. Box 25085*
*Wilmington, DE USA 19899*
*(302) 571-0510    FAX: (302) 571-1321*

*Original File 051107A.ASC, 135 Pages*
*Min-U-Script® File ID: 0978109236*

**Word Index included with this Min-U-Script®**

Page 1

[1]  IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF DELAWARE
[2]
     UNITED STATES OF AMERICA, for      :
[3]  the Use and Benefit of
     JERSEY SHORE AUTOMATION, INC.,     :
[4]  a New Jersey corporation,
[5]       Plaintiff,                    :
                                        : C.A. No.
[6]    v.                               : 04-1416 (JJF)
[7]  CHUGACH SUPPORT SERVICES, INC.,   :
     an Alaska corporation, and SAFECO :
[8]  INSURANCE COMPANY OF AMERICA,     :
     a Washington corporation,
[9]                                     :
        Defendants.                     :
[10]
[11]       Deposition of ROBERT P. HAFEY, taken
[12]  pursuant to notice before Adam D. Miller, Registered
[13]  Professional Reporter and Certified Shorthand
[14]  Reporter, in the law offices of Connolly, Bove, Lodge
[15]  & Hutz, LLP, The Nemours Building, 1007 Orange
[16]  Street, Wilmington, Delaware, on Monday, November 7,
[17]  2005, beginning at approximately 8:56 a.m., there
[18]  being present:
[19]
[20]
[21]
[22]        CORBETT & ASSOCIATES
           Registered Professional Reporters
[23]   1400 French Street    Wilmington, DE 19801
              (302) 571-0510
[24]        www.corbettreporting.com

Page 2

[1]             APPEARANCES:
[2]    BIRCH, HORTON, BITTNER & CHEROT, P.C.
       Suite 1200, 1155 Connecticut Avenue, N.W.
[3]    Washington, District of Columbia 20036
       BY: HARVEY A. LEVIN, ESQUIRE
[4]    Attorney for Plaintiff
[5]    CONNOLLY, BOVE, LODGE & HUTZ, LLP
       The Nemours Building
[6]    1007 Orange Street
       P.O. Box 2207
[7]    Wilmington, Delaware 19899
       BY: JAMES D. HEISMAN, ESQUIRE
[8]    and M. EDWARD DANBERG, ESQUIRE
       Attorneys for Defendants
[9]
       ALSO PRESENT: GEORGE WEHRHAHN
[10]
[11]      ROBERT P. HAFEY, having first been
[12] duly sworn according to law, was examined and
[13] testified as follows:
[14]
[15]           BY MR. HEISMAN:
[16]   Q: Good morning, Mr. Hafey.
[17]   A: Good morning.
[18]   Q: My name is Jim Heisman. And I represent
[19] Jersey Shore Automation in connection with a matter
[20] pending in the Delaware District — District Court of
[21] the District of Delaware against Chugach Support
[22] Services. And we're going to be taking your
[23] deposition today.
[24]      Sir, the first question I have for you

Page 3

[1] is, have you ever had your deposition taken before?
[2]   A: One time, long time ago.
[3]   Q: Okay. Was that in connection with a
[4] construction dispute?
[5]   A: Yes.
[6]   Q: Do you recall the matter that that was
[7] involved in?
[8]   A: I think it was in 1980.
[9]   Q: Uh-huh.
[10]  A: It was an electrical incident with a
[11] client involving IBM.
[12]  Q: Do you remember who you were working for
[13] at the time?
[14]  A: W.B. Moore Electrical Contractors out of
[15] Dallas.
[16]  Q: All right. And did you give trial
[17] testimony as well?
[18]  A: No.
[19]  Q: Okay. The process today will be that I
[20] will be asking you a series of questions and showing
[21] you some documents.
[22]  A: Okay.
[23]  Q: If you don't understand a question or if
[24] something's not clear, you need to tell me right

Page 8

[1] BY MR. HEISMAN:
[2] Q: Mr. Hafey, as I understand your work
[3] history in the construction industry, you began in
[4] the '80s in the electrical field?
[5] A: '70s, late '70s.
[6] Q: Late '70s; okay. And in about the mid to
[7] late '80s you then began working with a general
[8] contractor —
[9] A: Correct.
[10] Q: — with government projects; correct?
[11] A: Correct.
[12] Q: And when I'm talking about government
[13] projects, I'm talking about projects for the armed
[14] forces; is that also correct? Or did you do other
[15] work for the government as well?
[16] A: The prison in Hondo was a State job.
[17] Q: Okay.
[18] A: All the others were federal jobs.
[19] Q: Were federal jobs with branches of the
[20] armed services?
[21] A: Yes.
[22] Q: And you mentioned that you've held a
[23] number of different positions as a QC. Was that a
[24] quality control —

Page 9

[1] A: Correct.
[2] Q: — person?
[3] And what would your responsibilities
[4] be as a QC?
[5] A: To verify that the material that you
[6] submit is being actually installed and also to make
[7] sure that the — the way that the work is going in is
[8] going in according to national standards.
[9] Q: Okay. And what would a superintendent be
[10] responsible for?
[11] A: Superintendent is responsible for
[12] schedule, drive the crews, a timely finish.
[13] Q: And I believe you also said that you were
[14] a project manager at one time?
[15] A: (Nodded.)
[16] Q: And what responsibilities does a project
[17] manager have?
[18] A: As a project manager, I'm responsible for
[19] negotiating, estimating, monthly reports, you know,
[20] to the government, status meetings.
[21] Q: Okay.
[22] A: My complete staff, you know.
[23] Q: Okay. Now, you were a project manager for
[24] Chugach at the Dover Air Force Base; correct?

