Page 88

[1] But, you know, if you gave him two things or three
[2] things, everything, you know...
[3]    Q: Were there problems with his estimates in
[4] terms of quantities or — we'll start with
[5] quantities.
[6]    A: Not that I can recall. I know that other
[7] people have. But, you know, they're negotiated with
[8] the government. All the quantities are hashed out.
[9] A lot of times, if it's a problem with the
[10] quantities, it's not because of the estimate; it's
[11] because of the negotiations.
[12]    Q: Now, what about with respect to his
[13] estimates in terms of capturing the scope of work?
[14]    A: They were as good as they could be. You
[15] know, I can't — that — it's not an itemized
[16] situation once you negotiate the job. I mean,
[17] everyone is looking for a dollar amount, more than
[18] they are quantifying the job. If you go to the
[19] government, they're not going to give you more money,
[20] most of the time, if you forgot three doors.
[21]    Q: Right.
[22]    A: You know. At the same time, if you go in
[23] and try to get more money, they're not going to give
[24] it to you. And it's kind of a hard-bid thing once

Page 89

[1] you negotiate a price.
[2]    Q: And Chugach was responsible for preparing
[3] the estimates?
[4]    A: Yes.
[5]    Q: Okay. Who was Tamara Vicere, V-I-C-E-R-E?
[6] Do you know?
[7]    A: I hired Tamara to take Deborah's place.
[8]    Q: And how did she work out for you?
[9]    A: You know, she came on like she was going
[10] to do pretty good, and she just got swamped. That's
[11] when we, we brought in personnel from the home
[12] office.
[13]    Q: Okay. Do you recall the period when she
[14] got swamped?
[15]    A: Well, when she started, she was, you know,
[16] behind the eight ball.
[17]    Q: Uh-huh.
[18]    A: And we tried to work together to get
[19] certified payrolls squared away so people could be
[20] getting paid.
[21]    Q: Right.
[22]    A: I thought there would be a leveling-off
[23] period, but it just seemed to keep snowballing.
[24]    Q: And who did you bring in from Alaska to

Page 90

[1] help with these administrative tasks?
[2]    A: The two names you mentioned earlier,
[3] Dorinda and Taylor.
[4]    Q: And what was their work assignment when
[5] they came from Alaska down to Dover?
[6]    A: To get the paperwork squared away so we
[7] could get paid; mostly certified payroll issues.
[8]    Q: When you're saying "certified payroll
[9] issues," what do you mean by that?
[10]    A: Certified payrolls that were wrong, you
[11] know, from various subs.
[12]    Q: What about the internal Chugach processing
[13] of these payrolls; did they help speed that process
[14] up?
[15]    A: Yes.
[16]    Q: Is it your view that it was slow before
[17] these people came from Alaska to help things out?
[18]    A: Yes. And I don't think they were ever a
[19] hundred percent while I was there. Jacquie was a
[20] tough customer there. You're off — we were off
[21] 2 cents on a certified payroll; she held up the
[22] entire billing.
[23]    Q: Do you know if Tamara's still with
[24] Chugach?

Page 91

[1]    A: I don't know.
[2]    Q: Who's David Neal?
[3]    A: David was my QC guy.
[4]    Q: And how was your working relationship with
[5] David?
[6]    A: Dave was — I think he was retired Air
[7] Force. I didn't hire him. He did his job well, did
[8] it thorough. He was too slow for Dover, though.
[9]    Q: When you say "too slow for Dover," what do
[10] you mean?
[11]    A: You know, there's QC reports that are due.
[12] And he'd just — he'd do them very thoroughly. But
[13] he was just slow at his job.
[14]    Q: And what are the QC reports used for?
[15]    A: Daily reports, progress, safety.
[16]    Q: Do they have any impact on billing?
[17]    A: I had Dave involved little in the
[18] construction — I mean as far as the percentages.
[19]    Q: When you say "as far as the percentages,"
[20] going and approving —
[21]    A: Progress payments; yeah.
[22]    Q: And he was slow with that as well?
[23]    A: He just wasn't involved with it much.
[24] That's not the function of a QC guy. I might have

Page 96

[1] or agree with Jersey Shore to negotiate additional
[2] funds, presumably from the government?
[3]    A: Based on modifications?
[4]    Q: Well, I'm looking at this — it's — just
[5] at this allegation. Do you —
[6]    A: I did on the hospital job. You know, we
[7] were trying to get through with that job. There was
[8] high-powered people in there. And, you know, I did
[9] what I had to do to get it done. One of them was
[10] waiving liquidated damages. Another was to pay
[11] additional funds that were into our 21 percent.
[12]    Q: Is that reflected in a written document
[13] somewhere?
[14]    A: I, I don't think so.
[15]    Q: Was that a change order or anything of
[16] that nature?
[17]    A: It would have been a change order in their
[18] contract. But it wasn't a change order to the
[19] delivery order for the government.
[20]    Q: I understand that. But was that number,
[21] to the best of your recollection, included in the
[22] price in the delivery order that Chugach and Jersey
[23] Shore agreed to?
[24]    A: I don't understand that.

Page 97

[1]    Q: Well, that was Building 300?
[2]    A: Correct.
[3]    Q: I'm sorry. I don't have the complete
[4] delivery order here. But what I'm asking is — the
[5] delivery order would have a price in it; correct?
[6]    A: (Nodded.)
[7]    Q: You have to say yes.
[8]    A: Right.
[9]    Q: And was the price that was in the delivery
[10] order, to the best of your recollection, that you and
[11] Jersey Shore signed onto, did that price include the
[12] additional funds to which you just referred?
[13]    A: No; because that came up as the job went
[14] on.
[15]    Q: And that, you say, would be reflected
[16] somewhere else in the document?
[17]    A: Correct.
[18]    Q: Did Jersey Shore at any time — again, to
[19] the best of your knowledge — make any written claim,
[20] request, or demand for additional funds to reflect
[21] UPG prices?
[22]    A: Like I said, right there at the end, that
[23] was a major topic. And as — every time I tried to
[24] go and, and — with the government, I ran into a

Page 98

[1] brick wall. So there was, there was no way for me to
[2] do that and, and keep up with, you know, the
[3] agreement that I had made.
[4]    Q: But, specifically, to the best of your
[5] recollection now, do you recall ever seeing a piece
[6] of paper from Jersey Shore where it said, We
[7] request/claim/demand additional compensation to
[8] reflect UPG prices?
[9]    A: I don't recall that.
[10]    Q: To the best of your recollection, did you
[11] ever see any written piece of paper from Jersey Shore
[12] saying that Jersey Shore requests, claims, or demands
[13] additional compensation to reflect a differential
[14] between Davis-Bacon rates and rates embedded in
[15] R.S. Means?
[16]    A: I don't know that those were written
[17] documents. I know that was the big topic of
[18] discussion. And I kept trying to go with the Air
[19] Force, with reluctance — not my reluctance, their
[20] reluctance.
[21]    Q: I understand. Thank you. Just focusing
[22] in, again, to the best of your recollection, did
[23] Jersey Shore ever put in writing a claim to Chugach
[24] saying, Please pay/we demand/we request an amount

Page 99

[1] equal to some differential — either in a number or a
[2] narrative saying a number — the difference between
[3] Davis-Bacon and the rates embedded in R.S. Means?
[4]    A: I, I don't recall.
[5]    Q: Other than any change orders that were
[6] issued, did you sign any documents that might be
[7] viewed as a modification of the Jersey Shore/Chugach
[8] master subcontract agreement?
[9]    A: Not, not to my knowledge.
[10]    Q: I'd like you to take a look at Exhibit 10,
[11] please. Do you have that in front of you, which is
[12] that memorandum, the October 3rd memorandum? Do you
[13] have that?
[14]    A: Yes.
[15]    Q: Let me ask you, could you turn to the
[16] second page of it. Do you see the sentence in the
[17] next-to-last paragraph, the last sentence that says,
[18] All information regarding Chugach Support Services
[19] and our work at Dover Air Force Base will be treated
[20] as confidential?
[21]    Did Jersey Shore ever tell you why
[22] they wanted it treated as confidential?
[23]    A: No.
[24]    Q: Did they ever tell you from who they

Page 104

[1] attach any conditions or reservations to it?

[2] A: What job was this?

[3] Q: This is —

[4] A: Not that I recall.

[5] Q: Did he say to you that this does not

[6] comply with our September/October agreement?

[7] A: I don't think so.

[8] Q: Did you ever see anything in writing from

[9] Mr. Meehan or anyone else — Mr. Wehrhahn, Mr. Wright

[10] or Mr. Sparandera, or anybody else from Jersey

[11] Shore — that said the delivery order for Building

[12] 1272 did not — was somehow not correct or was a

[13] violation of an agreement?

[14] A: Not that I recall.

[15] Q: Did you ever see anything in writing where

[16] Jersey Shore expressed any reservations about

[17] entering into this delivery order?

[18] A: No. I think 1272 was — that was one they

[19] selected. No. Not, not that I can recall.

[20] MR. LEVIN: Mark this as 15, please.

[21] (Exhibit Hafey 15 was marked for

[22] identification.)

[23] BY MR. LEVIN:

[24] Q: Mr. Hafey, the reporter's handed you

Page 105

[1] what's been marked as Exhibit 15. Again, I will

[2] represent to you this is page 1 and the signature

[3] page of the delivery order for Building 302. Do you

[4] recognize that?

[5] A: Yes.

[6] Q: And that's your signature and Mr. Meehan's

[7] signature on the back page there?

[8] A: Correct.

[9] Q: Now, in connection with Jersey Shore's

[10] agreeing to this and presenting you with an executed

[11] delivery order, did they do so with any reservations

[12] or claims that this was in violation of some

[13] agreement that you had reached earlier?