Page 10

[1] A: Correct.
[2] Q: And in addition to the responsibilities
[3] which you just described for us, did you have
[4] responsibility for oversight of the staff of Chugach
[5] on the base?
[6] A: Yes.
[7] Q: And were you involved in any hiring and
[8] firing decisions with respect to the staff?
[9] A: Yes.
[10] Q: Okay. And did the staff report to you as
[11] project manager — strike that.
[12] Were you the person in charge for
[13] Chugach at the Dover Air Force Base?
[14] A: Yes.
[15] Q: Okay. Now, you mentioned to me that you
[16] worked on a number of different types of contracts —
[17] for instance, IDIQ and job order contracts. And you
[18] also mentioned that you had previous experience with
[19] SABER contracts?
[20] A: Dover was my first SABER contract.
[21] Q: Dover was your first SABER contract; okay.
[22] A: In the Air Force, it's SABER. In the
[23] Army, it's JOC, job order contracting. It's the same
[24] philosophy; they have different acronyms.

Page 11

[1] Q: All right. Now, can you walk me through
[2] the process of — strike that.
[3] You came on to Chugach after Chugach
[4] had already entered into a SABER contract with the
[5] Dover Air Force Base; correct?
[6] A: Correct.
[7] Q: Do you know who negotiated the contract on
[8] Chugach's part with the Air Force?
[9] A: No.
[10] Q: When were you first hired to come on board
[11] at Chugach?
[12] A: I was supposed to come up for, you know,
[13] an interview and site visit in I believe it was
[14] February, but I couldn't even get down to the airport
[15] in, in Austin because of an ice storm. My first day
[16] of employment was the day after St. Patrick's Day. I
[17] think that was 2003.
[18] Q: Okay. Now, would you walk me through the
[19] process of how Chugach would formulate a delivery
[20] order after the Air Force requested that you do a
[21] certain piece of work.
[22] MR. LEVIN: Objection to the form of
[23] the question.
[24] BY MR. HEISMAN:

Page 16

[1] Q: Can you tell me what your understanding [2] was of those differences?
[3] A: That was called the UPG, which was the [4] Unit Price Guide, as part of the contract. And they [5] were much higher than the R.S. Means pricing.
[6] Q: Do you understand that R.S. Means is for a [7] national average of costs?
[8] MR. LEVIN: Objection.
[9] THE WITNESS: I, I understand it is. [10] And there's also city cost indexes that apply, based [11] on where you are in the nation.
[12]                 BY MR. HEISMAN:
[13] Q: Okay. And is your understanding that the [14] UPG reflects different costs?
[15] MR. LEVIN: Objection.
[16] THE WITNESS: Than?
[17]                 BY MR. HEISMAN:
[18] Q: Did you — than the R.S. Means.
[19] A: Correct.
[20] Q: And how are those costs different, if you [21] know?
[22] A: General numbers. I don't know the [23] exact-to-the-penny numbers. But in the R.S. Means, [24] journeymen craft people were getting about, I want to

Page 17

[1] say, $38 an hour in the Means, the way we used it. [2] In the UPG, that figure was almost double, 65, [3] something like that.
[4] Q: And you were aware that on these projects [5] that the Davis-Bacon wage rates were required to be [6] paid; correct?
[7] A: Correct.
[8] Q: And were you familiar in a general way [9] with the wages that needed to be paid under the [10] Davis-Bacon Act under this contract?
[11] A: Yes.
[12] Q: Are you aware of any instances where the [13] wages that were required to be paid under the [14] Davis-Bacon exceeded the line-item cost provided in [15] R.S. Means?
[16] MR. LEVIN: Objection. Well — object [17] to the form of the question.
[18]                 BY MR. HEISMAN:
[19] Q: You can answer if you know.
[20] A: Yes.
[21] Q: Okay.
[22] A: That was discovered early on in our [23] estimates that that was a problem.
[24] Q: And when you say that was a problem, why

Page 18

[1] was it a problem?
[2] A: Well, you know, I couldn't, I couldn't [3] really build the estimate to, to match the prevailing [4] wage.
[5] Q: Okay. Is it the purpose of the wages in [6] the R.S. Means to provide a profit margin for [7] contractors?
[8] MR. LEVIN: Objection.
[9] THE WITNESS: I don't know.
[10] MR. HEISMAN: Let met ask the court [11] reporter to mark Hafey 1, please.
[12]     (Exhibit Hafey 1 was marked for [13] identification.)
[14]                 BY MR. HEISMAN:
[15] Q: First question I'll ask, have you ever [16] seen this document before?
[17] A: A definition of SABER, yes.
[18] Q: Could you turn, please — and if you'll [19] note on the bottom right-hand corner, there are some [20] numbers that begin with JSA. Could you turn to 4661, [21] please, and, specifically, 1.2 in the definitions, [22] and then in paren 1, in the Unit Price Guide. Do you [23] see that paragraph?
[24] A: Uh-huh. Yes.