[14] A: Not that I can recall.

[15] Q: Did you ever see anything in writing from

[16] Jersey Shore where Jersey Shore said that the

[17] delivery order for 302 was not in compliance with an

[18] agreement that you had made in late September or

[19] early October of 2003?

[20] A: Not that I can recall. I mean the

[21] agreement I made was — and I told you on that — was

[22] for 79 percent of what I could get.

[23] Q: And to the best of your recollection, was

[24] each of these delivery orders in compliance with that

Page 106

[1] agreement?

[2] A: Yes.

[3] (Exhibit Hafey 16 was marked for

[4] identification.)

[5] BY MR. LEVIN:

[6] Q: I'm going to show you what's been marked

[7] as Deposition Exhibit 16. Again, I will represent to

[8] you it's page 1 and signature page for Maintenance

[9] Shop 781. Do you recognize that?

[10] A: Yes.

[11] Q: And on the second page, is that your

[12] signature; and, again, is that Mr. Meehan's

[13] signature?

[14] A: Yes.

[15] Q: His is dated December 8th, 2003?

[16] A: Correct.

[17] Q: This would be some two months or more

[18] after the alleged agreement that you've been asked

[19] about?

[20] A: Correct.

[21] Q: When you received this from Jersey Shore,

[22] did it come with any reservations/concerns/claims

[23] that this was somehow not in compliance with your

[24] agreement?

Page 107

[1] A: Not in writing. But there was concerns

[2] about this project. That's why it was so late.

[3] Q: All right. When did those concerns arise?

[4] Before or after this delivery order?

[5] A: During the solicitation of this delivery

[6] order.

[7] Q: By "during the solicitation" you mean

[8] during your solicitation — you and Jersey Shore, or

[9] you — Chugach and the government?

[10] A: Chugach and subcontractors.

[11] Q: All right. What were those concerns?

[12] A: As I recall this particular project, one,

[13] one part of it was very cut and dried; it was putting

[14] an epoxy floor down. Another part was building like

[15] a mezzanine to an office area. And pricing was a

[16] problem on this one. And there was one other. I

[17] mean, they just couldn't cover costs.

[18] Q: And was that something that came up before

[19] Jersey Shore signed this delivery order?

[20] A: I think so.

[21] Q: So Jersey Shore was aware of that?

[22] A: Yes.

[23] Q: And Jersey Shore was aware of that at the

[24] time they handed you this delivery order, completed

Page 112

[1] tasks the way R.S. Means does it?

[2] A: My dealings with them were at Dover. I
[3] don't know.

[4] Q: Did you ever engage in any kind of
[5] conversation or discussions with them about
[6] R.S. Means in general?

[7] A: Just what we've discussed here today.

[8] Q: Do you think they indicated they had a
[9] working understanding of R.S. Means?

[10] A: They seemed to.

[11] Q: Did Jersey Shore, to your knowledge, have
[12] a knowledge of the Davis-Bacon Act?

[13] A: Yes.

[14] Q: Did Jersey Shore know that it would have
[15] to pay Davis-Bacon wages?

[16] A: Yes.

[17] Q: Did Jersey Shore know that R.S. Means is
[18] priced on a task basis?

[19] MR. HEISMAN: Objection; just for the
[20] record, this witness can't have any personal
[21] knowledge of what Jersey Shore knew.

[22] MR. LEVIN: Fair objection.

[23] BY MR. LEVIN:

[24] Q: Did Jersey Shore, to the best of your

Page 113

[1] knowledge, indicate that they understood that
[2] R.S. Means priced on a basis of performing particular
[3] tasks?

[4] A: As far as I know.

[5] Q: And to the best of your knowledge, did
[6] Jersey Shore indicate an understanding that
[7] R.S. Means did not break out wage rates?

[8] A: I don't know.

[9] Q: Was Jersey Shore performing any other work
[10] at Dover when they made contact with Chugach?

[11] A: Not to my knowledge.

[12] Q: Do you know if Jersey Shore did work for
[13] any other contractor at Dover during the time it was
[14] doing work for Chugach?

[15] A: Not that I know of.

[16] Q: Do you recall — if you could take out
[17] Exhibit 8, please. Exhibit 8, which is
[18] Mr. Meehan's — an unsigned copy of a letter,
[19] Mr. Meehan to you, dated February 5th...

[20] A: What was the question?

[21] Q: Well, I just wanted — do you remember
[22] whether or not you got this letter?

[23] A: I'm pretty sure that I did.

[24] Q: Okay. Then let's mark this as 18, please.

Page 114

[1] (Exhibit Hafey 18 was marked for
[2] identification.)

[3] BY MR. LEVIN:

[4] Q: Take a look at 18, which is Bates stamped
[5] JSA614 and purports to be an email from Terry Wright
[6] to you dated February 5th.

[7] Do you recall getting that email?

[8] A: I believe so.

[9] Q: Okay. Let me ask you a couple questions.
[10] Now, you see it's dated the same date as Exhibit 8,
[11] February 5th?

[12] A: Yes.

[13] Q: To the best of your recollection, was it
[14] your understanding that the latest — the, quote,
[15] latest cash-flow problem, end quote, that's referred
[16] to in Exhibit 18 is the problem that is referred to
[17] in Exhibit 8?

[18] MR. HEISMAN: Objection.

[19] THE WITNESS: I, I would think so.

[20] BY MR. LEVIN:

[21] Q: And to the best of your recollection, the
[22] reference in the Exhibit 18 email to "the latest
[23] fiasco, what with invoicing and such," is that the
[24] same subject matter as in Mr. Meehan's letter to you

Page 115

[1] that's Exhibit 8?

[2] A: I, I believe so.

[3] Q: Okay. Then down five lines into the email
[4] it says, and I quote, Our friend in CE should be
[5] accountable for this mess, end quote.

[6] To whom, if you know, was Terry Wright
[7] referring?

[8] MR. HEISMAN: Objection.

[9] THE WITNESS: In my opinion, it was
[10] Jacquie McGee.

[11] BY MR. LEVIN:

[12] Q: Was that your understanding?

[13] A: Yes.

[14] Q: And had you and Mr. Wright or others had
[15] discussions about that, about Ms. McGee being, quote,
[16] accountable for this mess, end quote?

[17] A: Yes.

[18] Q: And Jersey Shore agreed?

[19] MR. HEISMAN: Objection.

[20] BY MR. LEVIN:

[21] Q: To the best of your understanding?

[22] A: To the best of my understanding, yes, she
[23] was a problem for the contract.

[24] Q: Did Mr. Wright ever accuse you or Chugach

Page 120

[1] which the contracting officer claimed that Jersey
[2] Shore was underpaying workers under Davis-Bacon?
[3]    A: That was a ruling by the contracting
[4] officer, that — I think I mentioned this earlier —
[5] if you had a hammer in your hand, you were a
[6] carpenter. So that's when we submitted — I
[7] submitted a request for a classification that would
[8] eliminate that, because I disagreed with that.
[9]    But as I said, that came back denied.
[10] That's the only time I can recall.
[11]    Q: Was that request for classification for
[12] the benefit of Jersey Shore?
[13]    A: Yes.
[14]    Q: Did the government give you any reason for
[15] denying that?
[16]    A: Not that I can recall.
[17]    Q: How many times, if you remember, did
[18] Jersey Shore threaten to stop work on various jobs?
[19]    A: It wasn't an ongoing thing. It's, I
[20] think, the one time.
[21]    Q: Did other subcontractors on other jobs
[22] stop work?
[23]    A: I don't believe so. But that decision
[24] that Jacquie McGee made against that roofer hurt him

Page 121

[1] big time, almost put him out of business, until
[2] payment was made.
[3]    Q: Did the roofer complete the work?
[4]    A: Yes.
[5]    MR. LEVIN: Jim, why don't you go
[6] ahead and finish. Then if I have anything else —
[7] might as well use the time.
[8]    (Discussion held off the record.)
[9]              RECESS
[10]         BY MR. LEVIN:
[11]    Q: Just to finish up my little piece here,
[12] Mr. Hafey, did you or anybody else from Chugach, to
[13] the best of your knowledge, ever promise Jersey Shore
[14] to pay them or reimburse them for labor at
[15] Davis-Bacon rates?
[16]    A: Not to my knowledge.
[17]    Q: Did you or, to your knowledge, did anybody
[18] from Chugach ever agree or commit to pay or reimburse
[19] Jersey Shore for wages paid at Davis-Bacon rates?
[20]    A: Is that the same question?
[21]    Q: Well, it's a little bit — it's worded a
[22] little bit differently.
[23]    A: Can you ask it again.
[24]    Q: The first one is did you promise and the

Page 122

[1] second one is did you agree.
[2]    A: Not to my knowledge.
[3]    Q: And did you or anyone else at Chugach, to
[4] the best of your knowledge, ever promise or agree to
[5] price any delivery orders with the government using
[6] Davis-Bacon wage rates?
[7]    A: Not to my recollection.
[8]    Q: And to the best of your knowledge, if you
[9] had tried to do that, would the government — could
[10] you have done that under the SABER contract?
[11]    A: No.
[12]    MR. LEVIN: Thank you, Jim.
[13]    MR. HEISMAN: Sure.
[14]         BY MR. HEISMAN:
[15]    Q: Mr. Hafey, would you take a look at
[16] Exhibits 13, 14, 15, and 16, please. Do you have
[17] them in front of you, sir?
[18]    A: Yes.
[19]    Q: And they are the delivery orders for
[20] various projects, starting with a date on or about
[21] November 12, going through December 3rd; is that
[22] correct?
[23]    A: Correct.
[24]    Q: Okay. And the meeting you had with Jersey