Page 19

[1] Q: Okay. Now, do you agree with the [2] statement that, quote, because the task [3] specifications and prices apply to a general area or [4] industry, it is necessary to tailor the UPG of the [5] costs and practices of a specific location, period. [6] This step, which is called localization — and that's [7] in quotes — is critical to the success of a SABER [8] program, period, end quote?
[9] MR. LEVIN: Objection.
[10]                 BY MR. HEISMAN:
[11] Q: Is it your understanding that that is the [12] purpose of the UPG?
[13] MR. LEVIN: Objection.
[14] THE WITNESS: It wasn't on that [15] project. That was not my understanding. My [16] understanding and what I was told by the Air Force [17] was that it was only applicable to what was not [18] covered in the R.S. Means.
[19]                 BY MR. HEISMAN:
[20] Q: I think you told me early on that the [21] R.S. Means costs for certain laborers, for instance, [22] perhaps carpenters, was not adequate to cover the [23] costs required to be paid under Davis-Bacon; is that [24] correct?

Page 24

[1] A: I recall the meetings. I don't — you
[2] know, I can't remember what all was said.
[3] Q: Do you recall a meeting sometime in late
[4] September, early October, at the Jersey Shore
[5] offices?
[6] A: Yes.
[7] Q: And do you recall who was at that meeting?
[8] A: Darryl, George, and Mike. I believe that
[9] was it.
[10] Q: Okay.
[11] A: And myself.
[12] Q: And at that meeting, didn't Jersey Shore
[13] indicate to you that they could no longer continue to
[14] perform using the same cost structure up until the
[15] date of that meeting?
[16] MR. LEVIN: Objection.
[17] A lot of my objections, Mr. Heisman,
[18] have been that you're leading the witness. And I
[19] think in this area it might be better if you asked
[20] him for his testimony rather than giving him his.
[21] But that's my objection for the record.
[22] MR. HEISMAN: Thank you.
[23] You can answer.
[24] MR. LEVIN: Can I have the question

Page 25

[1] read back, please.
[2] (The court reporter read back the
[3] following:
[4] "Q And at that meeting, didn't
[5] Jersey Shore indicate to you that they could no
[6] longer continue to perform using the same cost
[7] structure up until the date of that meeting?")
[8] THE WITNESS: We were having a problem
[9] with pricing. I don't know that that applied to
[10] every job. There were some jobs more favorable than
[11] other jobs. And I — we really needed Jersey Shore
[12] to perform work. But I believe that was the original
[13] meeting where, you know, the problem was discussed.
[14]           BY MR. HEISMAN:
[15] Q: Right. And did you ever, at any time
[16] during those meetings —
[17] A: That was probably about the time I
[18] requested the skilled laborer classification. I
[19] mean, that was in an effort to get pricing more in
[20] line.
[21] Q: Did you represent to Jersey Shore at that
[22] time that, going forward, that the projects would be
[23] profitable?
[24] MR. LEVIN: Objection.

Page 26

[1] THE WITNESS: I, you know, I was
[2] hoping every job would be profitable.
[3]           BY MR. HEISMAN:
[4] Q: Do you recall any representations that you
[5] may have made to Jersey Shore?
[6] A: No.
[7] Q: Did you indicate to Jersey Shore that you
[8] would find additional funds for projects going
[9] forward?
[10] MR. LEVIN: Objection.
[11] THE WITNESS: I don't recall. On one
[12] job, you know, me as a project manager have to — I
[13] have to make a profit for my company. That was one
[14] reason why I made the deals that I made with Jersey
[15] Shore, as far as we'd make a profit, they'd make a
[16] profit.
[17] On, on one particular job, we — I, I
[18] had to bite into our margin because — to, to make up
[19] for costs for Jersey Shore because of — they didn't
[20] want the job, but I needed to get it done. They
[21] jumped in there and did it. And I, I — it was a
[22] small enough job where it wouldn't hurt me that bad
[23] to bite into my margin some. But that was not a
[24] practice that I wanted to maintain.

Page 27

[1]           BY MR. HEISMAN:
[2] Q: Let me go back to coming up with pricing
[3] for the delivery orders notice to proceed; okay. We
[4] walked through the process up until the point where
[5] you used your coefficient to multiply against the
[6] quantities of material cost; correct?
[7] A: Correct.
[8] Q: Okay. What documents did Chugach provide
[9] to Jersey Shore for Jersey Shore's consideration in
[10] determining whether or not to accept a delivery order
[11] notice to proceed?
[12] A: I think originally there was no documents.
[13] They'd come and look at the job. Our first task
[14] order, they came and looked at the job, gave us a
[15] price. And it was, it was where it needed to be. So
[16] I felt like that, you know, that was a good, good
[17] estimate; it was a good price.
[18] And then after that, pricing became —
[19] well — that job was not as successful for Jersey
[20] Shore as I think they thought that it would be. I
[21] don't exactly know what happened there, but...
[22] After that, in order for them to
[23] continue to do work with us, we, we talked about
[24] sharing the responsibilities of estimating and

Page 32

[1] you would be so kind as to turn to CSS214 for me,
[2] please.
[3]     And if you look down, the second from
[4] the bottom includes carpenters' wages; correct?
[5] **A:** Correct.
[6] **Q:** And you would agree with me that this is
[7] from the March 1, 2004 Unit Price Guide?
[8] **MR. LEVIN:** Objection.
[9] **THE WITNESS:** It appears to be.
[10]         BY MR. HEISMAN:
[11] **Q:** Okay. So I guess my question is, if the
[12] UPG provides for carpenters' rates and the R.S. Means
[13] provides for carpenters' rates, do you have any idea
[14] why this would be included in here as well?
[15] **MR. LEVIN:** Objection.
[16] **THE WITNESS:** My conversations with
[17] the Air Force contracting officer were that this was
[18] to cover things that the Means did not cover.
[19]         BY MR. HEISMAN:
[20] **Q:** Okay. But if the Means covered work
[21] typically done by a carpenter —
[22] **A:** It might not cover every item. And that
[23] was at her discretion.
[24] **Q:** Was there ever a time when a UPG rate was