Page 123

[1] Shore occurred around September or October of 2003;
[2] correct?
[3]    A: Correct.
[4]    Q: And that's at the time that you discussed
[5] the ways in which the Chugach and Jersey Shore could
[6] continue working together in the future; correct?
[7]    A: Correct.
[8]    Q: Okay. And that was also around the crunch
[9] time, as you called it, where the government wanted
[10] to spend all the money that was appropriated for that
[11] particular year; correct?
[12]    A: That's correct.
[13]    Q: And you also indicated to me that
[14] Chugach's procedure typically was not to share
[15] estimates with subcontractors like Jersey Shore prior
[16] to providing them with a delivery order notice to
[17] proceed; correct?
[18]    A: Well, it's not typical to supply them
[19] anytime.
[20]    Q: Okay. So Chugach did not supply the
[21] estimates for these particular jobs to Jersey Shore
[22] prior to the execution of these delivery orders by
[23] Jersey Shore, correct, during the crunch time?
[24]    A: Probably not. I don't know — I would say

Page 128

[1]  Q: Okay. Now, the second page, I guess, you
[2] talked about people on the job, George Molina. You
[3] reiterate that he was not qualified, in your opinion?
[4]  A: He was not qualified when I first got
[5] there. But, you know, he was a very key asset, in my
[6] opinion, because of his relationship with contracting
[7] and the Air Force. He was coached well by Tom, was
[8] one of my estimators. And Tom assured me that he
[9] could do it, so...
[10]  Q: Okay.
[11]  A: I didn't realize I was going to be writing
[12] these for everyone to review, but...
[13]  Q: Now, Deborah — which Deborah are you
[14] talking about?
[15]  A: Deborah Taylor.
[16]  Q: "Space case." What do you mean by that?
[17]  A: I tried to use her, because she was the
[18] office manager for the contractor before us. She was
[19] hired before I got there.
[20]  The reason I wrote that is because of
[21] what happened after I terminated her.
[22]  Q: Which was what?
[23]  A: She had, supposedly, some Delaware highway
[24] patrolman after me, boyfriend, going to get me on the

Page 129

[1] interstate and do something, you know.
[2]  Q: All right.
[3]  MR. LEVIN: At Davis-Bacon wage rates.
[4]  MR. HEISMAN: Thank you, Harvey.
[5]  BY MR. HEISMAN:
[6]  Q: Now, how would you describe Deborah's
[7] organizational skills?
[8]  A: She kept things from me very well, as I
[9] stated earlier. I felt that she was doing a good
[10] job. Every time I'd ask her for a document or
[11] anything, I mean, she'd have it.
[12]  When I realized I had a problem with
[13] her was when she was not performing the things that
[14] task order managers needed her to do. They'd come to
[15] me. And then I found out that we had a big problem.
[16] And this all happened really in a short period of
[17] time.
[18]  Q: And, again, the problem was what?
[19]  A: Just, you know, not doing — not
[20] performing her work and hiding, you know — she'd
[21] produce what I wanted.
[22]  Q: Did she ever tell you that she did
[23] something and you would find out that that was not
[24] correct?

Page 130

[1]  A: She wouldn't. You know, we had, we had
[2] specific deadlines we had to make. And when things
[3] wouldn't go out, I finally got to the bottom of why.
[4] And a lot of it had to do with, you know, her
[5] performance. And that's why I terminated her.
[6]  Q: And she was the principal person in charge
[7] of the processing of requests for payments —
[8]  A: Office manager.
[9]  Q: — correct?
[10]  A: Correct.
[11]  (Discussion held off the record.)
[12]  MR. HEISMAN: Mr. Hafey, thank you
[13] very much for coming here today. I'm finished at
[14] this juncture. I don't know if Mr. Levin has some
[15] follow-ups.
[16]  MR. LEVIN: Can we just take five
[17] minutes or so and just see.
[18]  RECESS
[19]  (Exhibit Hafey 20 was marked for
[20] identification.)
[21]  BY MR. LEVIN:
[22]  Q: Mr. Hafey, you recall earlier I had asked
[23] you about whether there were any delays in Jersey
[24] Shore's submittals, and I'd shown you an early email.

Page 131

[1]  Let me show you what's been marked as
[2] Exhibit 20; ask you to look at that, please.
[3]  A: Okay.
[4]  Q: All right. Is that your signature?
[5]  A: Yes.
[6]  Q: Do you recall sending this letter?
[7]  A: No.
[8]  Q: Does this at all revive your recollection
[9] about Jersey Shore delinquencies in submittals?
[10]  MR. HEISMAN: Objection.
[11]  THE WITNESS: I, I believe this was
[12] the same job. This was that job that had partial
[13] epoxy flooring and a — building a mezzanine in an
[14] office area.
[15]  And, you know, to my recollection,
[16] this is a job that Jersey Shore didn't want to do
[17] that I — that they agreed to do. And — but we
[18] still thought we could make liquidated damages — or
[19] the timeframe on this job. I know the one that was
[20] the real problem was the hospital, that Building 300.
[21]  BY MR. LEVIN:
[22]  Q: Would, in — just ordinarily, would a
[23] delay in submittals cause a delay in progress of the
[24] job?

Page 134

[1]          EXHIBITS CONTINUED
[2] NAME        DESCRIPTION        PAGE
[3] Hafey 16    Maintenance Shop 781 Delivery   106
             Order Excerpt
[4]
   Hafey 17    Hafey Email, 1/23/04        108
[5]
   Hafey 18    Email from Wright to Hafey,    114
[6]          2/5/04
[7] Hafey 19   Email from Taylor to Clowers   125
[8] Hafey 20   Hafey Letter        130
[9]          (The Exhibits were retained by
             the witness; no copies are
[10]         attached hereto.)
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 135

[1]          CERTIFICATION
[2]
[3]
[4]       I, ADAM D. MILLER, Registered
[5] Professional Reporter, certify that the foregoing is
[6] a true and accurate transcript of the foregoing
[7] deposition, that the witness was first sworn by me at
[8] the time, place and on the date herein before set
[9] forth.
[10]        I further certify that I am neither
[11] attorney nor counsel for, not related to nor employed
[12] by any of the parties to the action in which this
[13] deposition was taken; further, that I am not a
[14] relative or employee of any attorney or counsel
[15] employed in this case, nor am I financially
[16] interested in this action.
[17]
[18]
[19]
[20] Adam D. Miller
     Registered Professional Reporter, Notary Public,
[21] and Certified Shorthand Reporter of the State of
     Delaware #109-RPR (Exp. 01-31-2008)
[22]
[23]
[24]

## $

**$20** 20:6; 64:24
**$32,000** 40:10
**$38** 17:1
**$64,517** 54:19
**$79,000** 85:20

## 0

**03** 45:16
**04** 48:3

## 1

**1** 18:11, 12, 22; 32:7; 39:14, 22; 71:22; 105:2; 106:8
**1.02** 77:14
**1.1** 39:17
**1.2** 18:21
**1.23** 77:13
**10** 45:9; 69:5, 6; 78:13; 99:10; 103:1
**1007** 2:6
**11** 82:7, 8
**11/17/03** 50:9
**11/18** 50:7
**11/18/03** 50:3
**11/20/03** 50:8
**1155** 2:2
**12** 94:16, 20; 122:21
**12/8/03** 50:10
**1200** 2:2
**1272** 103:15; 104:12, 18; 119:13, 13
**12:33** 132:12
**13** 6:9; 59:11; 101:24; 102:1; 122:16
**14** 103:9, 10; 122:16
**15** 104:20, 21; 105:1; 122:16
**16** 106:3, 7; 122:16
**17** 108:12, 14, 17
**170,000-square-foot** 6:12
**17th** 102:18
**18** 77:1, 1; 113:24; 114:1, 4, 16, 22
**18th** 109:22, 24
**19** 125:3, 4
**1980** 3:8
**1987** 5:23
**1988** 6:4
**19899** 2:7
**1993** 7:11
**1996** 7:15

## 2

**2** 30:4, 5; 39:22; 73:12; 90:21
**2-cent** 118:23
**20** 130:19; 131:2
**200,000** 45:10
**2000** 7:18
**2003** 11:17; 23:11; 45:15; 46:16; 56:5; 61:22; 69:10, 23; 70:18; 105:19; 106:15; 123:1
**20036** 2:3
**2004** 32:7; 56:1; 59:11; 108:19
**20th** 103:22
**21** 76:23; 77:4, 5; 84:22; 96:11
**2177** 30:16, 21
**2207** 2:6
**23rd** 108:19
**25** 48:3
**29** 56:5

## 3

**3** 31:19, 20; 69:10; 77:2
**30** 6:9; 51:19; 78:24
**300** 97:1; 102:6; 131:20
**300,000** 117:17, 18, 18
**302** 105:3, 17; 117:14
**3rd** 69:22; 70:18; 99:12; 122:21

## 4

**4** 36:3, 4; 40:16; 78:13, 14; 100:19; 101:2
**401** 30:10
**42** 95:1
**4661** 18:20

## 5

**5** 39:2, 3; 40:17; 79:3; 100:18
**50** 68:17
**50-10** 50:2, 6, 7; 54:14
**50-18** 50:4, 8
**50-19** 50:9; 103:15
**50-21** 50:10
**5th** 56:1; 113:19; 114:6, 11

## 6

**6** 47:20, 22; 95:1
**65** 17:2

## 7

**7** 40:17; 54:4, 5
**70s** 8:5, 5, 6
**781** 106:9
**79** 77:9; 84:12, 14, 23; 85:6, 12; 105:22; 108:4
**79,000** 85:22