Page 33

[1] used for a carpenter at the job?
[2] **A:** Not that I recall. There was for
[3] electrical, electrician.
[4] **Q:** And was that because there was some task
[5] that was not included in the R.S. Means?
[6] **A:** She considered exploratory work to be UPG.
[7] **Q:** Can you tell me what exploratory work is?
[8] **A:** For an electrician to go out and look at
[9] something to determine what has to be done.
[10] **Q:** But then once the electrician actually
[11] wields his craft, so to speak, then he or she would
[12] be paid under the R.S. Means rate?
[13] **A:** That's correct.
[14] **Q:** Okay. We're not quite done with that one
[15] yet, sir.
[16]     (Discussion held off the record.)
[17]         BY MR. HEISMAN:
[18] **Q:** Mr. Hafey, if you could turn to the last
[19] page of that particular document, which is CSS253.
[20] And, sir, is that your signature on behalf of
[21] Chugach?
[22] **A:** Yes.
[23] **Q:** Okay. And you had the authority to bind
[24] Chugach and enter into contracts?

Page 34

[1] **A:** Yes.
[2] **Q:** And does this look like your agreement
[3] with Jersey Shore?
[4] **A:** Yes.
[5] **Q:** Okay. And is this the SABER contract
[6] which Chugach utilized at the Dover Air Force Base?
[7] **MR. LEVIN:** Well, objection; because
[8] this is the master subcontract agreement.
[9] **MR. HEISMAN:** Correct.
[10] **MR. LEVIN:** When you say "is this the
[11] SABER contract," it isn't, the one we're looking at
[12] now. Just for the record, can we keep thing clear.
[13] **MR. HEISMAN:** Fine.
[14]         BY MR. HEISMAN:
[15] **Q:** Well, do you consider this to be the
[16] entire master subcontract agreement with Jersey
[17] Shore?
[18] **A:** Yes.
[19] **Q:** Now, you worked with Jersey Shore on this
[20] project for how long — as a representative from
[21] Chugach?
[22] **A:** That was May — ten months — nine months,
[23] ten months.
[24] **Q:** And, overall, how would you describe the

Page 35

[1] quality of Jersey Shore's work?
[2] **A:** Acceptable. Really never had any problems
[3] with their quality.
[4] **Q:** Okay. Can you describe for me, please,
[5] the payment process which Chugach was required to
[6] utilize for payments under this contract with the Air
[7] Force.
[8] **A:** Ask me that again.
[9] **Q:** Okay. How was it determined that payments
[10] would be made on a monthly basis?
[11] **A:** Based on what we received from the
[12] government. It's normally a percentage, and we pay
[13] the same to the sub.
[14] **Q:** Okay. Well, how were those percentages
[15] determined?
[16] **A:** With Chugach personnel and the government
[17] personnel. There, again, it's a negotiating thing.
[18] **Q:** Okay. Would a document known as a
[19] progress report be generated?
[20] **A:** Yes.
[21] **Q:** And what was the purpose of a progress
[22] report?
[23] **A:** Payment.
[24] **Q:** Okay.

Page 40

[1] Then there's a value of work completed
[2] to date. And would that number be determined after
[3] the progress report was signed off on?
[4]   A: Yes.
[5]   Q: Okay. Then we have the value of approved
[6] change orders. And I would — would a progress
[7] report also have to have been signed off on that as
[8] well?
[9]   A: Not — I wouldn't think separately.
[10]   Q: Not separately. But before the $32,000 in
[11] this example would be released —
[12]   A: Correct.
[13]   Q: — Chugach would have to certify to the
[14] government that that work was completed; correct?
[15]   A: That's correct.
[16]   Q: Okay. And then you would add lines 4 and
[17] 5. Then No. 7 would be total payments to date. And
[18] then that's how you would determine the amount of the
[19] payment; correct?
[20]   A: Correct.
[21]   Q: Now, to receive payment from the
[22] government, Mr. Hafey, in addition to the progress
[23] reports, were certified payrolls also required to be
[24] submitted to the government?

Page 41

[1]   A: Yes.
[2]   Q: Was there any other documentation required
[3] other than certified payrolls and an executed
[4] progress report?
[5]   A: I don't recall.
[6]   Q: Okay. Now, Mr. Hafey, you indicated that
[7] you were the Chugach representative in charge for the
[8] project; correct?
[9]   A: Correct.
[10]   Q: Could you tell me the people who were in
[11] your administrative staff that processed payment
[12] requests?
[13]   A: My estimators generated the paperwork and
[14] would forward that to my office manager, whose name
[15] was Deborah — I forget her last name.
[16]   Q: Was it Deborah Taylor?
[17]   A: Yes.
[18]   Q: And so Deborah Taylor would be responsible
[19] for processing the payment requests?
[20]   A: Yes.
[21]   Q: And do you know what she would need to
[22] submit on behalf of Chugach to the government for
[23] payment?
[24]   A: The — everything we've just discussed