## 8

**8** 55:20, 21; 113:17, 17; 114:10, 17; 115:1
**80s** 5:11; 8:4, 7
**8th** 106:15

## 9

**9** 59:4, 5
**93,957** 54:22

## A

**ability** 48:24
**able** 49:11, 20; 50:23
**accept** 27:10; 101:16
**Acceptable** 35:2; 37:12
**accepted** 7:22; 65:1
**accepting** 29:10
**accord** 125:24
**according** 2:12; 9:8; 21:3; 65:10; 118:15
**accountable** 115:5, 16
**accuse** 115:24
**acquired** 7:14, 16
**acronyms** 10:24
**Act** 17:10; 112:12
**action** 57:18, 20
**actually** 6:21; 9:6; 15:13; 31:3; 33:10; 37:12; 46:11; 50:3; 58:17; 64:15; 79:22; 93:6; 101:20; 110:19; 116:15; 119:13
**adamant** 49:19; 109:6
**add** 40:16; 76:16
**added** 31:7
**addition** 10:2; 40:22
**additional** 15:18; 26:8; 49:21; 81:2, 6; 95:4; 96:1, 11; 97:12, 20; 98:7, 13
**adequate** 19:22
**adjusted** 39:21
**administrative** 41:11; 53:10; 61:23; 90:1
**advance** 117:10
**advanced** 118:1
**advise** 71:7
**AF** 127:11, 12
**again** 21:10; 35:8, 17; 68:22; 71:10; 74:11;

86:22; 87:3; 97:18; 98:22; 103:13; 105:1; 106:7, 12; 109:4; 121:23; 129:18; 132:2
**against** 2:21; 27:5; 29:5; 120:24
**ago** 3:2; 49:7; 60:8; 77:16
**agree** 19:1; 28:12; 32:6; 59:20; 60:2, 11; 71:1; 74:4; 84:19; 95:9, 16, 20; 96:1; 121:18; 122:1, 4; 124:8
**agreeable** 75:21
**agreed** 51:18; 84:21; 96:23; 103:5; 115:18; 117:10, 23; 131:17
**agreeing** 105:10
**agreement** 34:2, 8, 16; 47:8; 79:8; 84:11; 85:4, 19; 95:3; 98:3; 99:8; 102:22; 104:6, 13; 105:13, 18, 21; 106:1, 18, 24; 108:4, 5; 127:5
**ahead** 50:6; 53:2; 62:7; 116:19; 121:6
**Air** 6:23; 9:24; 10:13, 22; 11:5, 8, 20; 12:9; 15:13; 19:16; 20:10; 32:17; 34:6; 35:6; 36:8; 43:10; 45:2; 48:2, 9; 52:14; 58:6, 11; 63:17; 65:10; 66:12; 72:13; 80:2, 6; 82:15; 86:23, 24; 87:20; 91:6; 98:18; 99:19; 127:13; 128:7
**airplane** 4:15
**airport** 11:14
**Alabama** 5:16
**Alaska** 52:3, 5; 89:24; 90:5, 17
**allegation** 96:5
**alleged** 106:18
**alleviate** 58:12
**almost** 17:2; 121:1
**along** 47:10; 60:3; 75:3; 87:10, 20
**always** 28:2; 31:7; 58:4; 108:8; 109:1
**amount** 37:22; 38:10; 39:15, 22; 40:18; 44:11; 54:18, 21; 56:10; 88:17; 98:24; 118:4
**and/or** 95:3
**animal** 65:18; 93:23
**answered** 71:17
**Antonio** 6:9
**APPEARANCES** 2:1
**appears** 30:9; 32:9; 36:21; 48:1; 125:7
**applicable** 19:17
**applied** 25:9; 78:22; 95:13
**apply** 16:10; 19:3; 38:23
**appropriated** 123:10
**approve** 21:8
**approved** 20:7, 12, 15,

19; 39:18; 40:5; 54:11; 68:19
**approving** 91:20
**area** 19:3; 24:19; 107:15; 131:14
**arise** 107:3
**arm** 7:19
**armed** 8:13, 20
**Army** 10:23
**around** 123:1, 8
**arrive** 22:9
**arrived** 86:8
**arriving** 21:11
**aside** 38:18
**assessment** 74:4
**asset** 87:1; 128:5
**assignment** 90:4
**assist** 73:20
**assistant** 43:15; 87:18
**assistants** 53:20
**associated** 15:7; 71:3
**assume** 74:15
**Assuming** 68:18
**assure** 28:14
**assured** 128:8
**Atlanta** 6:2
**atmosphere** 76:12
**attach** 104:1
**attempt** 64:23
**attendee** 48:3
**attention** 59:8
**Attorney** 2:4
**attorney/client** 63:7
**Attorneys** 2:8
**August/September** 23:7, 9
**Austin** 5:10; 11:15
**authority** 33:23
**authorize** 118:14
**Automation** 2:19
**Avenue** 2:2
**average** 16:7
**awarded** 48:14; 78:24; 79:2
**aware** 15:17, 21; 17:4, 12; 56:22; 107:21, 23; 118:1
**away** 4:1; 23:6; 89:19; 90:6

## B

**back** 5:24; 21:10; 25:1, 2; 27:2; 29:4; 30:16, 17; 65:16; 76:16; 78:12; 83:19, 21; 101:4; 105:7; 111:18; 120:9; 127:20
**bad** 26:22
**ball** 89:16
**ballpark** 126:22
**Base** 9:24; 10:5, 13; 11:5; 15:13; 34:6; 36:9; 43:10, 22; 99:19; 111:17

CSS214 32:1
CSS253 33:19
cumulative 36:17
current 71:8
customer 90:20
cut 47:14; 107:13

**D**

D 2:7
Daily 91:15
Dallas 3:15; 5:7
damages 51:11; 96:10; 131:18
Dan 14:4; 46:13; 74:8; 92:2, 3
Dan's 14:4
DANBERG 2:8
Darryl 24:8; 59:10; 69:10; 110:12
Darryl's 102:16
date 24:15; 25:7; 40:2, 17; 79:1; 114:10; 122:20; 125:13, 14
dated 56:1; 59:10; 69:10; 102:18; 103:22; 106:15; 108:19; 113:19; 114:6, 10
dates 56:6; 102:17
Dave 43:19; 46:7; 91:6, 17; 109:13
David 91:2, 3, 5
Davis-Bacon 17:5, 10, 14; 19:23; 83:2, 6, 9; 84:1; 93:18; 98:14; 99:3; 112:12, 15; 120:2; 121:15, 19; 122:6; 129:3
day 11:15, 16, 16; 37:6
days 49:21; 51:19; 109:4
dead 22:24
deadlines 130:2
deal 63:15; 65:21; 76:7, 9; 77:3, 8; 79:4; 87:4; 126:16
dealing 118:24
dealings 112:2
deals 26:14
dealt 64:8
Debbie 53:16
Deborah 41:15, 16, 18; 43:24; 57:11; 85:24; 128:13, 13, 15
Deborah's 89:7; 129:6
debt 58:12
deceive 76:5
December 106:15; 122:21
decide 100:24; 101:15
decided 7:21; 119:5, 7
decision 111:8; 120:23
decisions 10:8
decreased 67:17
deep 86:3
Defendants 2:8
deficient 74:2

define 43:9
definitely 66:2
definition 18:17
definitions 18:21
Delaware 2:7, 20, 21; 128:23
delay 131:23, 23
delays 56:20; 130:23
delinquencies 109:10; 131:9
delinquency 109:15
deliveries 70:16
delivery 11:19; 21:11; 22:10; 27:3, 10; 29:1, 17; 30:13, 20; 45:17, 24; 49:22; 50:2, 3, 8, 8, 9, 13, 16, 17; 54:14; 55:1, 13; 59:17; 60:4, 24; 61:24; 67:21; 70:8, 18; 77:17; 78:2, 22; 80:17; 81:16, 21; 84:8, 22; 85:2, 18; 94:6, 10; 96:19, 22; 97:4, 5, 9; 101:20; 102:6, 21; 103:15; 104:11, 17; 105:3, 11, 17, 24; 107:4, 5, 19, 24; 108:3; 122:5, 19; 123:16, 22; 124:5
demand 97:20
demand/we 98:24
demands 98:12
demolition 21:1
denied 20:7; 65:5; 120:9
denying 120:15
Department 20:3; 21:8; 64:23; 68:6; 71:12
depend 75:13, 14
Depended 127:3
depends 45:6; 75:11
deposition 2:23; 3:1; 106:7; 132:12, 13
describe 5:3; 34:24; 35:4; 42:3; 44:6; 129:6
described 10:3
deserved 117:19
detail 82:2
detailed 31:24
determination 20:3
determine 33:9; 40:18; 100:21
determined 21:24; 22:8; 35:9, 15; 40:2; 48:20
determining 27:10
develop 92:20
development 59:18
difference 7:6; 71:16; 94:5, 8; 99:2
differences 15:22; 16:2
different 8:23; 10:16, 24; 16:14, 20; 42:7, 21; 46:10; 49:12, 14; 51:15; 74:24; 84:18; 127:1
differential 98:13; 99:1
differently 121:22
difficult 38:20; 109:4