Page 42

[1] here: the progress report, the payout. I don't
[2] think we did a narrative monthly.
[3]   Q: And could you describe for me the filing
[4] system utilized by Chugach for the payment requests?
[5]   A: I don't recall. You know we had a task
[6] order file for each task order. And it consisted of
[7] several different folders.
[8]   Q: How would you say that Ms. Taylor
[9] performed on behalf of Chugach?
[10]   A: I was relying on her experience with
[11] the — she was, she was hired before I got there.
[12] And I was relying on her experience with the previous
[13] SABER contractor. And as it came to light, she was
[14] not capable of performing her job, and I terminated
[15] her.
[16]   Q: And when you say "not capable," was she
[17] unable to process payment requests in a timely
[18] fashion?
[19]   MR. LEVIN: Objection.
[20]   THE WITNESS: A lot of times, you
[21] know — that, that was several different things.
[22] If — that might have been part of it. Certified
[23] payrolls being wrong was another part of it.
[24] Untimely certified payrolls from subs was another

Page 43

[1] part of it.
[2]   It was a problem that — and at Dover
[3] they would not waiver. If there was one certified
[4] payroll wrong, they'd hold up my whole payment.
[5]     BY MR. HEISMAN:
[6]   Q: And how long —
[7]   A: That's not the normal practice — I mean,
[8] in my experience in government work.
[9]   Q: Could you define the management structure
[10] for me at the Dover Air Force Base? I understand
[11] that you were the project manager. And who was below
[12] you in terms of title and name, to the extent that
[13] you recall?
[14]   A: I had three estimators. One of them
[15] filled in for me as assistant project manager when I
[16] wasn't there: George.
[17]   Q: George Molina?
[18]   A: Uh-huh.
[19]   Dave — I forget his last name — was
[20] my quality control.
[21]   I hired a superintendent, based on his
[22] reputation on other projects on the base. But he did
[23] not last very long, and I don't even recall his name.
[24]   And then Deborah was my office

Page 48

[1] Q: And this appears to be a memo from a
[2] meeting with the Air Force. And it lists you as an
[3] attendee for a meeting held February 25, '04. Do you
[4] recall such a meeting?
[5]   A: No.
[6] Q: Okay. On the second page, if you look
[7] down to item "I," can you tell me who Mr. Shore is?
[8]   A: He was Kim Shore. He was like the team
[9] leader for the Air Force inspectors.
[10] Q: And Mr. Shore — can you read small
[11] paragraph "I," just the first part of it?
[12]   A: Mr. Shore noted that the end of the fiscal
[13] year had to be hard on CSS with so many projects
[14] being awarded virtually at the same time.
[15] Q: And is that what you were referring to as
[16] the crunch time?
[17]   A: Yes.
[18] Q: And the scheduling for these projects,
[19] which were handed out at crunch time, how was that
[20] determined?
[21]   A: By the government.
[22] Q: By the government. Now, prior to the
[23] crunch-time projects, did Jersey Shore have the
[24] ability to influence the schedules?

Page 49

[1]   A: Yes.
[2] Q: And were those schedules negotiated with
[3] the government at that time?
[4]   A: Well, I negotiated schedules with the
[5] government, and I also negotiated schedules with
[6] Jersey Shore.
[7] Q: Okay. Now, you told me a minute ago that
[8] the government established the schedules for the
[9] crunch-time work; correct?
[10]   A: (Nodded.)
[11] Q: Okay. Were you able to negotiate
[12] different schedules for this work?
[13]   A: Sometimes.
[14] Q: Did you, in fact, negotiate different
[15] schedules for any of the projects that were part of
[16] the crunch time?
[17]   A: I believe so.
[18] Q: Do you recall —
[19]   A: They were pretty, they were pretty adamant
[20] that their timing was good. But I was able to get
[21] some additional days on some projects.
[22] Q: Prior to giving the delivery order notice
[23] to proceed to Jersey Shore for these crunch-time
[24] projects — and I will reference them, just so the

Page 50

[1] record's clear as to what we're referring to — would
[2] be for delivery order 50-10, which I'll represent on
[3] the record was actually queued at 11/18/03; delivery
[4] order 50-18 —
[5]   MR. LEVIN: Jim, can you hold on.
[6] 50-10 was — I'm sorry. Go ahead.
[7]   MR. HEISMAN: 50-10, executed 11/18;
[8] delivery order 50-18, executed 11/20/03; delivery
[9] order 50-19, executed 11/17/03; and delivery order
[10] 50-21, executed 12/8/03.
[11]         BY MR. HEISMAN:
[12] Q: Does my reading of those particular
[13] delivery orders help refresh your recollection at all
[14] as to the projects for the crunch time?
[15]   A: No.
[16] Q: Okay. Prior to giving the delivery orders
[17] notice to proceed to Jersey Shore for the delivery
[18] orders we just referenced, did Chugach ever
[19] communicate the schedule that was required to
[20] complete these jobs to Jersey Shore?
[21]   A: Yes.
[22] Q: And did Jersey Shore indicate that they
[23] would be able to perform under those time
[24] constraints?

Page 51

[1]   A: Most of them.
[2] Q: When you say "most of them," do you have
[3] any specific recollection?
[4]   A: Well, I know of one project that there was
[5] not enough time.
[6] Q: And which project was that?
[7]   A: It was a hospital job, Building three
[8] hundred — I'm not sure of the number.
[9] Q: And did you at that time indicate to
[10] Jersey Shore that Chugach would waive liquidated
[11] damages for that project?
[12]   A: I did, because they didn't have time to
[13] finish.
[14] They did not want the job. I
[15] solicited it to several different subs. I could not
[16] ever get it within budget or — I really couldn't
[17] find anybody that wanted to do it. Jersey Shore
[18] agreed to go in there and do it. And they didn't
[19] have enough time; I think I only had about 30 days
[20] left in the job by the time I got them on board.
[21] Q: Could you tell me who Dorinda Mahler or
[22] "Mahler" is?
[23]   A: She's from the home office. I knew her
[24] briefly on my exiting.