dimensions 82:24
direction 66:11
directive 20:10
disagree 28:11; 71:20
disagreed 21:5; 120:8; 127:21
discover 23:2
discovered 17:22
discrepancies 23:22; 46:17; 62:15; 80:20
discrepancy 83:8, 24
discretion 32:23
discuss 12:17; 22:3; 80:14; 82:1; 100:15
discussed 4:18; 25:13; 41:24; 53:4; 56:24; 71:24; 72:8; 79:16; 112:7; 123:4
Discussion 7:24; 33:16; 55:17; 81:10; 82:4; 94:15; 98:18; 121:8; 125:1; 130:11; 132:8
discussions 112:5; 115:15
dispute 3:4
District 2:3, 20, 20, 21; 5:9, 15
division 5:14
document 13:7; 18:16; 29:16; 31:24; 33:19; 35:18; 36:24; 39:13; 54:4, 8; 69:4; 82:12; 94:21; 96:12; 97:16; 108:20; 129:10
document's 39:6
documentation 41:2; 73:20; 77:22, 24; 82:15
documents 3:21; 27:8, 12; 53:6, 9; 59:16; 60:3; 98:17; 99:6
dollar 88:17
dollars 85:16; 118:22
done 12:6; 26:20; 32:21; 33:9, 14; 37:14; 45:24; 66:6; 93:18; 96:9; 111:15; 122:10
doors 74:16; 75:3, 6, 23; 88:20
Dorinda 51:21; 64:19; 90:3
Dormitory 30:10
double 17:2
doubt 92:10; 103:2
Dover 6:24; 7:23; 9:24; 10:13, 20, 21; 11:5; 13:8; 14:21; 20:10; 21:4; 34:6; 36:8; 43:2, 10; 44:23; 52:4; 58:6; 63:23; 65:23; 66:2; 68:1; 80:2; 82:15; 90:5; 91:8, 9; 92:15; 99:19; 109:5; 110:7; 112:2; 113:10, 13; 132:1
down 11:14; 32:3; 36:19; 48:7; 64:20; 66:8; 75:5; 90:5; 92:8, 10; 107:14; 110:7; 115:3; 126:14
downspouts 72:21

drafted 125:22
dried 47:14; 107:13
drive 9:12
due 91:11; 119:21
duly 2:12
dump 44:13, 16
during 25:16; 45:15, 23; 46:15; 55:2; 61:21; 62:5; 68:4; 84:10, 19; 107:5, 7, 8; 113:13; 123:23

**E**

earlier 21:12; 44:4; 56:20; 60:18; 64:19; 69:17; 72:15; 77:23; 80:13; 87:13; 90:2; 93:22; 102:23; 105:13; 118:13; 120:4; 129:9; 130:22
early 17:22; 19:20; 24:4; 105:19; 130:24
EDWARD 2:8
effect 66:13; 100:20
effort 25:19
eight 89:16
either 20:9; 99:1; 124:17
electrical 3:10, 14; 5:6, 8, 13; 6:1, 11; 8:4; 33:3; 110:9, 18
electrician 33:3, 8, 10
eliminate 120:8
else 72:9; 87:17; 97:16; 103:5; 104:9, 10; 109:5; 119:9; 121:6, 12; 122:3; 126:17
email 59:10; 108:18; 114:5, 7, 22; 115:3; 125:7, 12; 130:24
embedded 98:14; 99:3
employed 4:17; 67:5; 74:7
employee 72:1
employment 11:16
end 19:8; 48:12; 66:14; 73:22; 84:4; 86:3; 97:22; 101:19; 114:15; 115:5, 16
ends 22:24
engage 112:4
engineers 7:19
enough 26:22; 51:5, 19; 87:23
enter 33:24
entered 11:4
entering 104:17
entire 34:16; 77:5; 90:22
entities 76:15
entity 81:16
epoxy 107:14; 131:13
equal 99:1
ESQUIRE 2:3, 7, 8
established 49:8
estimate 12:24; 13:4, 13, 17; 14:7; 18:3; 21:14, 18;

27:17; 28:8, 15; 30:9, 11; 46:24; 47:6; 55:9; 59:18; 60:11; 73:17, 17, 23; 75:3, 16; 82:24; 83:1; 88:10; 100:21; 124:3, 8
estimated 23:15
estimates 15:10; 17:23; 23:16; 28:4, 23; 29:9; 31:4; 44:3; 46:17; 60:19, 23; 61:13, 19, 24; 62:4, 6; 67:17; 72:2; 73:20, 21; 78:15, 16; 80:2; 81:20; 83:9; 84:1; 86:20; 87:17; 88:3, 13; 89:3; 93:13; 95:3, 10; 101:11; 116:12, 21, 24; 123:15, 21; 127:10
estimating 9:19; 14:17; 27:24; 61:10; 74:2, 8; 116:2, 16
estimator 22:1; 92:4; 94:10
estimators 13:18, 19, 20; 14:7; 41:13; 43:14; 128:8
even 11:14; 28:5; 43:23; 57:24; 58:10
everybody 58:7
Everyone 64:8; 88:17; 94:2; 128:12
exact 117:16
exact-to-the-penny 16:23
exactly 27:21; 64:4; 76:10; 77:12; 87:14
examined 2:12
example 30:23; 31:1, 1; 40:11
exceeded 17:14
except 63:17
Excuse 30:22; 36:16; 37:11; 61:24; 64:11; 70:10, 15; 116:19
executed 41:3; 50:7, 8, 9, 10; 70:18; 105:10
execution 123:22; 127:4
Exhibit 18:12; 30:5; 31:20; 36:4; 39:3; 47:20, 22; 54:5; 55:21; 59:5; 69:6; 82:8; 94:16, 20; 99:10; 102:1, 10, 24; 103:10; 104:21; 105:1; 106:3, 7; 108:14; 113:17, 17; 114:1, 10, 16, 17, 22; 115:1; 125:4; 130:19; 131:2
Exhibits 122:16
exiting 51:24; 52:9
experience 5:4; 10:18; 42:10, 12; 43:8; 46:13; 56:8; 63:20; 76:24; 92:23; 93:1; 111:20, 24
explain 14:19; 64:4; 76:10; 94:8; 118:20
exploratory 33:6, 7; 73:8
expressed 104:16
extent 43:12

indicated 41:6; 77:17; 112:8; 123:13
individual 81:20
industry 5:4; 8:3; 19:4; 56:9; 67:24
influence 48:24
influenced 56:22
information 14:6, 8, 11; 15:18; 82:22; 99:18; 100:12; 111:12
inspect 37:3
inspection 87:6
inspector 37:2
inspectors 13:1; 21:23; 48:9
installed 9:6
instance 10:17; 15:5; 19:21; 95:17; 117:9
instances 17:12; 65:7; 109:9; 117:24; 118:14; 119:24
instead 4:3; 7:4, 5; 119:8
intent 38:5, 6; 101:9
intention 101:6
internal 90:12
International 7:20, 21
interpretation 73:5
interstate 129:1
interview 11:13
into 5:24; 6:13; 11:4; 23:18; 26:18, 23; 33:24; 63:6; 81:7; 82:2; 93:7, 22; 96:11; 97:24; 104:17; 115:3; 116:7
invoices 56:4, 22
invoicing 114:23
involve 12:21
involved 3:7; 10:7; 59:16; 91:17, 23; 117:15
involving 3:11
ironworker 119:8
issue 37:11; 58:15; 63:13; 64:3
issued 45:18; 55:16; 60:24; 62:5; 75:8; 85:19; 99:6
issues 56:21; 57:1, 1, 2, 3, 6; 62:22; 90:7, 9; 117:22
item 32:22; 39:14; 48:7; 71:22; 73:13; 79:21; 82:2, 3; 100:18, 19
itemized 88:15
items 15:4, 8; 72:22; 73:3; 74:16; 83:17; 92:21; 116:15; 127:22

**J**

Jacquie 38:19; 63:15; 64:22; 90:19; 95:14; 115:10; 119:5, 7, 15; 120:24; 132:3
JAMES 2:7
January 108:19

Jersey 2:19; 23:21; 24:4, 12; 25:5, 11, 21; 26:5, 7, 14, 19; 27:9, 9, 19; 28:24; 29:1, 8, 17, 21; 34:3, 16, 19; 35:1; 47:1, 1; 48:23; 49:6, 23; 50:17, 20, 22; 51:10, 17; 52:17; 56:1; 57:21; 58:1, 5; 60:5, 13, 19, 23; 61:17; 62:6; 67:10, 22; 68:1; 69:16, 16; 70:17; 71:1, 6; 72:1; 73:18, 19; 75:9; 76:7, 10, 22; 77:9, 24; 78:8, 10; 79:5, 22, 24; 80:19; 81:15; 84:4, 9, 12, 21, 23; 85:3, 8, 20; 93:23; 94:20; 95:9, 16, 20; 96:1, 22; 97:11, 18; 98:6, 11, 12, 23; 99:7, 21; 100:4, 7, 10, 19, 24; 101:6, 14, 15, 21; 102:15; 103:3, 5; 104:10, 16; 105:9, 16, 16; 106:21; 107:8, 19, 21, 23; 108:7; 109:1, 10, 14; 110:2, 14; 111:7, 8, 13, 15, 19, 23; 112:11, 14, 17, 21, 24; 113:6, 9, 12; 115:18; 116:23; 117:2, 6, 10, 19; 118:2; 119:1, 11, 16; 120:1, 12, 18; 121:13, 19; 122:24; 123:5, 15, 21, 23; 124:4, 4, 6; 126:16, 20; 127:5; 130:23; 131:9, 16
Jim 2:18; 50:5; 52:1, 2; 63:14; 64:9, 11, 15; 66:14, 21; 94:14; 121:5; 122:12; 126:5, 7
job 5:20; 6:2, 14, 21, 22; 7:3, 4, 7, 7, 9, 9, 23; 8:16; 10:17, 23; 22:2, 2, 3; 25:10; 26:2, 12, 17, 20, 22; 27:13, 14, 19; 29:6; 33:1; 36:1, 12; 37:6, 7; 42:14; 46:16; 51:7, 14, 20; 52:18; 57:9; 58:3; 61:15; 64:10; 67:3; 75:15; 76:1, 2; 82:13; 87:11, 12; 88:16, 18; 91:7, 13; 92:1, 11, 12, 14; 93:22, 24; 94:3; 96:6, 7; 97:13; 103:3; 104:2; 111:5; 119:18; 127:3, 18; 128:2; 129:10; 131:12, 12, 16, 19, 24
jobs 5:18; 8:18, 19; 23:15, 17; 25:10, 11; 29:3; 50:20; 63:20; 68:2, 20; 80:3; 86:21; 110:17; 119:12, 19; 120:18, 21; 123:21; 127:8
JOC 7:7; 10:23; 44:8; 45:9; 76:12
jog 127:16
Jones 14:4; 92:2, 3
journeyman 20:1, 2, 9, 11; 21:5
journeyman's 20:24
journeymen 16:24
JSA 18:20
JSA501 108:18
JSA614 114:5
jump 63:19