Page 56

[1] letter dated February 5th, 2004, from Jersey Shore?
[2]   A: I believe so.
[3]   Q: And do you have any recollection that
[4] there were invoices outstanding for material and
[5] labor costs from November 29 of 2003 at this time?
[6]   A: I'm not sure of the dates, but they were
[7] outstanding.
[8]   Q: Okay. In your experience in the
[9] construction industry, were they outstanding a
[10] reasonable amount of time?
[11]   A: No.
[12]   Q: How —
[13]   A: Very unreasonable.
[14]   Q: Very unreasonable?
[15]   A: Uh-huh.
[16]   Q: And in terms of it's much too long, at
[17] this point?
[18]   A: Correct.
[19]   Q: And we talked about some reasons for the
[20] delays earlier. We talked about certified payroll
[21] issues. Are there any other reasons that you're
[22] aware of that may have influenced why these invoices
[23] weren't paid in a timely fashion?
[24]   A: Just what we've discussed. You know,

Page 57

[1] there was personnel issues, paperwork issues.
[2]   Q: When you say "personnel issues," do you
[3] mean personnel issues within Chugach?
[4]   A: Both subcontractor and Chugach.
[5]   Q: And Chugach — could you specifically
[6] identify the personnel issues that you're talking
[7] about.
[8]   A: People that were terminated for not doing
[9] their job.
[10]   Q: And that would be —
[11]   A: Deborah Taylor was one of them.
[12]   Q: And she was the person primarily
[13] responsible for processing payrolls; correct?
[14]   A: Yes; and hid it well from me for a long
[15] time.
[16]   Q: Do you recall when Miss Taylor was fired?
[17]   A: No.
[18]   Q: Can you tell me what action Chugach
[19] took — strike that.
[20]   Can you tell me what action you took,
[21] if any, in response to this letter from Jersey Shore?
[22]   A: I believe, if this is the same timeframe,
[23] I went to the home office and asked for payment to be
[24] released, even though Chugach had not been paid;

Page 58

[1] because I didn't feel like it was all of Jersey
[2] Shore's problem that they weren't receiving payment.
[3] Sometimes it wasn't — if they were on the same job
[4] as another sub, it wasn't always them. If another
[5] sub had a problem, it wasn't Chugach or Jersey Shore.
[6] The Air Force there at Dover would hold up payment on
[7] everybody.
[8]   Q: All right.
[9]   A: And I believe they were paid some of the
[10] money that I requested, even though we weren't paid
[11] by the Air Force. And that is not a Chugach policy.
[12] And I was just trying to alleviate some of the debt
[13] here.
[14]   Q: Did you talk to Mr. Hutton at this point
[15] about this issue?
[16]   A: Yes.
[17]   Q: And did Mr. Hutton actually release these
[18] funds?
[19]   A: I can't answer that. I don't know who
[20] did.
[21]   Q: Do you know if Mr. Hutton's still with
[22] Chugach?
[23]   A: I don't believe so.
[24]   Q: Do you know why he's not with Chugach any

Page 59

[1] longer?
[2]   A: No.
[3]   MR. HEISMAN: Let me ask the reporter
[4] to mark this as Hafey 9, please.
[5]   (Exhibit Hafey 9 was marked for
[6] identification.)
[7]       BY MR. HEISMAN:
[8]   Q: And what I'd like to focus your attention
[9] on, Mr. Hafey, is the bottom of the first page. And
[10] it's an email from Darryl Meehan to you dated
[11] February 13, 2004. Do you see that?
[12]   A: Uh-huh. Yes.
[13]   Q: Now, Mr. Meehan makes some statements in
[14] here that I'd like to speak with you about.
[15]   Mr. Meehan states that, quote, There
[16] are three documents involved in the creation of each
[17] delivery order: the government's statement of work,
[18] the estimate or scope of development, and Chugach's
[19] narrative.
[20]   Do you agree with that statement?
[21]   A: As I said before, sometimes all three were
[22] there. Most of the time, probably not.
[23]   Q: Okay.
[24]   A: It was a mutual understanding through site

Page 64

[1] pretty much by their budget. I mean, you know, all
[2] of this is the reason I left.
[3]  Q: Since you raise the issue now, can you
[4] explain why exactly you left Chugach.
[5]  A: There was — it was a no-win situation for
[6] me personally.
[7]  Q: And can you give me specifics, please.
[8]  A: Everyone that I had dealt with was no
[9] longer there, Jim and Bob. That was my only
[10] connection, really, with the job.
[11]  Q: Excuse me. When you say Jim, was that
[12] Mr. Hutton?
[13]  A: Yes.
[14]  Q: And Bob?
[15]  A: Westerman. Actually, Jim hadn't been gone
[16] that long when I left, but...
[17]  We were trying to rectify, you know,
[18] all of the problems with home office personnel. The
[19] names that you had mentioned earlier, Dorinda and
[20] that — Taylor. They were down trying to remedy the
[21] certified payroll and office management part of it.
[22]  I, I, I tried and tried with Jacquie.
[23] My first attempt was with the Department of Labor. I
[24] never got any feedback that the $20 an hour was low