jumped 26:21
juncture 130:14

**K**

keep 34:12; 66:12; 67:1; 84:21; 89:23; 92:16; 98:2
kept 6:3, 3; 98:18; 100:1; 129:8
key 128:5
Kim 48:8
kind 5:19; 28:7, 13; 32:1; 53:15; 76:8; 78:17; 86:3, 22; 87:3, 24; 88:24; 92:12; 112:4; 119:4
knew 37:6; 51:23; 74:9; 76:8; 92:8; 112:21
knock 127:20
knowledge 54:1; 55:11; 70:21; 86:11; 97:19; 99:9; 112:11, 12, 21; 113:1, 5, 11; 116:23; 118:3; 121:13, 16, 17; 122:2, 4, 8; 132:15
known 29:16; 35:18; 124:17
Knox 6:21; 7:1

**L**

Labor 20:3, 4; 21:8; 56:5; 64:23; 68:6, 11; 71:12; 93:14; 121:14
laborer 20:9, 13, 14, 18; 22:23; 25:18
laborers 19:21
language 6:23
large 45:17
last 4:21; 7:20; 13:24; 14:4; 33:18; 41:15; 43:19, 23; 44:10; 46:4; 79:12; 83:20; 99:17; 110:7; 111:2; 125:14
late 8:5, 6, 7; 24:3; 105:18; 107:2
later 20:7; 53:21; 72:11; 79:20; 110:13
latest 114:14, 15, 22
law 2:12
lawyer 63:4
leader 48:9
leading 24:18
least 38:10
leave 83:17
left 46:16; 51:20; 64:2, 4, 16; 66:21; 86:13
lengthy 31:24
Leonard 6:5; 7:10
letter 56:1; 57:21; 100:17; 113:18, 22; 114:24; 131:6
level 83:3
leveling-off 89:22
LEVIN 2:3; 5:1; 11:22; 16:8, 15; 17:16; 18:8; 19:9,

13; 22:20; 23:4; 24:16, 24; 25:24; 26:10; 28:17; 29:12; 30:22; 31:12, 17; 32:8, 15; 34:7, 10; 38:4; 42:19; 45:19; 46:20; 47:3; 50:5; 52:23; 53:1; 60:6, 14; 61:2; 62:12; 63:8; 67:13; 68:3, 21; 69:18; 70:10, 19; 71:9, 21; 72:24; 74:19; 75:10; 80:22; 81:4; 83:10, 16; 84:16; 93:20; 94:13, 18; 101:4, 5, 13; 102:3; 103:12; 104:20, 23; 106:5; 108:12, 16; 109:19; 112:22, 23; 114:3, 20; 115:11, 20; 121:5, 10; 122:12; 124:9; 126:12; 129:3; 130:14, 16, 21; 131:21; 132:7
Lien 39:6, 9
light 42:13
liked 5:19
line 15:3, 7; 25:20; 39:14, 18; 73:13; 75:4, 5; 82:2, 3; 92:21; 100:21; 116:15; 127:22
line-item 14:16; 17:14; 78:15; 80:1
lines 40:16; 87:9; 115:3
liquidated 51:10; 96:10; 131:18
list 101:20
lists 48:2
little 23:14, 19; 44:10; 83:5; 91:17; 121:11, 21, 22
LLP 2:5
lo 75:5
local 86:4; 111:6
localization 19:6
locally 86:6
located 52:3
location 19:5
LODGE 2:5
long 3:2; 4:22; 34:20; 43:6, 23; 56:16; 57:14; 64:16; 110:5
longer 24:13; 25:6; 59:1; 64:9
look 12:14; 27:13; 30:17; 32:3; 33:8; 34:2; 36:7; 48:6; 54:16; 95:1; 99:10; 114:4; 122:15; 131:2
looked 27:14
looking 34:11; 66:22; 88:17; 96:4; 110:13
looks 36:20; 102:16; 125:15
Lori 125:8
losing 53:9, 11; 80:20
lot 23:16; 24:17; 42:20; 68:7; 74:13; 78:3; 88:9; 109:7; 110:19; 130:4
low 28:16; 64:24
lower 84:3; 127:21

**M**

M 2:8
Mahler 51:21, 22
main 100:17
maintain 26:24
Maintenance 106:8
major 97:23
makes 59:13
man 21:4; 66:20; 111:5
management 43:9; 64:21
manager 6:21; 7:3, 8, 9; 9:14, 17, 18, 23; 10:11; 26:12; 41:14; 43:11, 15; 44:1; 46:6, 9; 86:18; 92:3; 94:6; 128:18; 130:8
manager's 94:10
managers 129:14
many 45:2; 48:13; 120:17; 127:1
March 32:7; 109:23, 24; 125:15
margin 18:6; 26:18, 23; 81:8; 93:23
mark 18:11; 30:3; 31:19; 36:2; 39:1; 47:19; 54:4; 55:20; 59:4; 69:5; 82:6; 101:23; 103:9; 104:20; 108:12; 113:24; 125:3
marked 18:12; 30:5; 31:20; 36:4; 39:3; 47:22; 54:5; 55:21; 59:5; 69:6; 82:8; 94:16, 20; 102:1; 103:10; 104:21; 105:1; 106:3, 6; 108:14, 17; 114:1; 125:4; 130:19; 131:1
master 34:8, 16; 99:8; 127:5
match 18:3; 87:6
material 9:5; 27:6; 30:9, 17; 56:4
materials 75:2
MATOC 44:9
matter 2:19; 3:6; 21:7; 65:3; 74:13; 92:20; 114:24
May 6:4; 26:5; 34:22; 45:15; 46:16; 56:22; 109:22
maybe 110:4; 125:18
McGee 95:14; 115:10, 15; 119:7, 15; 120:24; 132:3
McGee's 73:5
mean 14:23; 21:20; 23:15; 25:19; 28:17, 18; 43:7; 45:8; 47:12, 16; 53:3; 57:3; 64:1; 65:12, 20; 67:1, 4; 68:6; 71:13; 76:10; 83:10; 87:14; 88:16; 90:9; 91:10, 18; 92:16, 23; 95:12; 100:16; 105:20; 107:7, 17; 118:23; 119:5; 126:19; 127:15; 128:16; 129:11

78:14; 79:3, 7; 95:1; 99:17
paren 18:22
part 11:8; 16:4; 42:22, 23; 43:1; 48:11; 49:15; 60:12; 64:21; 65:19; 107:13, 14
partial 131:12
particular 22:1; 26:17; 33:19; 37:10, 11; 38:2, 9; 39:13; 45:1, 12; 50:12; 53:24; 61:15; 62:5; 71:4, 20; 76:6, 21; 78:2; 79:7, 15; 81:16; 107:12; 111:12; 113:2; 119:11; 123:11, 21; 125:12
parties 80:14
Patrick's 11:16
patrolman 128:24
pay 20:9, 24; 35:12; 65:13; 83:3; 84:12; 96:10; 112:15; 118:6; 119:15; 121:14, 18
pay/we 98:24
paying 118:17; 119:6, 9
payment 35:5, 23; 37:14, 22; 40:19, 21; 41:11, 19, 23; 42:4, 17; 43:4; 54:2; 57:23; 58:2, 6; 65:8; 118:15; 119:14, 20; 121:2
payments 35:6, 9; 40:17; 52:18, 22; 91:21; 130:7
payout 42:1
payroll 43:4; 56:20; 64:21; 90:7, 8, 21; 117:22
payrolls 40:23; 41:3; 42:23, 24; 53:5; 57:13; 65:9, 11; 89:19; 90:10, 13; 118:16, 21
pending 2:20; 94:21
people 4:17; 16:24; 20:24; 41:10; 44:3; 53:10; 57:8; 65:13, 17, 22; 74:6; 80:13; 88:7; 89:19; 90:17; 92:17; 96:8; 110:12, 18, 20; 111:1, 4; 118:17; 128:2
percent 29:14, 19; 36:12, 14, 16; 37:10; 47:13; 53:12; 68:17; 76:23; 77:1, 1, 2, 4, 5, 9; 78:11; 84:12, 13, 14, 22, 23; 85:5, 6, 9, 12; 90:19; 96:11; 105:22; 108:4; 124:1
percentage 35:12; 37:19; 76:7, 9; 79:4; 117:20
percentages 35:14; 91:18, 19
perfect 60:8
perform 12:4; 20:22; 22:19; 24:14; 25:6, 12; 45:3; 50:23; 60:5; 71:24; 76:1; 77:19; 126:22
performance 46:16; 84:19; 130:5
performed 42:9; 47:9; 117:23
performing 42:14; 113:2, 9; 129:13, 20