Page 65

[1] or would not be accepted.
[2]  Q: Right.
[3]  A: As a matter of fact, it was paid — you
[4] know, until the time that it was not — that it was
[5] denied.
[6]  Q: Right.
[7]  A: There were several instances where I —
[8] the payment was held up, not because certified
[9] payrolls were wrong — well, they were, but because
[10] according to the Air Force contracting officer, the
[11] payrolls were not right.
[12]  I mean, they did not — supposedly, we
[13] did not pay the people the proper wage rate. And
[14] that was a battle every month. I'm not in this
[15] business to battle. I've never had a problem. You
[16] can go back on my reputation all the way.
[17]  Normally, people will negotiate with
[18] you. It's a, it's a strange animal this business
[19] because of the part of the country you're in. I
[20] didn't fit well here. I'm from the South. I mean,
[21] it's no secret. I just — I didn't deal well with
[22] the people here. I'm not a screamer.
[23]  But there was no negotiating at Dover.
[24] I've worked all over the South and, and had no

Page 66

[1] problems. I'm not saying it's a geographical
[2] problem, but I'm saying that Dover was definitely a
[3] problem in the fact that there was no fluctuation.
[4] You know, this is not a type of contract to me that's
[5] a cast-in-stone. We have to work within the means of
[6] the contract to get work done and be successful.
[7]  I believe the contractor before us
[8] went belly up down there.
[9]  Q: The prime contractor?
[10]  A: Yeah.
[11]  Q: Were you ever given direction to, quote,
[12] keep the Air Force happy, unquote, or something to
[13] that effect?
[14]  A: At the end. That was not from Jim.
[15]  Q: Who was that from?
[16]  A: The guy the took Westerman's place,
[17] Clowers.
[18]  Q: Can you give me some context of that
[19] conversation with Clowers?
[20]  A: It was minimal. I didn't know the man. I
[21] was very frustrated. And Jim Hutton had just left.
[22] And I was, I was just looking for, you know, my next
[23] move, what do I do.
[24]  Q: Right.

Page 67

[1]  A: And to me, I mean, I like to keep the
[2] client happy. The client's very happy with me where
[3] I'm at, and they were on the job previous to this.
[4] But if I can't make a profit, I'm in — I mean, I'm
[5] employed to make a profit. I could not do that
[6] there.
[7]  Q: And when you say you could not do that
[8] there, Chugach could not do that there?
[9]  A: (The witness shook his head.)
[10]  Q: Was there any way Jersey Shore could have
[11] made a profit under that cost structure that was in
[12] place?
[13]  MR. LEVIN: Objection.
[14]  THE WITNESS: Well, you know the cost
[15] structure and all the other — I went to battle
[16] several times, you know, trying to get rates
[17] decreased, estimates increased. It — that wasn't a
[18] winning situation.
[19]    BY MR. HEISMAN:
[20]  Q: Okay. Now, do you know, at the time that
[21] the delivery orders notice to proceed which were
[22] offered to Jersey Shore in the "fallout" period, in
[23] your opinion, based upon your time in the
[24] construction industry, under the pricing scheme as

Page 72

[1] having a Jersey Shore employee, you know, do
[2] estimates and —
[3]          BY MR. HEISMAN:
[4]   Q: Uh-huh.
[5]   A: — be in the office. And we just never
[6] got to that point.
[7]   Q: Okay.
[8]   A: We also discussed, you know, the
[9] skilled-laborer wage rate. There was not much else
[10] that I could do than, you know, what — then the UPG
[11] was raised later in conversation. Why is this price
[12] higher than — well, and I've told you what the
[13] response was I got to that from the Air Force. It
[14] was for things not covered in Means.
[15]   Q: Sure. Now, I believe you told me earlier
[16] today that the UPG was used in some roofing
[17] contracts?
[18]   A: I believe it had quite a bit of metal
[19] roofing in it.
[20]   Q: Okay.
[21]   A: Gutters, downspouts, as I recall.
[22]   Q: And were those items not included in
[23] R.S. Means?
[24]   MR. LEVIN: Objection.

Page 73

[1]   THE WITNESS: I don't recall.
[2]          BY MR. HEISMAN:
[3]   Q: But if those items were included in
[4] R.S. Means, then consistent with, I guess,
[5] Ms. McGee's interpretation, then the R.S. Means cost
[6] should be used rather than the UPG; correct?
[7]   A: That's correct.
[8]   Q: Unless it was exploratory type work?
[9]   A: Or not covered —
[10]   Q: Or not covered.
[11]   A: — under R.S. Means.
[12]   Q: Okay. And, I guess, No. 2 on this memo —
[13] was there time to review the line item pricing?
[14]   A: They would do that in-house. There was
[15] really no time — we might have once or twice. But
[16] there wasn't time between the time that we submitted
[17] an estimate and negotiated an estimate. And I don't
[18] recall Jersey Shore ever being in the negotiations.
[19]   Q: Right. Did Jersey Shore ever provide
[20] supporting documentation to assist in estimates,
[21] negotiating estimates?
[22]   A: Towards the end, I believe that they would
[23] do their own estimate —
[24]   Q: Uh-huh.

Page 74

[1]   A: — and provide us a copy and show us, you
[2] know, how deficient we were in our estimating
[3] practices.
[4]   Q: Do you agree with that assessment?
[5]   A: Well, we're bound, like I said, with
[6] negotiating with the government. The people that I
[7] had employed had reputations that — now, most of
[8] them, it's estimating. Most of them — well, Dan I
[9] knew of. The other guys I hired from their
[10] reputation.
[11]     But, there again, we're restricted by
[12] what the government will negotiate with us. Every —
[13] a lot of times it didn't really matter what the
[14] quantities are that you have.
[15]   Q: But let's just hypothetically assume one
[16] of the items omitted some windows and doors not
[17] referenced in the scope of work; okay?
[18]   A: (Nodded.)
[19]   MR. LEVIN: Objection. I don't
[20] understand. If it's omitted and not referenced in
[21] the scope of work, how can they be omitted. The
[22] question's confusing.
[23]   MR. HEISMAN: Let me strike that.
[24] We'll try it a different way.