perhaps 19:22
period 19:5, 8; 36:15, 16; 67:22; 69:24; 70:8, 11; 71:11; 84:10, 11; 89:13, 23; 109:5; 129:16
permitted 95:21
person 9:2; 10:12; 52:8; 53:18; 57:12; 86:4; 130:6
personal 70:20; 81:19; 112:20
personally 64:6
personalties 87:5, 6
personnel 35:16, 17; 57:1, 2, 3, 6; 64:18; 82:15; 89:11
philosophy 10:24
phone 4:19
piece 11:21; 12:4; 77:19; 98:5, 11; 121:11
place 66:16; 67:12; 89:7
Plaintiff 2:4
please 5:5; 14:20; 18:11, 18, 21; 25:1; 30:4; 31:19; 32:2; 35:4; 36:3; 39:2; 47:21; 54:4; 55:20; 59:4; 64:7; 69:5; 70:4; 76:11; 82:7, 12; 83:20; 94:9, 24; 98:24; 99:11; 104:20; 108:13; 113:17, 24; 122:16; 131:2
point 21:17; 27:4; 28:1; 44:5; 56:17; 58:14; 61:16; 72:6; 80:18; 85:24; 95:8, 15, 19, 24; 101:16; 116:20
Poisson 124:19
policy 58:11
position 7:23; 20:14, 18
positions 8:23
possible 22:18; 55:8
practice 26:24; 43:7; 44:24; 61:8, 12, 15; 81:23; 92:24
practices 19:5; 74:3
prepare 14:7; 30:11; 61:23; 78:1
prepared 37:17; 78:9; 81:20; 125:21, 23
preparing 13:16; 89:2; 124:8
PRESENT 2:9; 75:19; 83:13
presented 29:1; 37:17; 84:9
presenting 105:10
president 5:18
presumably 96:2; 101:1
pretty 47:14; 49:19, 19; 64:1; 87:24; 89:10; 92:14; 113:23; 118:9
prevailing 18:3
previous 10:18; 42:12; 46:13; 67:3
price 7:6; 14:22; 15:1, 2, 7, 19, 22; 16:4; 18:22; 22:9; 27:15, 17; 28:15;

32:7; 47:7, 7; 61:11; 68:10; 72:11; 75:20, 21; 76:1, 13, 13; 77:5, 10, 11; 79:11; 84:13, 13; 89:1; 93:8; 95:5, 10; 96:22; 97:5, 9, 11; 122:5
priced 95:17; 111:20; 112:18; 113:2
prices 19:3; 97:21; 98:8; 126:18
pricing 7:5, 5; 16:5; 22:11; 25:9, 19; 27:2, 18; 31:9, 14; 61:18; 67:24; 71:8; 73:13; 77:17; 82:16, 21; 107:15; 111:24
primarily 57:12
prime 61:9; 66:9
principal 130:6
principals 126:8
prior 28:24; 29:10, 17; 36:23; 37:14; 48:22; 49:22; 50:16; 111:20, 23; 123:15, 22; 124:4
prison 6:8; 8:16
privilege 63:7
Pro 81:13
probably 23:6; 25:17; 46:21; 52:15; 59:22; 60:15; 123:24
problem 4:23; 17:23, 24; 18:1; 23:3; 25:8, 13; 29:2; 43:2; 58:2, 5; 65:15; 66:2, 3; 81:3; 88:9; 107:16; 114:15, 16; 115:23; 118:23; 119:12, 13; 129:12, 15, 18; 131:20
problems 35:2; 53:8; 64:18; 66:1; 71:3; 88:3; 109:7; 119:4
procedure 118:6; 123:14
proceed 21:11; 27:3, 11; 29:11, 18; 30:13; 49:23; 50:17; 55:14; 60:4, 24; 67:21; 84:9, 22; 85:3, 19; 123:17; 124:5
process 3:19; 11:2, 19; 14:19; 20:2; 21:10; 27:4; 35:5; 37:14; 42:17; 53:16; 82:16, 20, 21; 90:13; 101:17
processed 41:11
processing 41:19; 57:13; 90:12; 130:7
produce 129:21
profit 18:6; 22:14, 16; 26:13, 15, 16; 62:14; 67:4, 5, 11; 68:2, 20; 77:2; 126:11
profitable 25:23; 26:2; 68:17, 17; 76:23
program 19:8
progress 35:19, 21; 36:1, 8; 37:8, 17; 38:2, 9, 13; 39:10; 40:3, 6, 22; 41:4; 42:1; 52:18; 91:15, 21; 131:23
project 5:8; 6:15, 21; 7:2,

8, 9; 9:14, 16, 18, 23; 10:11; 19:15; 21:23; 22:1; 23:3; 26:12; 34:20; 36:9, 14; 37:1, 10, 11; 38:10; 41:8; 43:11, 15; 44:6; 45:13; 46:5, 9; 51:4, 6, 11; 55:13; 71:4; 75:6; 86:18; 92:3; 107:2, 12
projects 8:10, 13, 13; 17:4; 25:22; 26:8; 43:22; 44:18; 45:2; 48:13, 18, 23; 49:15, 21, 24; 50:14; 111:12; 116:16; 122:20
promise 121:13, 24; 122:4
promoted 5:10; 6:20
proper 65:13
properly 75:8
proposal 12:8; 13:2, 3; 127:21, 23
proposed 127:20
provide 18:6; 27:8; 29:16; 73:19; 74:1; 116:21
provided 17:14; 28:24; 29:9, 21, 22, 24; 30:1; 46:18, 19; 47:1; 55:9; 60:12, 19; 62:6; 82:22; 93:19
provides 32:12, 13
providing 123:16; 124:4
Puerto 5:22
Purports 108:18; 114:5
purpose 18:5; 19:12; 35:21; 62:10; 80:11
purposes 14:17; 30:12
put 21:13; 30:8; 44:21, 22; 83:12; 86:19; 98:23; 121:1
putting 12:23; 87:17; 107:13; 126:14

quotes 19:7; 127:2

**R**

R.S 14:23; 15:6, 23; 16:5, 6, 18, 23; 17:15; 18:6; 19:18, 21; 20:8, 15; 22:12, 17; 23:3, 22; 31:5, 6, 9; 32:12; 33:5, 12; 62:21; 72:23; 73:4, 5, 11; 79:11; 80:21; 93:19; 95:5, 17; 98:15; 99:3; 111:21; 112:1, 6, 9, 17; 113:2, 7; 116:24; 124:7, 16
raise 62:21; 64:3; 102:21
raised 71:2; 72:11
ran 97:24
Randolph 46:9
rate 20:2; 22:23; 32:24; 33:12; 65:13; 68:6; 72:9; 84:4; 119:10
rates 17:5; 23:22; 32:12, 13; 67:16; 80:1; 83:2, 9; 84:1; 98:14, 14; 99:3; 113:7; 121:15, 19; 122:6; 124:7, 7; 129:3
rather 24:20; 73:6
rather've 87:16
Raytheon 7:12, 12, 18
reached 101:2; 105:13
read 25:1, 2; 48:10; 70:5; 83:19, 21; 132:13
reading 50:12; 126:4
reads 95:2
real 28:16, 16; 131:20
realize 128:11
realized 129:12
really 18:3; 25:11; 35:2; 51:16; 64:10; 73:15; 74:13; 82:2; 83:4; 87:20; 100:18, 18; 101:11; 129:16
reason 26:14; 53:23; 55:4; 64:2; 79:22; 120:14; 128:20
reasonable 56:10; 126:11
reasoning 127:22
reasons 52:21; 56:19, 21; 126:20
recall 3:6; 13:9, 10; 23:24; 24:1, 3, 7; 26:4, 11; 31:16; 33:2; 41:5; 42:5; 43:13, 23; 48:4; 49:18; 54:24; 55:3, 24; 57:16; 60:20; 62:8; 69:9, 14; 70:24; 72:21; 73:1, 18; 80:4, 5; 81:12, 15, 18; 88:6; 89:13; 92:1; 98:5, 9; 99:4; 104:4, 14, 19; 105:14, 20; 107:12; 108:7, 11, 21; 109:8, 12, 13, 18, 20; 113:16; 114:7; 116:3, 22; 117:8, 11, 16; 118:5, 18; 120:10, 16; 125:11; 127:23; 130:22; 131:6

**Q**

Q 25:4; 83:23
QC 6:14, 17, 18; 8:23; 9:4; 91:3, 11, 14, 24
qualified 86:17; 87:14, 19, 23; 128:3, 4
quality 6:11, 14; 8:24; 35:1, 3; 43:20
quantified 83:5; 117:6
quantify 15:4; 29:4; 117:2
quantifying 88:18
quantities 22:4, 6, 8; 27:6; 28:5; 29:5, 5; 61:17; 74:14; 88:4, 5, 8, 10
quantity 28:13
question's 74:22
queued 50:3
quit 6:17
quite 33:14; 72:18; 119:3
quote 19:2, 8; 59:15; 66:11; 114:14, 15; 115:4, 5, 15, 16