Page 75

[1]          BY MR. HEISMAN:
[2]   Q: If there are materials omitted from an
[3] estimate — windows or doors, something along that
[4] line — that Chugach used to negotiate with the
[5] government and down the line, lo and behold, windows
[6] and doors are required to be used in the project,
[7] would that, in your mind, be the type of situation
[8] where a change order would be properly issued to
[9] Jersey Shore?
[10]   MR. LEVIN: Objection.
[11]   THE WITNESS: That depends.
[12]          BY MR. HEISMAN:
[13]   Q: What would that depend on?
[14]   A: That would depend on their understanding
[15] of the job. Now, I might not have it in the
[16] estimate, but I might have it in the statement of
[17] work —
[18]   Q: Right.
[19]   A: — if both of them were present.
[20]     Like I said, we negotiate to a price,
[21] an agreeable price with the government.
[22]   Q: Okay.
[23]   A: Windows, doors, whatever. You know, we go
[24] on a site visit with the subcontractor, and they give

Page 80

[1] needed the UPG rates to be included in line-item
[2] estimates to continue work on the Dover Air Force
[3] jobs?
[4]   A: If — I don't recall that statement. I do
[5] recall going to — I'm sure that it was talked about.
[6] Because I did go to the Air Force on more than one
[7] occasion and ask why the UPG was so much more than
[8] the Means.
[9]   Q: And what was their response when you —
[10]   A: You know. You signed the contract.
[11]   Q: Wasn't the purpose of your meeting —
[12] which I believe happened sometime in September, with
[13] the people that we've spoken about earlier — to
[14] discuss the ways in which the parties would go
[15] forward with —
[16]   A: Yes.
[17]   Q: — future delivery orders?
[18]   And wasn't a focal point of those
[19] meetings the fact that Jersey Shore believed it was
[20] losing money as a result of the discrepancies in the
[21] UPG and the R.S. Means?
[22]   MR. LEVIN: Objection.
[23]   THE WITNESS: That could be.
[24]                  BY MR. HEISMAN:

Page 81

[1]   Q: Okay. And didn't you represent that,
[2] going forward, that additional funds would be found
[3] somewhere to compensate for this problem?
[4]   MR. LEVIN: Objection.
[5]   THE WITNESS: I've heard that. But
[6] I — the only way for me to get additional funds is
[7] through modification — or to, you know, go into my
[8] margin to cover costs that I can't get reimbursed for
[9] by the government.
[10]   (Discussion held off the record.)
[11]                  BY MR. HEISMAN:
[12]   Q: Do you recall a subcontractor by the name
[13] of Floor Pro?
[14]   A: I think so.
[15]   Q: And do you recall that Jersey Shore was
[16] required to use that entity on a particular delivery
[17] order?
[18]   A: I don't recall.
[19]   Q: Did you have any personal oversight over
[20] the estimates that were prepared for individual
[21] delivery orders?
[22]   A: Yes.
[23]   Q: And was it your practice to view them
[24] before they were submitted to the government?

Page 82

[1]   A: Sometimes I would. I'd discuss them.
[2] I really wouldn't go into great detail, line item by
[3] line item.
[4]   (Discussion held off the record.)
[5]                  RECESS
[6]   MR. HEISMAN: Let me ask you to mark
[7] what I'll call Hafey 11, please.
[8]   (Exhibit Hafey 11 was marked for
[9] identification.)
[10]                  BY MR. HEISMAN:
[11]   Q: And, Mr. Hafey, I would ask if you can
[12] identify that document, please.
[13]   A: It's a statement of work for a bunker job.
[14]   Q: And would this be the type of
[15] documentation that the Dover Air Force personnel
[16] would give to Chugach to begin its pricing process?
[17]   A: Sometimes.
[18]   Q: Sometimes?
[19]   A: (Nodded.)
[20]   Q: Now, how would you go about that process,
[21] the pricing process, using the statement of work as
[22] the information provided?
[23]   A: We'd site-visit, you know, take
[24] dimensions, do an estimate.

Page 83

[1]   Q: And when you did that estimate, you would
[2] recognize that there were Davis-Bacon rates that you
[3] needed to pay for a carpenter at one level; correct?
[4]   A: Well, that really didn't — it was
[5] quantified. It had little to do with what the
[6] Davis-Bacon was.
[7]   Q: Okay. But was there any way to recoup
[8] costs to make up for the discrepancy in the
[9] Davis-Bacon rates in your estimates?
[10]   MR. LEVIN: Objection. I mean — you
[11] know, I don't know what the rules are here. Can we
[12] put speaking objections on the record with the
[13] witness present?
[14]   MR. HEISMAN: No. The objection is
[15] statement is hearsay, no foundation, whatever.
[16]   MR. LEVIN: Well, I think you're
[17] confusing items here. So let me leave it at that,
[18] then.
[19]   MR. HEISMAN: Can you read back the
[20] last question, please.
[21]   (The court reporter read back the
[22] following:
[23]   "Q Okay. But was there any way to
[24] recoup costs to make up for the discrepancy in the