**sounds** 117:17
**source** 14:8; 15:9
**South** 65:20, 24
**Southeast** 5:14
**Space** 128:16
**Sparandera** 104:10
**speak** 33:11; 59:14
**speaking** 83:12
**Special** 6:12
**specific** 19:5; 51:3; 130:2
**specifically** 18:21; 57:5; 78:12; 98:4
**specifications** 19:3
**specifics** 64:7
**speed** 90:13
**spend** 44:10, 15; 123:10
**spoke** 21:12; 60:18; 63:1; 69:17; 70:7, 15; 77:23
**spoken** 80:13
**squared** 89:19; 90:6
**St** 11:16
**staff** 9:22; 10:4, 8, 10; 41:11; 46:1; 87:7
**stage** 101:2, 12
**stamped** 108:18; 114:4
**stand** 68:13
**standard** 92:24
**standards** 9:8
**start** 12:23; 88:4; 116:15
**started** 5:6, 20; 21:19; 46:12; 89:15; 109:21
**Starting** 7:10; 122:20
**State** 6:8; 8:16; 38:1
**stated** 60:7; 87:13; 93:22; 129:9
**statement** 13:7; 19:2; 29:22; 30:1; 46:19, 24; 59:17, 20; 60:3; 75:16; 78:5; 80:4; 82:13, 21; 83:15; 127:10
**statements** 59:13
**states** 59:15
**status** 9:20; 37:1, 6
**stead** 23:18
**step** 19:6
**steps** 12:18; 36:22
**sticking** 109:6
**still** 5:24; 58:21; 71:11; 86:10; 90:23; 131:18
**stop** 120:18, 22
**storm** 11:15
**strange** 65:18
**Street** 2:6
**strike** 10:11; 11:2; 12:2; 15:16; 57:19; 74:23
**structure** 24:14; 25:7; 43:9; 67:11, 15; 71:3, 4; 95:5
**sub** 35:13; 47:7; 58:4, 5; 61:11; 119:2, 18
**subcontract** 34:8, 16; 99:8; 127:5
**subcontractor** 20:23;

57:4; 75:24; 77:19, 24; 81:12; 111:9; 119:17
**subcontractors** 7:5; 12:21; 107:10; 120:21; 123:15
**subject** 114:24
**submission** 53:5
**submit** 9:6; 13:2; 30:12; 41:22; 124:3
**submittals** 108:8; 109:2, 11, 11, 15; 130:24; 131:9, 23
**submitted** 13:14; 39:10; 40:24; 68:5; 73:16; 78:16; 81:24; 93:13; 120:6, 7
**submitting** 127:23
**subs** 42:24; 51:15; 90:11; 93:7; 118:11
**subsequently** 85:3
**success** 19:7
**successful** 27:19; 66:6
**Suite** 2:2
**sum** 39:22
**superintendent** 5:9, 9, 15; 6:17, 18; 9:9, 11; 43:21; 94:6, 11; 110:21; 111:2
**superintendent's** 94:11
**superiors** 100:8
**supply** 123:18, 20
**Support** 2:21; 99:18
**supporting** 73:20
**supposed** 11:12; 118:17; 119:6
**supposedly** 65:12; 102:24; 118:17; 128:23
**Sure** 4:23; 5:24; 9:7; 29:5; 51:8; 56:6; 68:15; 72:15; 80:5; 87:8; 93:2; 113:23; 122:13; 125:22
**suspended** 79:22
**swamped** 89:10, 14
**sworn** 2:12
**system** 42:4

**T**

**tailor** 19:4
**takeoff** 78:1
**talk** 58:14; 70:5
**talked** 27:23; 56:19, 20; 80:5; 128:2
**talking** 4:22; 8:12, 13; 23:10; 52:16; 57:6; 77:15; 110:21; 128:14
**Tamara** 89:5, 7
**Tamara's** 90:23
**Tammy** 52:6, 7, 8; 125:8
**task** 19:2; 27:13; 33:4; 42:5, 6; 95:17; 112:18; 129:14
**tasks** 90:1; 112:1; 113:3
**Taylor** 41:16, 18; 42:8; 52:6, 7; 53:16; 57:11, 16;

64:20; 85:24; 90:3; 125:8; 128:15
**team** 48:8
**ten** 34:22, 23; 109:4
**term** 70:11
**terminated** 42:14; 57:8; 128:21; 130:5
**terms** 28:12; 43:12; 53:9; 56:16; 77:22; 88:4, 13; 93:14
**Terrific** 5:3
**Terry** 110:6, 7, 9; 114:5; 115:6
**testified** 2:13; 117:9; 118:13
**testimony** 3:17; 24:20; 53:1; 109:21
**Texas** 6:8
**thorough** 91:8
**thoroughly** 91:12
**though** 57:24; 58:10; 76:6; 91:8
**thought** 27:20; 89:22; 117:3; 125:18; 131:18
**thousand** 85:16, 21
**threaten** 120:18
**three** 5:12, 18; 6:6; 36:11; 43:14; 51:7; 59:16, 21; 88:1, 20
**three-quarters** 6:13
**three-year** 7:2
**till** 45:15
**timeframe** 57:22; 68:5; 131:19
**timeliness** 109:11
**timely** 9:12; 42:17; 52:19; 53:5; 56:23; 108:8; 109:2
**times** 42:20; 46:5; 67:16; 74:13; 78:3; 88:9; 120:17
**timing** 12:22; 29:2; 49:20; 71:23
**title** 43:12; 52:10
**titled** 39:6
**today** 2:23; 3:19; 4:9, 12; 69:17; 72:16; 77:23; 109:8; 112:7; 125:21; 130:13
**together** 7:15, 17; 12:24; 31:7; 86:19; 87:17; 89:18; 123:6
**told** 19:16, 20; 49:7; 69:3; 72:12, 15; 105:21; 110:16; 118:5
**Tom** 46:4; 86:17, 20; 128:7, 8
**took** 6:2; 23:19; 57:19, 20; 66:16
**top** 54:16
**topic** 97:23; 98:17
**total** 22:9; 30:15, 17; 36:12; 40:17
**tough** 90:20
**towards** 52:9; 73:22; 84:4; 101:19

**trained** 86:19
**transferred** 5:10; 6:7, 10, 16, 20; 7:1
**treated** 99:19, 22; 100:12
**trial** 3:16
**tried** 22:22; 64:22, 22; 84:3, 6; 87:9; 89:18; 97:23; 122:9; 128:17
**true** 20:1; 132:14
**truth** 44:13
**try** 12:20; 61:10; 63:17; 74:24; 76:4; 84:18; 88:23
**trying** 58:12; 61:23; 64:17, 20; 67:16; 84:5; 96:7; 98:18
**turn** 18:18, 20; 32:1; 33:18; 95:1; 99:15; 102:9
**turned** 21:7; 22:21
**twice** 73:15; 126:23
**two** 88:1; 90:2; 92:1; 106:17; 110:5, 13
**two-part** 31:4, 7
**type** 14:16; 30:11; 36:7; 44:24; 47:13; 66:4; 73:8; 75:7; 82:14; 110:14; 116:8
**types** 10:16; 110:21
**typical** 123:18
**typically** 30:23, 24; 32:21; 93:10; 123:14

**U**

**unable** 42:17
**unacceptable** 63:23
**under** 17:9, 10, 13; 19:23; 33:12; 35:6; 50:23; 60:5; 61:23; 67:11, 24; 71:7; 73:11; 95:21; 101:1; 120:2; 122:10
**underpaying** 120:2
**understood** 113:1
**Unit** 15:19, 22; 16:4; 18:22; 22:11; 32:7; 79:11; 93:7
**Unless** 73:8
**unquote** 66:12
**unreasonable** 56:13, 14
**unsigned** 113:18
**untimeliness** 109:14
**Untimely** 42:24; 52:22
**unusual** 45:20
**unusually** 45:17
**up** 11:12; 24:14; 25:7; 26:18; 27:2, 4; 30:12, 19; 43:4; 54:16; 58:6; 61:16; 62:15; 65:8; 66:8; 71:16; 76:13; 77:16; 83:8, 24; 86:17; 90:14, 21; 92:12; 97:13; 98:2; 107:18; 110:3, 18; 111:4, 18; 116:11; 118:22; 119:14, 20, 21; 121:11
**UPG** 16:3, 14; 17:2; 19:4, 12; 23:17, 22; 31:5, 6, 14;

32:12, 24; 33:6; 72:10, 16; 73:6; 79:18; 80:1, 7, 21; 84:5; 95:3, 9, 16, 21; 97:21; 98:8; 124:7, 14
**upon** 12:15; 67:23; 117:19
**use** 14:7; 31:6; 47:6; 76:13; 79:17; 81:16; 84:5; 95:3, 9, 11, 16, 20; 121:7; 128:17
**used** 15:1, 13; 17:1; 27:5; 33:1; 62:14; 70:11, 13; 72:16; 73:6; 75:4, 6; 91:14; 92:4; 124:7, 14, 16; 126:20
**using** 14:21; 22:17; 24:14; 25:6; 77:1; 82:21; 111:20; 122:5
**utilize** 35:6; 111:8; 116:24
**utilized** 23:17; 34:6; 42:4
**utilizing** 23:3

**V**

**V-I-C-E-R-E** 89:5
**value** 40:1, 5
**various** 90:11; 120:18; 122:20
**verbal** 78:3, 4
**verbally** 12:17
**verify** 9:5; 28:5
**versus** 62:21
**vice** 5:18
**Vicere** 89:5
**view** 81:23; 90:16
**viewed** 99:7
**violation** 104:13; 105:12
**virtually** 48:14
**visit** 11:13; 12:11, 13, 19, 21; 13:13; 14:9; 21:13; 37:7; 75:24; 78:4
**visits** 13:1; 60:1; 110:13
**visual** 37:4
**volume** 53:15

**W**

**W.B** 3:14
**wage** 17:5; 18:4; 20:2, 3; 22:23; 65:13; 68:5; 72:9; 113:7; 122:6; 129:3
**wage-rate** 62:22
**wages** 15:5; 17:9, 13; 18:5; 20:9, 24; 32:4; 112:15; 121:19
**waive** 51:10
**Waiver** 39:6, 9; 43:3
**waiving** 96:10
**walk** 11:1, 18
**walked** 27:4
**wall** 98:1
**Washington** 2:3; 7:20, 21
**way** 5:7, 19; 6:13; 9:7;

**Lawyer's Notes**